## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **Dillinger France S.A.** ) | |
| ) | |
| **Plaintiff,** ) | |
| **v.** ) | **Ct. No. 17-00159** |
| ) | |
| **United States** ) | |
| ) | |
| **Defendant.** ) | |

## COMPLAINT

On behalf of Dillinger France S.A. ("Dillinger"), we hereby bring this civil action and allege the following:

## Parties

1.   Dillinger is a producer of carbon and alloy steel plate located in Dunkirk, France.

2.   Defendant is the United States of America, acting by and through the United States Department of Commerce (the "Department").

## Jurisdiction

3.   This action is brought pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(II) and (B)(i) to contest the final determination by the Department under 19 U.S.C. §1673d in its antidumping investigation of certain carbon and alloy steel cut-to-length plate ("CTL plate") from France.  *See Certain Carbon and Alloy Steel Cut-to-Length Plate from France: Final Determination of Sales at Less Than Fair Value*, 82 Fed. Reg. 16363 (Apr. 4, 2017) ("Final Determination"); *see also* accompanying Issues and Decision Memorandum (March 29, 2017).

4.   The final affirmative determination by the Department resulted in the publication of

1

an antidumping duty order on May 25, 2017 that subjects CTL plate produced by Dillinger in France to antidumping duty deposits and to potential assessments of antidumping duties. *See Certain Carbon and Alloy Steel Cut-To-Length Plate from Austria, Belgium, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, and Taiwan: Amended Final Affirmative Antidumping Determinations for France, the Federal Republic of Germany, the Republic of Korea and Taiwan, and Antidumping Duty Orders*, 82 Fed. Reg. 24096 (May 25, 2017).

5.   Accordingly, this Court possesses jurisdiction over this action pursuant to 28 U.S.C. § 1581(c).

## Standing

6.   Dillinger is a foreign producer and exporter of CTL plate and participated in the investigations resulting in the contested determinations. Accordingly, plaintiff is an interested party that participated in the underlying administrative proceedings within the meaning of 19 U.S.C. §§ 1516a(d) & (f)(3) and 1677(9)(A).

7.   In addition, because the Department made a final determination that was not lawful, or, otherwise overstated plaintiff's antidumping duty margins, plaintiff has been adversely affected or aggrieved by agency action within the meaning of Section 702 of Title 5 of the United States Code. Therefore, plaintiff has standing to bring this action under 28 U.S.C. § 2631(c).

## Timeliness

8.   An antidumping duty order resulting from the Department's unlawful determination was published in the *Federal Register* on May 25, 2017. Plaintiff filed a summons instituting

this action within 30 days thereafter on June 23, 2017.  Plaintiff served notice of the action upon all other participants in the investigations on the same date.  Plaintiff is filing this complaint within thirty days after filing the aforementioned summons.  Plaintiff has thus commenced this action within the time limits specified in 19 U.S.C. § 1516a(a)(2)(A), 28 U.S.C. § 2636(c) and Rule 3 of the Rules of this Court.

## Facts

9.   On May 5, 2016, the Department published a notice of initiation of less-than-fair value investigations on certain carbon and alloy steel cut-to-length plate from Austria, Belgium, Brazil, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, the People's Republic of China, South Africa, Taiwan and the Republic of Turkey in the *Federal Register*.  81 Fed. Reg. 27089 (May 5, 2016).

10. In the investigation concerning France, Dillinger was chosen as one of two mandatory respondents and was sent a questionnaire dated May 25, 2016.

11. On June 8, 2016, within 14 days of issuance of this initial questionnaire, Dillinger informed the Department of various difficulties it had in collecting and reporting certain information requested in the questionnaire pursuant to section 782(c) of the Tariff Act of 1930, as amended, (19 U.S.C. § 1677m(c)) and as directed in the questionnaire itself.  *See* letter from Judith L. Holdsworth, *deKieffer & Horgan*, to the Secretary, *U.S. Department of Commerce* (June 8, 2016).

12. With respect to downstream sales made by Dillinger's affiliated service center in the home market, Eurodécoupe, SAS ("Eurodécoupe"), Dillinger explained that it would have

3

difficulties in reporting all of the transactions in the level of specificity requested by the Department because plate purchased from Dillinger may be commingled with plate from other manufacturers in the service center's warehouse and one shipment of plate from a supplier may be used by the service center to fulfill various orders from different customers, with quantities being as small as one discrete plate or piece of plate.  This resulted in the service center's computerized sales records not always being able to track full information for each piece of plate.

13. In its questionnaire responses, Dillinger reported four different levels of trade representing four different stages in the marketing of CTL plate (*i.e.*, LOT 1.1, 1.2, 2.0 and 3.0). LOT 1.1 represented direct sales from the mill to end-users.  LOT 1.2 represented direct sales from the mill to distributors (*i.e.*, stockists and service centers).  LOT 2.0 represented sales by the affiliated service center Eurodécoupe to its downstream customers, and LOT 3.0 represented sales of non-prime merchandise.

14. A large portion of Dillinger's sales to the United States during the period of investigation were made to the affiliated pipe producer Berg Steel Pipe Corporation ("BSPC") located in Panama City, Florida.  Dillinger provided complete sales and cost information concerning the pipe sold by BSPC that was produced from Dillinger plate.

15. On November 14, 2016, the Department published notice of its preliminary determination in the *Federal Register*.  81 Fed. Reg. 79437 (Nov. 14, 2016).

16. In November and December 2016, the Department conducted verification of the sales and COP data reported by Dillinger and BSPC.

17. On December 2, 2016, the Department published notice of an amended preliminary

determination in the *Federal Register* correcting a ministerial error in the calculation of Dillinger's weighted-average dumping margin.  81 Fed. Reg. 87019 (Dec. 2, 2016).

18. On April 4, 2017, the Department published notice of its final determination in the *Federal Register*.  82 Fed. Reg. 16363 (April 4, 2017).

19. In its final determination, the Department applied its differential pricing methodology to Dillinger and disregarded the positive margins on non-dumped sales, a practice known as "zeroing."

20. On May 25, 2017, the Department published notice of an amended final determination in the *Federal Register* once again correcting a ministerial error in the calculation of Dillinger's weighted-average dumping margin.  82 Fed. Reg. 24096 (May 25, 2017).

## COUNT I

21. The allegations of paragraphs 1 through 20 are restated and incorporated herein by reference.

22. The Department's collapsing of all of Dillinger's reported home market channels of distribution into one level of trade is not supported by substantial evidence on the administrative record and otherwise not in accordance with law.

23. Section 773(a)(1)(B)(i) of the Act (19 U.S.C. § 1677b(a)(1)(B)(i)) directs that the comparison between the export price and the normal value be made at the same level of trade. Similarly, pursuant to 19 C.F.R. § 351.412(c)(2), the Department  "will determine that sales are made at different levels of trade if they are made at different marketing stages (or their equivalent)."

24. In its questionnaire responses, Dillinger substantiated four different levels of trade representing four different stages in the marketing of CTL plate.  Included in these levels of trade was a separate level of trade for sales made by related service centers who purchase CTL plate from Dillinger and other producers, stock it and sell it to unrelated customers in various quantities, shapes and sizes.

25. Sales by resellers who stock the merchandise or sell it in further-processed form are at a different marketing stage than direct sales by the mill to end customers.  With sales through resellers, the plate passes through two distinct marketing stages.  First, the plate is sold from the mill to the reseller with the corresponding sales and marketing, freight and delivery and warranty and technical support being performed on those sales.  Then the reseller performs inventory maintenance and warehousing of the plate until it is sold to an end customer.  When the reseller sells the plate to an end customer, the reseller then performs additional sales and marketing, freight and delivery and warranty and technical support with respect to that second sale. Therefore, it is clear that the level and intensity of selling activities on sales through resellers is significantly different than that related to direct sales by the mill.  Indeed, the Department's consistent prior practice has been to recognize separate levels of trade for direct sales from the mill and sales through resellers or service centers.  *See, e.g.,* Notice of Final Determination of Sales at Less than Fair Value: Certain Cold-Rolled Steel Flat Products from the United Kingdom, 81 Fed. Reg. 49929 (July 29, 2016) and accompanying Issues and Decisions Memorandum at Comment 1, p.8 & n.21 (noting that the Department has "made similar determinations in other cases with similar fact patterns").  Therefore, the Department's failure to recognize a separate

level of trade for sales made by Dillinger's affiliated service center is contrary to law and the Department has not properly explained its departure from prior practice.

26. The Department's refusal to recognize the admitted difference in inventory maintenance and warehousing functions performed on sales by resellers but not direct mill sales as a substantial difference in selling activities warranting a separate level of trade is similarly contrary to law, arbitrary, capricious and an abuse of discretion.

27. The Department's refusal to consider service center operations such as cutting, sawing, *etc.*, as relevant selling functions is contrary to prior practice and results in a determination that does not make proper allowance for differences in the level of trade.  The Department's disregarding of these service center functions is therefore contrary to law and the Department has failed to give an adequate explanation for its departure from prior practice.

28. The Department's contention that the information supplied by Dillinger was insufficient to establish substantial differences in selling activities is not supported by substantial evidence on the administrative record and is otherwise not in accordance with law.  The information supplied by Dillinger, including the organizational charts detailing the number of employees performing the various selling functions, fully demonstrated substantial differences in selling activities requiring the recognition of separate levels of trade in the Department's antidumping duty calculations.

## COUNT II

29. The allegations of paragraphs 1 through 28 are restated and incorporated herein by reference.

30. The Department's use of adverse facts available for certain sales by Dillinger's home market affiliated service center, Eurodécoupe, is not supported by substantial evidence on the administrative record and otherwise not in accordance with law.

31. Pursuant to section 782(c) of the Act (19 U.S.C. § 1677m(c)), if an interested party promptly notifies the Department after receiving a request for information that it is "unable to submit the information requested in the requested form and manner," then the Department "shall consider the ability of the interested party to submit the information in the requested form and manner and may modify such requirements to the extent necessary to avoid imposing an unreasonable burden on that party."

32. Dillinger complied with the statutory provision when it informed the Department of the difficulties it had in providing full information on sales made by Eurodécoupe.

33. The Department's conclusion that Dillinger did not act to the best of its ability in reporting the downstream sales of its affiliated service center is not supported by substantial evidence on the administrative record.  The record clearly shows that Dillinger fully reported all of the relevant downstream sales made by its Eurodécoupe, and it reported full product and price information for each of these transactions.  The Department has not identified any non-reported transactions or any transactions that did not have full and complete pricing information.  Rather, the only information missing for a small number of the reported transactions is the identity of the producer of the underlying plate.

34. In its questionnaire responses, Dillinger fully explained the difficulties in tracing the producer for these transactions due to the fact that plate from various producers is co-mingled in

the warehouse and that when plate is further processed and the remaining pieces are put back into inventory, the producer information is not always recorded for that piece. Therefore, the Department's assertion that Dillinger withheld information in its possession is not supported by substantial evidence on the administrative record.

35. The Department's decision to assign the highest non-aberrational net price among Dillinger's downstream home market sales to all of the sales for which the manufacture could not be identified is contrary to law. The purpose of facts available is to replace missing information needed for the investigation. Here the missing information is limited to the identity of the plate producer. The pricing information for each transaction was full and complete and there is therefore no need for the Department to alter or replace this information in any manner.

36. The missing manufacture information is needed only for the Department to identify whether the plate was produced by Dillinger, and therefore relevant to the margin calculation, or by a non-affiliated producer, and therefore not relevant to the margin calculation. Therefore, as to the missing manufacture information, the Department must only decide whether to attribute the relevant transactions to Dillinger and include them in the margin calculation or attribute them to third-party producers and exclude them from the margin calculation.

37. In its final determination, the Department not only treated the transactions for which the manufacture could not be identified as transactions attributable to Dillinger, it also altered the prices for those transactions by replacing the valid reported price with the highest non-aberrational net price among all of the downstream home market sales made by Dillinger's affiliated service center. This price alteration by the Department is contrary to law because the

prices for those transactions were properly and correctly reported.

38. The Department's determination of the so-called "highest non-aberrational net price" has not been properly and fully explained and it is not supported by substantial evidence on the administrative record and otherwise not in accordance with law.

## COUNT III

39. The allegations of paragraphs 1 through 38 are restated and incorporated herein by reference.

40. The Department's application of its differential pricing methodology to Dillinger in this investigation is not supported by substantial evidence on the administrative record and otherwise not in accordance with law.

41. On May 4, 2007, the Department published notice in the *Federal Register* of its determinations under section 129 of the Uruguay Round Agreements Act that it was implementing the findings of the WTO Panel in *US—Zeroing (EC)* that prohibited disregarding the positive margin on non-dumped sales in investigations involving average-to-average transactions, a practice known as "zeroing."  86 Fed. Reg. 25261 (May 4, 2007).

42. Despite the clear findings in the WTO dispute settlement proceeding and the Department's section 129 proceedings, the Department used zeroing to calculate Dillinger's antidumping duty margin in this investigation.  By the Department's own admission, had it not applied zeroing to Dillinger in this investigation, Dillinger's antidumping duty margin would have been *de minimis*.  Final Determination Margin Calculation Memorandum for Dillinger at 4 (March 29, 2016).

43. The only stated reason by the Department for applying zeroing to Dillinger in this investigation is that it applied the average-to-transaction method to calculate Dillinger's antidumping duty rate.  However, application of the average-to-transaction method does not dictate or justify the use of zeroing.  Under both the average-to-average and the average-to-transaction methods, zeroing suffers from the same legal deficiencies.  This is evidenced by numerous rulings by the WTO Dispute Settlement Body, with the most recent being the September 7, 2016 WTO Appellate Body report in *US – Washing Machines (Korea)*, finding that the Department's differential pricing methodology ("DPM") is "inconsistent 'as such' with Article 2.4.2 of the Anti-Dumping Agreement."  *United States – Antidumping and Countervailing Measures on Large Residential Washers from Korea*, Report of the Appellate Body, WT/DS464/AB/R (Sept. 7, 2016).

44. The Department's interpretation of the U.S. antidumping statute in a manner that conflicts with the international obligations of the United States under the WTO Agreements violates the *Charming Betsy Doctrine* established by the U.S. Supreme Court and is therefore contrary to law.  Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 81, 2 L. Ed. 208 (1804) (stating that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains"); *see also*, Federal Mogul Corp. v. United States, 63 F.3d 1572, 1581 (Fed. Cir. 1995) (stating, "Absent express Congressional language to the contrary, statutes should not be interpreted to conflict with international obligations").  There is no express Congressional language that would require the Department to reach an interpretation that conflicts with the WTO Agreements on this matter.

45. Section 777A(d)(1) of the Act (19 U.S.C. § 1677f-1(d)(1)) permits the Department to use the average-to-transaction method only when (1) there is a "pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time" and (2) the administering authority explains why such differences cannot appropriately be taken into account by the use of the average-to-average or the transaction-to-transaction method.  However, even in situations where the Department may use the average-to-transaction method, there is nothing in the statute that states that zeroing, which may not be used when applying the average-to-average method, may be used when applying the average-to-transaction method.

46. The Department's determination that the requirements of section 777A(d)(1)(B) of the Act (19 U.S.C. § 1677f-1(d)(1)(B)) for use of the average-to-transaction method to calculate Dillinger's antidumping duty rate have been met is not supported by substantial evidence on the administrative record and contrary to law.

47. The information relied upon by the Department shows only certain differences in export prices.  It does not show a "pattern."  Price differences by themselves do not constitute a pattern.  All of Dillinger's sales are made-to-order pursuant to specific agreements with individual customers.  Prices are individually negotiated with each specific customer based upon normal market considerations such as supply, demand, production costs, capacity utilization, *etc.*  Accordingly, it is in no way unusual that there may be price differences between different customers or even between different orders for the same customer.  Such differences are normal and are based upon ordinary, ever-changing market conditions.  These normal price differences

12

do not evidence the "masking of dumping," the combatting of which is the stated purpose of the Department's differential pricing methodology. It is therefore necessary that the Department's methodology properly differentiate between normal price differences and "patterns" evidencing the masking of dumping.

48. The Department's differential pricing methodology also does not properly distinguish between differences among purchasers, regions and time periods. Rather, the methodology lumps differences related to each of these three elements into the same group and again no clear "pattern" can thereby be identified.

49. The Department's methodology also does not review whether the differences in export prices relate to rising or falling prices or the relationship of those price differences to the cost of production or the normal value of comparable merchandise. For example, the methodology does not properly distinguish between prices that are higher than the normal value of comparable merchandise and those that are lower than the normal value of comparable merchandise.

50. The methodology also does not have a control price or set of prices for comparison purposes. Rather, under its methodology, the Department simply compares all prices within a group to all other prices within that same group.

51. The Department's differential pricing methodology also fails to properly compare export prices for "comparable merchandise" as required by the statute. Due to its made-to-order business, Dillinger produces a myriad of different grades and specifications. The Department's model-match methodology however collects many different grades into broad quality baskets.

Therefore, any one CONNUM will contain many different grades that are seen as technically and commercially different within the market and therefore result in different pricing. The Department's differential pricing methodology does not account for these differences in the grade mix within a specific CONNUM when comparing across different purchasers, regions or time periods.

52. The Department's differential pricing methodology also did not account for differences in Dillinger's reported levels of trade or price differences related to customer categories such as distributers and end users.

53. Before using the average-to-transaction method, the statute also requires that the prices "differ significantly." Under the Department's methodology it looks at the significance of a difference in purely mathematical terms (*i.e.*, the size of the difference). However, the idea of significance with respect to combating the masking of dumping requires a more probative analysis. The significance of differences in export prices can only be seen with respect to their relationship to the development of the normal value and cost of production of comparable merchandise. The significance of a price difference also depends upon the quality of the price comparison itself with respect to comparing products and transactions which are actually comparable. In addition, the notion that one mathematical difference applies no matter what product may be the subject of the antidumping duty investigation is arbitrary and capricious. It would stand to reason that the more differences in product and selling terms there are, the larger the difference would need to be in order to reasonably be considered "significant."

54. The Department has also failed to adequately explain why the price differences it has

identified cannot appropriately be taken into account by the use of the average-to-average or the transaction-to-transaction method as required by the statute.

55. By its own admission, the Department has not explained why it could not account for the price differences using the transaction-to-transaction method.  Its statement that it is not required to do so is in direct conflict with the explicit wording of the statute.

56. Similarly, the Department's explanation with respect to the average-to-average method is deficient because the only difference between application of the average-to-average method and the average-to-transaction method is the use of zeroing.  The price differences and the dumping margins for each CONNUM, both positive and negative, would be the same regardless of whether the average-to-average or the average-to-transaction method were used. The only difference is that when using the average-to-transaction method, the Department applies zeroing and sets all positive margins to zero in calculating the antidumping duty rate.  The difference in result is not due to the comparison method being used but rather the difference is solely and completely due to the use of zeroing.

57. The Department has also not explained why applying the average-to-average method using shorter averaging periods as permitted by 19 C.F.R. § 351.414(d)(3) would not take the differences into account.  All of the transaction-specific pricing information necessary to determine whether using shorter averaging periods would take the differences into account is already on the administrative record, and the Department's assertion that it lacks the necessary information is therefore not supported by substantial evidence on the administrative record.

## COUNT IV

58. The allegations of paragraphs 1 through 57 are restated and incorporated herein by reference.

59. The Department's adjustment to Dillinger's reported costs of production by shifting costs incurred in the production of non-prime plate to prime plate is not supported by substantial evidence on the administrative record and otherwise not in accordance with law.

60. Pursuant to section 773(b)(3) of the Act (19 U.S.C. § 1677b(b)(3)), the reported cost of production for a product should correspond to the full costs of producing that product including "the cost of materials and of fabrication or other processing of any kind employed in producing" the product.

61. The Department therefore acted contrary to law when it shifted costs incurred for one class of subject merchandise (*i.e.*, non-prime merchandise) to another class of subject merchandise (*i.e.*, prime merchandise).

62. Non-prime plate cannot be identified until the end of production and therefore undergoes the exact same production steps as prime plate.  Non-prime plate does not become less costly simply because it cannot be sold at full price.  The Department's decision to reduce the actual costs incurred in producing non-prime plate to the sales price of such merchandise and to shift the excess costs to prime plate is contrary to law.

63. The Department's action has the effect of reporting the cost of non-prime plate at less than the full cost incurred in producing that merchandise and reporting the cost of production for prime plate at an amount greater than the actual cost incurred in producing that merchandise. The Department's statement that assigning full cost to non-prime merchandise "would be

16

unreasonable" is contrary to law and not supported by substantial evidence on the administrative record. The Department gives no explanation as to why reporting the full costs of a product that is within the scope of the investigation would be unreasonable; nor does the Department give any legal justification permitting its deviation from the explicit language of the statute.

64. The Department's apparent conclusion that Dillinger's normal books and records recorded the cost of production of non-prime plate at its sales value is not supported by substantial evidence on the administrative record. Dillinger's records kept in accordance with generally accepted accounting principles (GAAP) do not record a reduction in the cost of production for losses on the sale of non-prime plate. The only adjustment that is made is the normal write-down of finished goods inventory values based upon the lower of cost or market principle. It is the Department's long standing practice to exclude such inventory write-downs from a respondent's cost of production because they are more closely related to the sale of merchandise than to its production. *See* Issues and Decision Memorandum for Final Determination at 57 (March 29, 2017). Thus, the Department's decision in this case to increase the reported cost of production for prime plate based upon a write-down of the value of non-prime plate to its sales value is in direct conflict with this established practice.

65. The Department's statement that its decision to shift costs incurred in the production of non-prime plate to prime plate is justified because the non-prime merchandise cannot be used in the same general applications as the prime merchandise is contrary to law. Both the reported non-prime and prime merchandise are within the scope of the investigation. Therefore, under the statute, the actual costs incurred in producing that merchandise must be reported. The use of a

17

product and whether it has the same general applications as another product has nothing to do with the costs actually incurred to produce the product, and the statute provides no basis for the shifting of actual costs from one product to another.

66. The Department's calculation of its adjustment for non-prime plate revaluation suffers from computational and methodological errors. The Department's calculation and the figures used therein are also not properly and fully explained.

## COUNT V

67. The allegations of paragraphs 1 through 66 are restated and incorporated herein by reference.

68. The Department's capping of BSPC's freight revenue at the amount of reported freight expenses is not supported by substantial evidence on the administrative record and is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

69. The Department's capping of freight revenue is based upon the fiction that a company that includes freight charges in its customer invoice is engaging in two separate transactions: (1) the sale of a good; and (2) the sale of delivery services, and indeed the Department essential recharacterizes the respondent as two distinct companies: (1) a producer; and (2) a delivery service provider. There is no record basis for these artificial constructs; nor is there any basis in commercial reality for the creation of this dichotomy.

70. BSPC is not in the business of providing freight services and the freight charges listed on its customer invoices are part and parcel of the product sale and simply an element of the total effective price for that sale.

71. The arbitrary nature of the Department's methodology is seen by the fact that, when respondents do not itemize a charge (or revenue) for freight on their commercial invoice, the Department does not cap freight revenues in any manner even if the terms of sale include delivery. The mere fact that one respondent itemizes freight charges on its customer invoice and the other respondent does not cannot properly lead to a difference in result. In either case, freight charges are part of the effective price to the customer and the Department should use the full invoiced price as the basis for the reported sales price without capping the amount of the effective price related to freight.

## Prayer for Relief

**WHEREFORE**, plaintiff respectfully requests that the Court enter judgment in its favor and against the defendant by:

(1) Declaring the Department's collapsing of all of Dillinger's reported home market channels of distribution into one level of trade and failing to recognize separate levels of trade for direct sales by the mill and sales through affiliated resellers and service centers was not supported by substantial evidence on the administrative record and otherwise not in accordance with law;

(2) Declaring the Department's use of adverse facts available for certain sales by Dillinger's home market affiliated service center and its choice of information as facts available was not supported by substantial evidence on the administrative record and otherwise not in accordance with law;

(3) Declaring the Department's application of its differential pricing methodology to Dillinger in this investigation and its use of zeroing was not supported by substantial evidence on

the administrative record and otherwise not in accordance with law;

(4) Declaring the Department's adjustment to Dillinger's reported costs of production by shifting costs incurred in the production of non-prime plate to prime plate was not supported by substantial evidence on the administrative record and otherwise not in accordance with law;

(5) Declaring the Department's capping of BSPC's freight revenue at the amount of reported freight expenses was not supported by substantial evidence on the administrative record and otherwise not in accordance with law;

(6) Remanding to recalculate Dillinger's antidumping duty margin in light of the above; and

(7) Granting plaintiff such other and further relief as the Court may deem appropriate.

Respectfully submitted,

/s/ *Marc E. Montalbine*
Marc E. Montalbine
Gregory S. Menegaz
**deKieffer & Horgan, PLLC**
1090 Vermont Ave., N.W.
Suite 410
Washington, D.C. 20005
Tel:     (202) 783-6900
email: montalbine@dhlaw.com

Counsel for Plaintiff

Date:  July 24, 2017