A-427-828
Remand Redetermination
CIT 17-00159
**Public Document**
E&C/OA:  KLC

***Dillinger France S.A., v. United States*,**
**Court No. 17-00159 (CIT February 18, 2021)**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.     SUMMARY

The Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (the Court)

in *Dillinger France S.A., v. United States*, Court No. 17-00159 (CIT February 18, 2021)

(*Dillinger France*).  This action arises out of the final determination in the less-than-fair-value

(LTFV) investigation of certain carbon and alloy steel cut-to-length plate from France.[1]  The sole

issue remanded by the Court is Commerce's allocation of costs between Dillinger France S.A.

(Dillinger)'s non-prime and prime products based on Dillinger's books and records, which assign

costs to its non-prime production based on their estimated selling price rather than the actual

costs of production.  To comply with the Court's remand order, Commerce issued a

supplemental questionnaire to Dillinger asking for information pertaining to the physical

characteristics of the non-prime products produced and requested its actual product-specific costs

of production of the non-prime products.[2]  In its supplemental questionnaire response, Dillinger,

---

[1] *See Certain Carbon and Alloy Steel Cut-to-Length Plate from France:  Final Determination of Sales at Less Than Fair Value*, 82 FR 16363 (April 4, 2017) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM); *see also Certain Carbon and Alloy Steel Cut-to-Length Plate from Austria, Belgium, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, and Taiwan:  Amended Final Affirmative Antidumping Determinations for France, the Federal Republic of Germany, the Republic of Korea and Taiwan, and Antidumping Duty Orders*, 82 FR 24096 (May 25, 2017) (*Amended Final Determination*).
[2] *See* Commerce's Letter, "Supplemental Questionnaire to Dillinger France S.A.," dated March 17, 2021 (Remand Supplemental).

however, failed to provide either the physical characteristics of non-prime products produced or its actual product-specific costs of production of non-prime products, despite arguing that the actual costs of producing non-prime products should be used.  Therefore, upon reconsideration of the record evidence and to comply with the Court's remand order, Commerce must rely on the total cost assigned to the prime and non-prime products as recorded in Dillinger's normal books and records in accordance with section 776(a) of the Tariff Act of 1930, as amended (the Act), because, in light of Dillinger's failure to provide either information pertaining to the physical characteristics of non-prime products or the actual product-specific costs of producing non-prime products, it is the only reasonable record evidence available to use as the cost of production for the non-prime products produced.  As a result, the final estimated weighted-average dumping margin calculated for Dillinger of 6.15 percent remains unchanged from the *Amended Final Determination*.[3]

## II.    BACKGROUND

In the LTFV investigation, Dillinger explained that, while it valued non-prime merchandise at the estimated likely selling price in its normal books and records, for the purpose of reporting costs to Commerce, it revalued all non-prime plates to reflect the average cost of production for all prime plates produced.[4]  For the *Final Determination*, Commerce adjusted the reported costs for non-prime products to reflect the cost recorded in Dillinger's normal books and records (based on estimated sales values) and then allocated the excess costs allocated to non-prime products (*i.e.*, the difference between the reported and adjusted costs for non-prime products) to the cost of production for prime products.[5]  Dillinger challenged Commerce's

---

[3] *See Amended Final Determination*, 82 FR at 24098.
[4] *See* Memorandum, "Verification of Dillinger France S.A. in the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate from France," dated January 12, 2016 (Cost Verification Report) at 2.
[5] *See Final Determination* IDM at Comment 11.

decision to adjust the reported costs of non-prime products, and this Court affirmed Commerce's decision to adjust the reported costs.[6]   However, the United States Court of Appeals for the Federal Circuit (Federal Circuit) held that "a remand is required for Commerce to determine the actual costs of prime and non-prime products."[7]   Specifically, the Federal Circuit held that Dillinger's books and records, although in accordance with Generally Accepted Accounting Principles, relied on "likely selling prices" rather than reporting the actual cost of product for non-prime plate and further held that, because such information was not "based on the cost of production," Commerce erred on relying on Dillinger's books and records.[8]   On February 18, 2021, this Court remanded the final determination to Commerce with the instruction to "issue a redetermination consistent with the opinion of the Court of Appeals."[9]

On March 17, 2021, Commerce reopened the record and issued a supplemental questionnaire to Dillinger to obtain the physical characteristics of the non-prime products produced and the actual cost of producing the non-prime products.[10]   Because Commerce has an obligation to ensure that the reported costs of production reasonably reflect the cost of producing the merchandise under consideration,[11] we specifically explained that it was not appropriate to

---

[6] *See Dillinger France S.A. v. United States*, 350 F. Supp. 3d 1349, 1375 (Ct. Int'l Trade Oct. 31, 2018), sustained after remand, 393 F. Supp. 3d 1225 (CIT 2019).

[7] *See Dillinger France S.A. v. United States*, 981 F.3d 1318, 1321 (Fed. Cir. 2020) (*Dillinger France II*).

[8] *Id.*

[9] *See* Order in *Dillinger France II*.

[10] *See* Remand Supplemental.  On March 25, 2021, Dillinger filed a motion to clarify the scope of the remand.  *See* Motion to Clarify Scope of Remand (March 25, 2021) (ECF 74, 75).  On March 26, 2021, the United States Court of International Trade issued a stay order.  *See* Order to Stay Proceedings (March 26, 2021) (ECF 76).  On April 15, 2021, Commerce filed its response to the motion to clarify.  *See* Response to Motion to Clarify (April 15, 2021) (ECF 77).  On April 21, 2021, the United States Court of International Trade issued an order denying the motion to clarify.  *See* Order Denying Motion to Clarify Scope of Remand (April 21, 2021) (ECF 78).

[11] *See* section 773(f)(1)(A) of the Act (stating that "{c}osts shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and *reasonably* reflect the costs associated with the production and sale of the merchandise." (emphasis added.))  Additionally, the Court has recognized that Commerce "must ensure that {a respondent's} reported costs capture all of the costs incurred by the respondent in producing the subject merchandise' before it can appropriately use that respondent's cost allocation methodology."  *See Sidenor Indus. SL v. United States*, 664 F. Supp. 2d 1349 (Ct. Int'l Trade Oct. 30, 2009) (quoting *Myland Indus., Ltd. v. United States*, 31 CIT 1696, 1703 (Ct. Int'l Trade Oct. 25, 2007)).

rely on the overall average cost of producing all prime products as a surrogate for the actual cost of producing the specific non-prime products produced and requested that Dillinger provide the actual product-specific cost of production of the non-prime products.[12]  Commerce requires accurate and complete product-specific production cost information because such information: (1) provides the basis for determining whether comparison market sales were made in the ordinary course of trade and can be used to calculate normal value; (2) is used in the difference-in-merchandise analysis; and (3) in certain other instances, is used as the basis for normal value itself.[13]  Indeed, both the Federal Circuit and this Court have recognized that Commerce appropriately analyzes reported product-specific costs of production.[14]  Moreover, the Federal Circuit has recognized that requiring costs to reflect cost differences attributable to physical characteristics ensures that product-specific costs are reflective of the actual costs incurred to produce specific products and has explained that "{r}eliance on physical characteristics, because of its ability to promote consistency, is a predictable methodology that is administrable across all investigations and administrative reviews."[15]

On June 23, 2021, Dillinger submitted its response to Commerce's supplemental questionnaire.[16]  In its supplemental questionnaire response, Dillinger provided neither the physical characteristics of non-prime products produced nor the actual product-specific costs of production for the non-prime products.[17]  Specifically, concerning Commerce's request for the

---

[12] *See* Remand Supplemental at 3.
[13] *See, e.g.*, *Notice of Final Results of Antidumping Duty Administrative Review:  Stainless Steel Bar from India*, 70 FR 54023 (September 15, 2005), and accompanying IDM at Comment 1.
[14] *See generally Thai Plastic Bags Indus. Co. v. United States*, 853 F. Supp. 2d 1267 (Ct. Int'l Trade June 18, 2012), *aff'd*, *Thai Plastic Bags Indus. Co. v. United States*, 746 F.3d 1358 (Fed. Cir. 2014) (*Thai Plastic Bags*); *see also Hyundai Electric & Energy Systems Co., Ltd, v. United States*, 466 F. Supp. 3d 1303, 1309 (Ct. Int'l Trade Aug. 4, 2020).
[15] *See Thai Plastic Bags*, 746 F.3d at 1368.
[16] *See* Dillinger's Letter, "Supplemental Questionnaire Response," dated June 23, 2021 (Remand Supplemental Response).
[17] *Id.*

physical characteristics of non-prime products, Dillinger reiterated that, as explained during the investigation, it was not able to identify all of the physical characteristics of non-prime products and that it had reported the physical characteristics at the greatest level of detail possible.[18] Moreover, despite Commerce's explicit request that Dillinger provide the actual product-specific costs of production for the non-prime products, after explaining that its "system uses actual cost and consumption of inputs and actual yields to calculate actual per ton costs... for broad product groups of regular plates and line-pipe plates, not individual products"[19] and that "actual costs for these products are also not differentiated between prime and non-prime merchandise,"[20] Dillinger reiterated that it based its costs for producing non-prime products on the "average **actual** total cost of manufacture for all plate sold."[21]  In other words, Dillinger did not provide the product-specific actual cost of production for the non-prime products, even though it explained that all production "is made to order and non-prime plate results from the normal production of making plate for the specific customer order,"[22] that its "system uses actual cost and consumption of inputs and actual yields," and that its system "calculates the production cost and inventory value for broad product groups."[23]

## III.   ANALYSIS

As summarized above, the Federal Circuit remanded Commerce's final determination in its LTFV investigation to "determine the actual costs of prime and non-prime products"

---

[18] *Id.* at 10.
[19] *See* Remand Supplemental Response at 7.
[20] *Id.* at 8.
[21] *Id.* at 5 (emphasis in the original).
[22] *Id.* at 10.
[23] *Id.* at 7.  At verification, Commerce confirmed that Dillinger reported product-specific costs for the products selected for individual examination.  *See, e.g.*, Cost Verification Report at 17 (explaining "{w}e noted through our detailed testing of the selected products that the standard slab costs reflect the standard cost of alloys, yield loss, scrap offset and processing costs that is specific to the product being produced and its associated characteristics."); and Cost Verification Report at 20 (explaining "{w}e noted through our testing that given the same or similar production process, different products are allocated different costs relative to their processing times.")

produced by Dillinger during the relevant time period.[24]  During the investigation, Dillinger

provided the information necessary to calculate the actual costs of production for prime products.

As explained in detail here, in response to our remand supplemental questionnaire, Dillinger did

not provide Commerce with the information needed to calculate the actual costs of production

for the non-prime products.  Specifically, Dillinger neither provided Commerce with the actual

product-specific costs of producing the non-prime products nor with the physical characteristics

of the non-prime products produced.  As the total actual costs incurred by Dillinger, and verified

by Commerce,[25] must be allocated to all products produced, including prime and non-prime

products, not knowing the actual cost of producing the non-prime merchandise directly impacts

the amount of costs assigned to the production of the prime products.  If too much or too little

cost is assigned to the non-prime products, then too little or too much cost is assigned to the

prime products produced, respectively.  Dillinger has not provided the actual costs of production

of non-prime products.[26]  Therefore, pursuant to section 776(a)(1) of the Act, we have relied on

the total cost of production for both prime and non-prime merchandise as recorded in Dillinger's

normal books and records as facts otherwise available to comply with the Court's order.

### A.  Necessary Information is Missing from the Record

Commerce does not have information on the record of this proceeding that is necessary

within the meaning of section 776(a)(1) of the Act.  Specifically, despite Commerce's request

that Dillinger submit the product characteristics of the non-prime products and the actual

product-specific cost of producing non-prime products to determine the actual cost of production

for the prime and non-prime products, Dillinger did not submit either the physical characteristics

---

[24] *See Dillinger France II*, 981 F.3d at 1324.
[25] *See* Cost Verification Report at 10.
[26] *See* Remand Supplemental Response at 5-10.

of the non-prime products or the product-specific actual cost information.[27]  Dillinger is the sole

party in control of the actual production information.  It is incumbent on the company to make a

reasonable attempt to provide the actual product-specific cost information.  Dillinger explained

that it was unable to provide the actual cost of production of the non-prime merchandise and, as a

result, we do not have the actual cost of production information for the non-prime products

produced.  Section 776(a)(1) of the Act provides, subject to section 782(d) of the Act, that

Commerce shall select from among the facts otherwise available on the record if necessary

information is not available on the record of a proceeding.

While Dillinger attempts to downplay the necessity of the product-specific actual cost of

production information by arguing that because the "COM for the non-prime CONNUMs

reported by Dillinger corresponds to the average **actual** total cost of manufacture for all plate

sold during the POI,"[28] it had "properly reported the COP for non-prime merchandise based upon

actual costs of production,"[29] we disagree.  It is well-settled that Commerce analyzes and relies

upon product-specific costs.[30]  It is not appropriate to substitute the "average actual total cost of

manufacturing for all plate sold during the POI" for the actual product-specific costs.  The use of

an "average cost" would not, by definition, comply with the Federal Circuit's order to determine

the "actual costs of prime and non-prime products"[31] because it assigns the same cost to products

with varying physical characteristics.  Indeed, the distortive nature of simply taking the average

cost of all products can be seen by the wide disparity in the reported actual total cost of

---

[27] *See supra* notes 14 through 19 and accompanying text.
[28] *See* Remand Supplemental Response at 5 (emphasis in the original).
[29] *Id.* at 6.
[30] *See supra* notes 10 through 13 and accompanying text.
[31] *See Dillinger France II*, 981 F.3d at 1321.

manufacturing amounts for prime products.[32]  Moreover, Dillinger acknowledged that the non-
prime products can vary by size, specification, and grade, which indicates that the associated
costs vary, as well.[33]

Dillinger's acknowledgment that non-prime products can vary by size, specification, and
grade illustrates how Dillinger's inability to provide the actual physical characteristics of the
non-prime products prevents Commerce from adjusting the reported overall average cost of
prime products in an effort to estimate the actual product-specific costs of non-prime products.
We note that, while Dillinger implies that it reported some of the physical characteristics (*i.e.*,
"Dillinger is not able to identify all physical characteristics of the non-prime merchandise"),[34]
the record demonstrates that Dillinger did not report any of the physical characteristics of the
non-prime products in a useable manner.  Specifically, Dillinger explained that, for the few non-
prime products for which it reported physical dimensions, the reported physical dimensions
actually represent only certain potential dimensions for the plates covered by a small number of
the sales of non-prime products.[35]  In other words, while Dillinger submitted invoices to
demonstrate that the non-prime products were plates (*i.e.*, the merchandise under consideration),
the invoices did not contain precise information pertaining to the actual physical characteristics
of the non-prime products.[36]  Therefore, because the Federal Circuit has recognized that
requiring costs to reflect cost differences attributable to physical characteristics ensures that
product-specific costs reflect the actual costs to produce specific products,[37] Dillinger's failure to

---

[32] *See* Dillinger's Letter, "Certain Carbon and Alloy Steel Cut-to-Length Plate from France; Dillinger France S.A.
Second Supplemental Section D Response Part II," dated September 28, 2016 at Exhibit SD-24 (containing a
printout of Dillinger's COP database labeled "DFCOP03").
[33] *Id.*
[34] *See* Remand Supplemental Response at 7.
[35] *See* Dillinger's Letter, "Certain Carbon and Alloy Steel Cut-To-Length Plate from France; Dillinger France S.A.
Second Supplemental Sections D & E Response," dated October 13, 2016 at 6.
[36] *See, e.g.*, Remand Supplemental Response at Exhibit R-1.
[37] *See Thai Plastic Bags*, 746 F.3d at 1368.

submit the physical characteristics of the non-prime products precludes Commerce from estimating the actual costs of the non-prime products.

Because Dillinger did not submit the physical characteristics of the non-prime products and incorrectly claimed that the reported overall average cost of prime products was sufficient, rather than submit the requested product-specific actual cost of production data as requested, Commerce does not have the necessary information to determine the actual cost of production of non-prime products.  Therefore, Commerce must select from among the facts otherwise available to replace that missing information, pursuant to 776(a)(1) of the Act.

## B.  Commerce Satisfied Its Obligation to Provide Dillinger with the Opportunity to Supply the Necessary Information

Commerce satisfied its obligation under section 782(d) of the Act, because Commerce notified Dillinger of the deficiencies in the information it had reported and afforded Dillinger the opportunity to submit the necessary information.[38]  Section 782(d) of the Act provides that if Commerce determines that a response to a request for information does not comply with the request, Commerce will so inform the party submitting the response and will, to the extent practicable, provide that party the opportunity to remedy or explain the deficiency.  If the party fails to remedy the deficiency within the applicable time limits, Commerce may, subject to section 782(e) of the Act, disregard all or part of the original and subsequent responses, as appropriate.  Section 782(e) of the Act states further that Commerce shall not decline to consider submitted information if all of the following requirements are met:  (1) the information is submitted by the established deadline; (2) the information can be verified; (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable

---

[38] *See* Remand Supplemental at 3.

determination; (4) the interested party demonstrated that it acted to the best of its ability; and (5) the information can be used without undue difficulties.

As explained above, Commerce satisfied its obligation under section 782(d) of the Act when it reopened the record and issued a supplemental questionnaire to Dillinger with the explanation that the information submitted during the LTFV investigation (*i.e.*, the overall average actual cost of products sold during the period of investigation (POI)) was insufficient and that Commerce required the actual product-specific cost of production of the non-prime products produced.  Rather than submit the requested product-specific information, Dillinger maintained that the information that it had submitted previously was sufficient because it was based on production value, rather than sales value.[39]  Moreover, section 782(e) of the Act does not require that Commerce use the overall average cost data because, as explained above, the use of the overall average cost of all products as a proxy for the actual product-specific cost of production of the non-prime products cannot serve as a reliable basis for calculating an antidumping margin within the meaning of section 782(e)(3) of the Act.[40]  Therefore, because the physical characteristics of the non-prime products and the product-specific cost of production of non-prime products is necessary information that is missing from the record, despite Commerce's reopening of the record to obtain the information, Commerce is selecting from among the facts otherwise available on the record to determine the cost of production of prime and non-prime products, pursuant to section 776(a)(1) of the Act.

### C.  Use of Facts Available

Pursuant to section 776(a) of the Act, Commerce will use "facts otherwise available" to fill gaps in the record if:  (1) necessary information is not available; or (2) an interested party

---

[39] *See* Remand Supplemental Response at 6.
[40] *See* supra notes 29 through 31 and accompanying text.

withholds information requested by Commerce, fails to provide the information by the deadline or in the manner requested, significantly impedes the proceedings, or provides information that cannot be verified.  As discussed above, because Dillinger was unable to provide Commerce with the requested information, and because such information is necessary and missing from the record, we are selecting from among the facts otherwise available to fill the gap, pursuant to section 776(a)(1) of the Act.

In particular, Dillinger has explained that its system does not record the physical characteristics of the non-prime products produced or the actual product-specific costs of producing the non-prime products.[41]  Indeed, we acknowledge that Dillinger informed us of its inability to report the physical characteristics of non-prime products during the investigation.[42]  Moreover, there is no evidence on the record to demonstrate that Dillinger does, in fact, track the physical characteristics of non-prime products produced or the actual product-specific costs of the non-prime products.[43]

Specifically, Commerce is using the cost assigned to the prime and non-prime merchandise as recorded in Dillinger's normal books and records (the cost assigned to the non-prime merchandise is based on Dillinger's estimated selling price of the non-prime products), as facts otherwise available.  We have selected the estimated selling prices of the non-prime products as facts otherwise available because this amount is used by Dillinger in its normal books and records; importantly, was verified by Commerce; and it is the best information available on the record.[44]

---

[41] *See* Remand Supplemental Response at 4 and 8.
[42] *Id.* at 4.
[43] *See, e.g.*, Cost Verification Report.
[44] *See* Cost Verification Report at 2 (explaining that "products that are downgraded to non-prime are valued at their estimated likely selling price in the CO module," and that we traced the total value that Dillinger reported as being assigned to non-prime products in its normal books and records to Dillinger France's POI trial balance).

## IV.   INTERESTED PARTY COMMENTS

On July 29, 2021, Commerce released the draft results of redetermination to all interested

parties, and invited parties to comment.[45]  On August 5, 2021, we received comments from

Dillinger and Nucor Corporation (Nucor), which are summarized below.[46]

### 1.  Whether Necessary Information is Missing from the Record

*Dillinger's Comments:*[47]

- As recognized by both the Federal Circuit and the Court, the sole issue in dispute is Commerce's shifting of costs from non-prime to prime products.
- No party to the proceeding ever challenged Dillinger's reported cost information or the reported physical characteristics of non-prime products.  Moreover, the Federal Circuit did not identify a problem attributable to Dillinger's submitted cost information or the reported physical characteristics of non-prime products.
- Commerce accepted and verified the reported costs of both prime and non-prime products.  Indeed, in its calculations Commerce accepted the "Total Extended Cost of Non-Prime Products as Reported" and then shifted those costs to prime products (*i.e.*, Commerce never challenged the underlying amount of costs reported for non-prime products).
- During the LTFV investigation, Dillinger notified Commerce of its difficulties in reporting the physical characteristics of non-prime products.
- Section 782(c) of the Act mandates that Commerce "shall consider the ability of the interested party to submit the information in the requested form and manner and may modify such requirements to the extent necessary to avoid imposing an unreasonable burden on that party."
- Dillinger reported the actual costs of non-prime products at the highest level of specificity permitted by its normal books and records (*i.e.*, the average actual cost of all plate sold during the POI).  The overall average cost of prime plates best represents the actual cost of non-prime products because prime and non-prime products are produced in the same manufacturing lot using the same materials and production processes whereas Commerce's use of resale value portrays non-prime products as being cheaper to produce.
- The costs of non-prime products have no impact on the margin calculation because the quantity of home market sales of non-prime products is quite small, and no non-prime products were sold to customers in the United States.

---

[45] *See* Draft Results of Redetermination Pursuant to Court Remand, Certain Carbon and Alloy Steel Cut-to-Length Plate from France, *Dillinger France S.A., v. United States,* Court No. 17-00159 (Ct. Int'l Trade Feb. 18, 2021), dated July 29, 2021 (Draft Results of Redetermination).
[46] *See* Dillinger's Letter, "Comments on Draft Results of Redetermination," dated August 5, 2021 (Dillinger's Comments); *see also* Nucor's Letter, "Comments on Draft Results of Redetermination," dated August 5, 2021 (Nucor's Comments).
[47] *See* Dillinger's Comments at 2-5.

*Commerce's Position:*

We continue to find that, because Dillinger failed to submit either the actual product-specific costs of producing the non-prime products or the physical characteristics of the non-prime products, Commerce does not have the information that is necessary to calculate the actual costs of prime and non-prime products.  As explained above, Commerce has an obligation to ensure that the reported costs of production reasonably reflect the cost of producing the merchandise under consideration and necessarily analyzes information pertaining to the cost of producing the merchandise under consideration on both an aggregate and product-specific basis.[48]  Moreover, the Federal Circuit specifically ordered a remand requiring Commerce to "determine the actual costs of prime and non-prime products."[49]  Indeed, given the combination of the Federal Circuit's directive that Commerce "determine the actual costs of prime and non-prime products" and Commerce's long-standing judicially approved practice of analyzing costs on a CONNUM-specific basis,[50] it is perplexing that Dillinger asserts that its failure to submit the actual product-specific costs of producing non-prime products or, at a minimum, the physical characteristics of non-prime products as Commerce requested, has not resulted in a record lacking necessary information.

Dillinger's argument that section 782(c) of the Act requires that Commerce depart from its long-standing, judicially approved practice of analyzing costs on a CONNUM-specific basis because Dillinger cannot provide the necessary information is misplaced.[51]  Section 776(a)(1) of

---

[48] *See supra* notes 12 through 15 and accompanying text.
[49] *See Dillinger France II*, 981 F.3d at 1321.
[50] *See Thai Plastic Bags*, 746 F.3d at 1368.
[51] Section 782(c) of the Act provides that "{i}f an interested party, promptly after receiving a request from the administering authority or the Commission for information, notifies the administering authority or the Commission (as the case may be) that such party is unable to submit the information requested in the requested form and manner, together with a full explanation and suggested alternative forms in which such party is able to submit the

the Act requires that Commerce apply facts otherwise available if "necessary information is not available on the record." Unlike section 776(a)(2)(B) of the Act which requires that Commerce consider section 782(c) of the Act before applying facts available when an interested party fails to provide requested information by the deadlines or in the form and manner requested, section 776(a)(1) of the Act simply requires that necessary information is not available on the record. Here, as discussed above, information pertaining to the actual cost of producing the non-prime products and their physical characteristics is necessary information and Dillinger's assertion that it is unable to provide the necessary information does not create an obligation for Commerce to depart from its long-standing, judicially approved practice of analyzing costs on a CONNUM-specific basis.

Further, Dillinger's argument that Commerce must accept the overall average cost of prime products as a surrogate for the actual costs of producing non-prime products because no party challenged Dillinger's reported costs of non-prime products or its reporting of physical characteristics is meritless. In the *Preliminary Determination*, Commerce adjusted Dillinger's reported costs of non-prime products, which reflected the average cost of producing all prime plate products sold during the POI, to reflect the costs recorded in Dillinger's normal books and records (*i.e.*, based on estimated sales value).[52] For the *Final Determination*, Commerce agreed with the petitioner's argument that Commerce should continue to adjust Dillinger's reported costs of non-prime products.[53] In other words, despite Dillinger's argument that no party

---

information, the administering authority or Commission (as the case may be) shall consider the ability of the interested party to submit the information in the requested form and manner and *may* modify such requirements to the extent necessary to avoid imposing an unreasonable burden on that party" (emphasis added). Section 782(c) of the Act does not require that Commerce alter its judicially approved practice of analyzing costs on a CONNUM-specific basis.

[52] *See Certain Carbon and Alloy Steel Cut-To-Length Plate from France: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 81 FR 79437 (November 14, 2016) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum at 15.
[53] *See Final Determination* IDM at Comment 11.

challenged Dillinger's reporting of the cost of producing the non-prime products, Commerce identified a problem with Dillinger's reported costs of non-prime products and adjusted them in the *Preliminary Determination* and the petitioner explicitly argued that Commerce should continue to adjust Dillinger's reported costs for the final determination.  Dillinger's claim that Commerce's use of Dillinger's reported costs of non-prime products as the starting point in its calculation of the adjustment (*i.e.*, the fact that Commerce's calculated adjustment began by referencing the "Total Extended Cost of Non-Prime Products as Reported") somehow equates to an implicit acceptance of those costs is incorrect.  Commerce explained above why the overall average cost of producing prime products is not an appropriate substitute for actual product-specific costs of production.[54]

Concerning Dillinger's argument that no party ever challenged Dillinger's reporting of the physical characteristics of non-prime products, the combination of Dillinger's admission that it could not report the physical characteristics of non-prime products, Commerce's decision to accept the allocation of total costs assigned to non-prime products as recorded in Dillinger's normal books and records (*i.e.*, the estimated sales value), and the fact that no non-prime products were sold to customers in the United States (*i.e.*, the non-prime products sold in the home market would never serve as a potential match to products sold in the United States), rendered a discussion of Dillinger's inability to report the physical characteristics of non-prime products unnecessary for the *Final Determination*.  While Dillinger's reporting of the physical characteristics was not relevant for the final determination, the accurate reporting of the physical characteristics of non-prime products became necessary once the Federal Circuit held that Commerce must determine the actual costs of prime and non-prime products.  Accordingly,

---

[54] *See supra* notes 30 through 33 and accompanying text.

Commerce reopened the record and issued a supplemental questionnaire to obtain the information deemed necessary by the Federal Circuit (*i.e.*, the actual CONNUM-specific costs of non-prime products and the physical characteristics of non-prime products).[55]  As discussed above, Dillinger did not submit the requested information.[56]

Finally, Dillinger's argument that the costs of non-prime products have no impact on the margin calculation is flawed.  It is a *non sequitur* to state that "the only issue related to non-prime merchandise that was challenged in this case was Commerce's shifting of reported costs from non-prime to prime merchandise"[57] and then argue that the issue has no impact on the margin calculation.  Because the shifting of costs from prime to non-prime products has a direct effect on the costs of both product groups, it directly affects the results of the sales-below-cost test and calculation of constructed value profit regardless of whether non-prime products were sold in the United States.  Indeed, the fact that the weighted-average dumping margin changes as a result of the allocation of costs between prime and non-prime products demonstrates that there is an impact on the calculated weighted-average dumping margin, and it also illustrates why ensuring the accurate reporting of product-specific production costs is an essential step in Commerce's obligation to ensure that the reported costs reasonably reflect the cost of producing the merchandise under consideration.[58]

## 2.  The Use of Facts Available

*Dillinger's Comments:*[59]

- Dillinger neither impeded the proceeding nor withheld information requested by Commerce.

---

[55] *See* Remand Supplemental.
[56] *See* notes 16 through 23 and accompanying text.
[57] *See* Dillinger's Comments at 2.
[58] *See supra* note 11.
[59] *See* Dillinger's Comments at 6-8.

- The average actual cost of producing prime products is the best available information on the record to value non-prime products, and the fact that the reported costs of non-prime products reflect an average does not diminish the fact that they reflect actual costs.
- The reported cost of non-prime products meets all of the requirements of section 782(e) of the Act because the average actual cost of prime products, which was verified, was submitted by the established deadline, can serve as a reliable basis for reaching a final determination, and can be used without undue difficulties.
- Commerce's use of estimated selling prices does not vary by CONNUM and physical characteristics even though it rejected Dillinger's reported costs of non-prime plates because the costs did not vary by CONNUM and physical characteristics.  Indeed, Commerce's use of estimated sales values is precisely what the Federal Circuit found unlawful.
- While Commerce states that it cannot accept the per-unit costs reported for non-prime products, Commerce, in effect, actually does accept the per-unit amounts reported by Dillinger and then proceeds to shift a portion of the costs to prime products (*i.e.*, Commerce never challenged the total amount of costs reported for non-prime products).
- Because no party has challenged the reported verified costs of prime plates, it is inappropriate to adjust the reported costs of prime plates.  Indeed, the Court has recognized, facts available can only be used to fill an "informational gap" and cannot be used to adjust unchallenged record information.

*Nucor's Comments:*[60]

- Commerce's decision to rely on the costs assigned to non-prime products in Dillinger's normal books and records (*i.e.*, estimated selling prices) as facts otherwise available is consistent with both the Federal Circuit's remand order and the Act.
- Section 776(a)(1) requires that Commerce use facts otherwise available if necessary information is missing from the record.
- The Federal Circuit directed Commerce to determine the actual costs of producing prime and non-prime products.
- Because Commerce did not have the actual costs of producing non-prime products on the record (*i.e.*, the information that Commerce was directed by the Federal Circuit to use), Commerce notified Dillinger of the reporting deficiency and issued a supplemental questionnaire to obtain the necessary information.
- Dillinger did not provide the actual costs of producing non-prime products; thus, Commerce appropriately resorted to facts otherwise available in light of the gap in the record.
- Commerce explained that it selected the estimated selling prices of non-prime products as facts otherwise available because it is the amount used by Dillinger in its normal books and records, was verified by Commerce, and represents the best information available on the record.

---

[60] *See* Nucor Comments at 3-5.

*Commerce's Position:*

We continue to apply facts otherwise available, pursuant to section 776(a)(1) of the Act, because necessary information (*i.e.*, the actual CONNUM-specific costs of producing non-prime products) is not available on the record. Section 776(a)(1) of the Act simply requires that necessary information is missing from the record and does not, unlike section 776(a)(2) of the Act, consider whether a party has impeded a proceeding or withheld information. Section 776(a) of the Act states that *either* necessary information is missing from the record *or* an interested party has impeded the proceed or withheld information. There is no *and* statement; section 776(a) does not require both conditions to be met to apply facts otherwise available. Indeed, in a recent case this Court held that section 776(a) of the Act has several layers and multiple uses, stating "{n}otably, paragraphs (1) and (2) are in the alternative, joined by the word 'or,' meaning that Commerce must use facts otherwise available if *either* necessary information is not available *or* the circumstances in paragraph (2) apply."[61] Accordingly, Dillinger's argument that it neither withheld information nor impeded the proceeding is irrelevant. What is required is merely that one of the conditions provided by the statute is met – here, the record is missing necessary information and, thus, one of the conditions under section 776(a) of the Act is met.

We disagree with Dillinger's assertions that the overall average cost of producing non-prime plates satisfies the requirements of section 782(e) of the Act and represents the best available information on the record and that the use of facts otherwise available is not necessary. Section 782(e) of the Act provides that:

> Commerce shall not decline to consider submitted information if all of the following requirements are met: (1) the information is submitted by the established deadline; (2) the information can be verified; (3) the information is not

---

[61] *See Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1336 (Ct. Int'l Trade Dec. 3, 2020) (further explaining that the first pathway for applying the facts otherwise available analysis focuses solely on the absence of necessary information, not the reason why it is missing).

so incomplete that it cannot serve as a reliable basis for reaching the applicable determination; (4) the interested party demonstrated that it acted to the best of its ability; and (5) the information can be used without undue difficulties.

As explained previously, the use of the overall average cost of producing prime products cannot serve as a reliable basis for calculating an accurate weighted-average dumping margin because it assigns the same costs to products with varying physical characteristics even though there is, in fact, a wide disparity in the reported actual total cost of manufacturing amounts for prime products.[62]

Dillinger's contention that the use of the overall average actual cost of producing prime plates satisfies the Federal Circuit's directive because it necessarily results in the calculation of the actual aggregate costs of producing non-prime products is false.  As discussed above, while Dillinger knows its total costs of producing all products (*i.e.*, prime and non-prime products),[63] Dillinger does not record the actual product-specific costs of producing non-prime products.[64] Dillinger's argument that the overall average cost of producing all of its prime products equals the product-specific cost of the non-prime plates produced assumes, without evidence, that the product mixes of prime and non-prime products produced during the period are identical.  If Dillinger had wanted to present evidence of the specific non-prime products produced, it could have relied on production reports or finished goods inventory excerpts to show which production runs resulted in the production of non-prime plates.  Dillinger chose not to do so.  Because Dillinger has not reported the actual product-specific costs of producing non-prime products and, because Commerce has verified the total costs of producing all products during the POI,[65] we are relying on the allocation of costs between prime and non-prime products recorded in Dillinger's

---

[62] *See* notes 31 through 33 and accompanying text.
[63] *See supra* note 25.
[64] *See supra* note 20.
[65] *See supra* note 25.

normal books and records as the best available information.  While we recognize that the use of the non-prime cost information recorded in Dillinger's normal books and records (*i.e.*, the estimated sales prices) does not vary by CONNUM and does not reflect cost differences attributable to the physical characteristics, this information is preferrable because it is based on the actual costs Dillinger assigns to the non-prime products produced in its normal books and records.

Dillinger's argument that, because no party challenged Dillinger's reported costs of prime plates, Commerce is precluded from adjusting the costs of prime plates by allocating the difference between the reported cost of non-prime plates and actual costs of non-prime plates recorded in Dillinger's normal books and records, is factually incorrect and meritless.  As discussed above, Commerce identified a problem with Dillinger's reported costs of non-prime products in the *Preliminary Determination* and the petitioner explicitly argued that Commerce should continue to adjust Dillinger's reported costs for the final determination.[66]  In other words, both Commerce and the domestic industry identified a problem with Dillinger's reported costs of non-prime products.  In Dillinger's normal books and records, Dillinger uses the costs assigned to non-prime products (*i.e.*, the estimated sales prices) as an offset to the total pool of costs incurred, and the result net costs are allocated to the prime products produced.[67]  Because Dillinger treats the costs of non-prime products as an offset to prime product costs in its normal books and records, absent the reporting of the actual product-specific costs of production for the non-prime products, any adjustment to the costs assigned to non-prime product costs necessarily affects the costs assigned to prime products.  Consequently, when faced with these facts, using

---

[66] *See supra* notes 49 through 50 and accompanying text.
[67] *See Final Determination* IDM at Comment 11.

20

costs from Dillinger's normal books and records as facts otherwise available to fill the gaps for the missing information is reasonable.

Finally, Dillinger's argument that Commerce's use of the total reported costs assigned to non-prime products as the starting point in its calculation of its adjustment somehow constitutes an implicit acceptance of the reported costs of non-prime products is baseless. The logical extension of this argument is that, when a respondent chooses to create a gap in the record or report inaccurate or distortive information, Commerce is precluded from adjusting the reported costs by determining the difference between the appropriate amount and the reported inaccurate amount. Such an extension would necessitate that Commerce choose between forgoing its statutory obligation to ensure that the reported costs reasonably reflect the cost of producing the merchandise under consideration[68] or disregarding the reported information in total and, because the accurate information could have been reported, applying facts available with an adverse inference. Similarly, the fact that neither Commerce nor the domestic industry challenged the mathematical calculation of the average cost of producing prime products once Commerce determined that the use of such an average was inappropriate somehow equates to an acceptance of the total costs assigned to non-prime products using that methodology is farcical. As explained previously, the use of the average cost of producing all prime products sold is not an appropriate estimate of the average cost of producing non-prime products.[69]

## V.    FINAL RESULTS OF REDETERMINATION

For the reasons discussed above, we have continued to use the approach presented in the draft results of redetermination as the approach in these final results of redetermination. As a result of its redetermination, Commerce is relying on the cost assigned to the prime and non-

---

[68] *See* section 773(f)(1)(A) of the Act.
[69] *See supra* notes 28 through 33 and accompanying text.

prime products as recorded in Dillinger's normal books and records as facts otherwise available

pursuant to section 776(a)(1) of the Act because Dillinger failed to provide its actual product-

specific cost of production of non-prime products.  As a result, Dillinger's final estimated

weighted-average dumping margin of 6.15 percent remains unchanged from the *Amended Final*

*Determination*.

8/24/2021

X _____

Signed by: CHRISTIAN MARSH

_____
Christian Marsh
Acting Assistant Secretary
  for Enforcement and Compliance

22