UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: The Honorable Gary S. Katzmann, Judge

| | |
|---|---|
| DILLINGER FRANCE S.A., ) | |
| Plaintiff, ) | |
| v. ) | |
| UNITED STATES, ) | Ct. No. 17-00159 |
| Defendant, ) | |
| and ) | **NONCONFIDENTIAL VERSION** |
| SSAB ENTERPRISES LLC, *et. al.*, ) | Confidential information deleted from pages 2, 3, 4 & 10. |
| Defendant-Intervenors. ) | |

**PLAINTIFF'S COMMENTS IN
<u>OPPOSITION TO THE FINAL RESULTS OF REDETERMINATION</u>**

Marc E. Montalbine
Gregory S. Menegaz
Alexandra H. Salzman
**deKieffer & Horgan, PLLC**
1090 Vermont Ave., N.W.
Suite 410
Washington, D.C. 20005
Tel: (202) 783-6900
email: montalbine@dhlaw.de
*Counsel to Plaintiff*

Dated: September 24, 2021

**TABLE OF CONTENTS**

I.   ARGUMENT ................................................................................................................. 1

    A.   Commerce's Redetermination Ignores the Explicit Directions of the CAFC ........ 1

    B.   Dillinger Properly Reported the Actual Costs of Prime Plate .............................. 2

    C.   Dillinger Properly Reported the Total Actual Costs of Non-Prime Plate .............. 3

    D.   Dillinger Has Reported the Product Characteristics and Costs of Non-Prime Plate to the Best of Its Ability ................................................................................ 4

    E.   Commerce Has Misapplied the Facts Available Provisions ................................. 6

    F.   The Information Commerce Claims Is Missing On The Administrative Record Has No Effect Upon the Reported Actual Costs of Prime Plate or the Reported Total Actual Costs of Non-Prime Plate ................................................................. 9

    G.   The Court Should Remand This Matter Back To Commerce With Explicit Directions To Accept Dillinger's Costs As Reported .......................................... 11

II.  CONCLUSION ............................................................................................................ 12

# TABLE OF AUTHORITIES

**Cases**

Borden, Inc. v. United States,
  4 F. Supp. 2d 1221 (CIT 1998) ................................................................................................ 7

Dillinger France S.A. v. United States,
  981 F.3d 1318 (Fed. Cir. 2020) ..................................................................................... 1, 6, 11

Dillinger France S.A. v. United States,
  350 F. Supp. 3d 1349 (CIT 2018) .......................................................................................... 10

F.LII De Cecco Di Filippo Fara S. Martino S.p.A. v. United States,
  216 F.3d 1027 (Fed Cir. 2000) ................................................................................................ 7

United States v. Great Am. Ins. Co. of New York,
  738 F.3d 1320 (Fed. Cir. 2013) ............................................................................................... 6

World Finer Foods v. United States,
  24 CIT 541 (2000) ................................................................................................................... 7

**Statutes**

19 U.S.C. § 1677b(f) .................................................................................................................... 6

19 U.S.C. § 1677e(b) .................................................................................................................... 8

19 U.S.C. § 1677m ....................................................................................................................... 7

19 U.S.C. § 1677m(c) ................................................................................................................... 7

19 U.S.C. § 1677m(e) ............................................................................................................... 7, 8

**Other Authorities**

Uruguay Round Agreements Act, Statement of Administrative Action,
  H.R. Doc. No. 103-316, vol. 1 (1994) reprinted in 1994 U.S.C.C.A.N 4040 ............................ 4

Pursuant to the Court's order of June 2, 2021 (ECF 82), plaintiff, Dillinger France S.A. ("Dillinger"), hereby submits these comments in opposition to the Final Results of Redetermination filed by the U.S. Department of Commerce ("Commerce") in this case on August 25, 2021 (ECF 85).

**I.      ARGUMENT**

    **A.      Commerce's Redetermination Ignores the Explicit Directions of the CAFC**

In its decision, the Court of Appeals for the Federal Circuit ("CAFC") explained the problem with Commerce's original determination regarding the treatment of non-prime plate as follows:

> Commerce accordingly adjusted Dillinger's reported costs for non-prime plate "to reflect the sales values recorded in {Dillinger's} normal books and records" and allocated the difference to the costs for Dillinger's prime plate. In doing so, Commerce reduced the cost of non-prime plate and allocated a greater portion of cost to prime plate based on the selling price of non-prime plate.

<u>Dillinger France S.A. v. United States</u>, 981 F.3d 1318, 1321 (Fed. Cir. 2020) (citations omitted). In striking down Commerce's determination, the CAFC specifically held that Commerce erred in relying on "likely selling price" in Dillinger's books and records, explaining:

> Dillinger's records that Commerce relied on for the cost of non-prime and prime plate were based on "likely selling price" rather than costs of producing and selling the merchandise. <u>Because Dillinger's books and records were based on "likely selling price" rather than cost of production, Commerce erred in relying on them</u>.

<u>Id</u>. at 1324 (citations omitted) (emphasis added).

Despite this clear admonition from the Court of Appeals, Commerce has made no change in its determination and continues to rely exclusively on the "likely selling price" in Dillinger's books and records rather than the actual cost of production data reported by Dillinger.

Commerce attempts to justify this refusal to follow the CAFC's clear directions by

1

claiming that there is necessary information missing from the record and that it must therefore apply facts available. The record however shows that Dillinger accurately reported the actual costs of production for both prime and non-prime plate and that facts available does not justify the shifting of reported costs from non-prime to prime plate based upon the likely selling price of non-prime plate as specifically prohibited by the CAFC.

> B.     **Dillinger Properly Reported the Actual Costs of Prime Plate**

In the original investigation, Dillinger carefully reported the actual cost of prime plate on a per-CONNUM basis. Dillinger started with the standard cost calculation for each specific customer order. See Section D Response, App. D-21 (July 15, 2016); P.R. 178, C.R. 110.[1] Dillinger then adjusted the standard costs to actual costs by applying a cost variance. Id. Dillinger calculated the variance separately for the two groups of plate for which actual costs are tracked in its normal books and records (*i.e.*, regular plate and line-pipe plate). See Supplemental Section D Response, App. SD-11 (Aug. 17, 2016); P.R. 203, C.R. 170. Dillinger then allocated a portion of the actual cost of each group to non-prime plate based upon the specific yield rate for each group. Id. For example, of the total quantity of regular plate produced during the period of investigation, [     ]% was non-prime plate. Id. Therefore, [     ]% of the actual costs for the regular plate group were allocated to non-prime plate. The same was done for line-pipe plate, with [     ]% of the actual costs of that group being allocated to non-prime plate. Id. In total, [     ] Euros in actual costs were allocated to non-prime plate based upon the actual yield rates for each of the plate groups. Id.

All of the remaining actual costs were allocated to prime plate and specific variances were applied for material costs, labor costs, variable overhead, fixed overhead and depreciation.

---

[1] In accordance with the Chambers Procedures of this Court, citations to the confidential record are designated as "C.R." and citations to the public record are designated as "P.R."

2

This variance was then applied to the CONNUM-specific standard costs for prime plate in order to arrive at the actual cost for each CONNUM of prime plate. This variance calculation was fully verified by Commerce and neither Commerce nor the petitioners have ever challenged the CONNUM-specific actual costs reported for prime plate. *See* Cost Verification Report, Ex. 10 (Jan. 12 2016); C.R. 624.

Therefore, because Dillinger has accurately reported the cost of prime plate and no party has challenged either the standard cost or variance calculations, it is improper for Commerce to shift any additional costs from non-prime plate to prime plate. To do so would be to report the cost of prime plate at more than their actual cost of production thereby violating the CAFC's decision in *Dillinger France*.

    **C.**    **Dillinger Properly Reported the Total Actual Costs of Non-Prime Plate**

As shown by the variance calculation discussed above, Dillinger also properly reported the total actual cost of non-prime plate. As detailed above, Dillinger allocated a portion of its total actual production costs to non-prime plate based upon the specific yield rate for each of the two plate groups. The yield rates were very specific, rounded to the fourth decimal place, and resulted in [          ] Euros of Dillinger's total actual cost of production being allocated to non-prime plate. This corresponds to an actual cost for non-prime plate of [          ] Euro/ton.[2] This is the most accurate information on the administrative record regarding the total actual cost of

---

[2] There is a slight difference between this cost of [          ] Euro/ton from Dillinger's verified variance calculation and the [          ] Euro/ton reported for non-prime plate in the cost data file, which was based upon the total average cost of all plate produced during the period of investigation. *See* Second Supplemental Section D Response (Questions 2-5), App. SD-17 (Sept. 21, 2016); P.R. 277, C.R 294. This slight difference has no effect upon the reported cost of prime plate because the costs of prime plate were based upon the verified variance calculation, which used the specific yield rates for non-prime plate. The variance calculation also resulted in a greater percentage of the actual cost being allocated to prime plate.

production for non-prime plate.  *See* Supplemental Section D Response, App. SD-11; P.R. 203, C.R. 170.

It is an error for Commerce to replace this specific actual cost information with the likely selling price of non-prime plate.  The likely selling price of non-prime plate does not correspond to the plate's cost of production and the use of the likely selling price in place of the cost of production was specifically prohibited by the CAFC.  Rather than applying the [          ] Euros in actual costs allocated to non-prime plate in Dillinger's verified variance calculation, Commerce applies a total likely selling price of [          ] Euros and shifts the difference to the cost of prime plate.  *See* Cost Calculation Adjustments for Final Determination, Attachment 2 (March 29, 2017); P.R. 447, C.R. 701.  This results in the cost of non-prime plate being written-down to only [       ] Euros/ton.[3]  This dramatically low value cannot reasonably be used as facts available for the actual costs of production.  In fact, this per-ton value is far less than the total cost of manufacture (TOTCOM) of any of the reported prime plate CONNUMs and is even far lower than the direct material costs for any of these CONNUMs.  *See* COP data file dhcop03.sas7bdat.

As stated in the Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA"), the information Commerce uses as facts available must be "reasonable to use under the circumstances."  *See* Statement of Administrative Action, H.R. Rep. No. 103-316, at 869 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4198.  Commerce's use of the likely selling price of non-prime plate as facts available for the actual costs of production of the non-prime plate fails this standard of reasonableness.

    **D.**    **Dillinger Has Reported the Product Characteristics and Costs of Non-Prime Plate to the Best of Its Ability**

---

[3] [          ] Euros / [       ] tons.

4

Within 14 days of receiving the original questionnaire in the investigation back in 2016, Dillinger notified Commerce of its difficulties in reporting all of the physical characteristics for non-prime plate and suggested that it report sales of non-prime merchandise by indicating a zero ("0") for any items, such as specification, that cannot be identified.  *See* Notification of Difficulties in Responding to the Questionnaire, 1-2 (Jun. 8, 2016); P.R. 96.  In a conference call on June 17, 2017, Commerce informed Dillinger that, "if Dillinger required specific guidance or acceptance of its reporting methodology, we would need to consider additional information that we expected Dillinger to include in its questionnaire responses."  Telecon with Dillinger Counsel on Questionnaire Reporting (June 20, 2016); P.R. 129.  Dillinger provided additional information concerning its reporting of non-prime material in its questionnaire responses, and this information was verified by Commerce.

Commerce noted no problems with Dillinger's reporting of the product characteristics for non-prime material or the actual costs for prime and non-prime material reported in Dillinger's verified variance calculation.  Rather, Commerce's only objection was that the reported COP should be based upon the sales value of non-prime material because prime and non-prime products could not be used in the same general applications and because Dillinger's normal books and records valued non-prime products at their likely selling price.  *See* Final Issues & Decision Memorandum, 60 (March 29, 2017); P.R. 445 (hereinafter "Final IDM").

Thus, the limitations on Dillinger's ability to report the product characteristics and cost of production for non-prime material were known by Commerce at the very beginning of the investigation.  In fact, in the final results of redetermination, Commerce stated:.

> Indeed, we acknowledge that Dillinger informed us of its inability to report the physical characteristics of non-prime products during the investigation. Moreover, there is no evidence on the record to demonstrate that Dillinger does, in fact, track the physical characteristics of non-prime products produced or the

5

actual product-specific costs of the non-prime products.

Final Results of Redetermination, 11 (Aug. 25, 2021) (footnotes omitted) (ECF 85). Commerce's issuance of a remand questionnaire to request information on the physical characteristics for each of the non-prime CONNUMs was therefore a meaningless exercise. *See* Remand Questionnaire, 3-5 (March 17, 2021). Commerce had already been informed at the beginning of the investigation in 2016 that Dillinger did not possess this information and Commerce accepted Dillinger's alternative reporting methodology for the non-prime CONNUMs.

In addition, Commerce never claimed in the original investigation or in any previous stage of these judicial proceedings that the likely selling price of non-prime plate in Dillinger's books and records was necessary as facts available for the actual production cost of the non-prime plate. Commerce simply argued that it was entitled to use the likely selling price under 19 U.S.C. § 1677b(f) because they were recorded in Dillinger's records kept in accordance with GAAP. The CAFC specifically rejected this argument stating that Commerce erred in relying on the likely selling price recorded in Dillinger's books and records because they were not based upon the costs of production. Dillinger France, 981 F.3d at 1324. Commerce cannot now raise a new argument as to why it can rely on the likely selling price in Dillinger's books and records despite the clear prohibition set by the CAFC. Commerce's arguments are not based on any new evidence or change in the administrative record and these arguments should have been previously raised in these proceedings. Having failed to do so, Commerce has waived the ability to raise its new argument at this time. *See* United States v. Great Am. Ins. Co. of New York, 738 F.3d 1320, 1328 (Fed. Cir. 2013) (finding that government waived arguments that were not properly raised in its summary-judgment filings).

      **E.**    **Commerce Has Misapplied the Facts Available Provisions**

As explained above, within 14 days of receiving the original questionnaire in the investigation back in 2016, Dillinger notified Commerce of its difficulties in reporting all of the physical characteristics for non-prime plate and suggested a reporting alternative pursuant to 19 U.S.C. § 1677m(c).  *See* Notification of Difficulties in Responding to the Questionnaire, 1-2 (Jun. 8, 2016); P.R. 96.  Under section 1677m(c), if an interested party promptly notifies Commerce after receiving a request for information that it is "unable to submit the information requested in the requested form and manner," then Commerce "shall consider the ability of the interested party to submit the information in the requested form and manner and may modify such requirements to the extent necessary to avoid imposing an unreasonable burden on that party."

The Court in *World Finer Foods* found that when, as in this case, a respondent notifies Commerce of its difficulties in providing requested information pursuant to 19 U.S.C. §1677m(c), Commerce may not impose adverse facts available unless it has first responded to the "overtures of cooperation from the exporter/producer."  *See* World Finer Foods v. United States, 24 CIT 541, 544-45 (2000).  In that case, the Court stated that the statutory scheme under 19 U.S.C. § 1677m "is designed to prevent the unrestrained use of facts available as to a firm that makes its best efforts to cooperate with Commerce."  Id. at 543 (citing Borden, Inc. v. United States, 4 F. Supp. 2d 1221, 1245 (CIT 1998), *aff'd sub nom*, F.LII De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027 (Fed Cir. 2000)).  The Court also noted that this provision was enacted to implement portions of Annex II to the WTO Antidumping Agreement, which provides that "information which 'may not be ideal' should not be disregarded if the party 'has acted to the best of its ability.'"  World Finer Foods, 24 CIT at 543 (citing Agreement on Implementation of Article VI of the General Agreement on Tariffs and

7

Trade 1994, Annex II).

Similarly, 19 U.S.C. § 1677m(e) states that the Commerce "shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements" if the following factors are present:

(1) the information is submitted by the deadline established for its submission,

(2) the information can be verified,

(3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,

(4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by the administering authority or the Commission with respect to the information, and

(5) the information can be used without undue difficulties.

19 U.S.C. § 1677m(e).

The actual costs allocated to non-prime plate in Dillinger's variance calculation fulfill all of the requirements of section 1677m(e) and should therefore have bene accepted. Dillinger submitted the actual cost information for prime and non-prime plate by the established deadline in the original investigation and this information was fully verified. Dillinger acted to the best of its ability in providing the cost information for non-prime plate on the most product-specific basis permitted by its books and records. This information on the actual costs of non-prime plate is a reliable basis for reaching the final determination and this information can be used without undo difficulties.

By using the likely selling price of non-prime plate rather than the actual cost of production allocated to non-prime plate in Dillinger's verified variance calculation, Commerce has imposed an impermissible adverse inference. Under the statute, Commerce may only impose an adverse inference when it "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with the request for information." 19 U.S.C. § 1677e(b).

8

Dillinger cooperated to the best of its ability with respect to reporting the product characteristics for non-prime plate and the actual cost of production. A neutral and reasonable application of facts available would apply the total cost of production for non-prime plate reported in Dillinger's verified variance calculation. As explained above, this calculation allocates the actual cost of production based upon the specific yield rates for non-prime plate from each of the plate groups for which actual costs are tracked in Dillinger's books and records. Because non-prime plate can only be distinguished from prime plate at the end of the production process, both types of plate use precisely the same materials and undergo precisely the same processing steps. Therefore, it is reasonable to assume that their average costs of production will be the same. Commerce's assumption that the actual cost of non-prime plate are nearly 50% lower than those of prime plate based on the likely selling price of non-prime plate is simply unreasonable and is unsupported by any evidence on the administrative record.

> F.   **The Information Commerce Claims Is Missing On The Administrative Record Has No Effect Upon the Reported Actual Costs of Prime Plate or the Reported Total Actual Costs of Non-Prime Plate**

The information that Commerce claims is missing on the record (*i.e.*, the product characteristics for non-prime plate) has no effect upon the reported actual cost of prime plate or the reported total actual cost of non-prime plate. It is beyond dispute, that all the product characteristics for prime plates have been properly reported and that Dillinger has reported the actual CONNUM-specific production cost for prime plate according to its verified variance calculation. This same verified variance calculation properly allocated a portion of the total actual production costs to non-prime plate based upon the specific yield rates of each plate group.

The fact that not all of the product characteristics for non-prime plate are available from

Dillinger's records does not affect the accuracy of the total actual production costs allocated to non-prime plate in Dillinger's variance calculation. Rather, it is simply a question of how the total amount of [      ] Euros in actual costs for non-prime plate would be allocated to each individual non-prime CONNUM. However, whether the same average cost per ton is reported for each non-prime CONNUM or the CONNUMs are assigned varying per ton costs, the total amount of actual production cost allocated to non-prime plate would still be the same [      ] Euros reported in Dillinger's variance calculation. This means that there is no basis to reduce the [      ] Euros of actual production cost allocated to non-prime plate. Rather, it is simply a question of how this [      ] Euros of actual production cost are distributed to the individual non-prime CONNUMs. This question therefore is limited exclusively to the non-prime CONNUMs and it is inappropriate for Commerce to alter the actual cost reported for the prime CONNUMs. As the Court has already determined in this proceeding, facts available is only used to fill an "informational gap" in the administrative record. It cannot be used to replace known, unchallenged record information. <u>Dillinger France S.A. v. United States</u>, 350 F. Supp. 3d 1349, 1364 (CIT 2018). With respect to the costs of prime plate, there is no missing information. Therefore, whatever adjustments Commerce makes with respect to the costs of non-prime plate, they must be limited to non-prime plate and cannot alter the properly reported costs of prime plate.

In addition, the distribution of the actual production cost among the individual non-prime CONNUMs is irrelevant to the margin calculations in this case. This is because no non-prime plate was sold to the United States. Therefore, none of these CONNUMs will be used in calculating the dumping margin. In addition, because non-prime plate is sold at below the price of production, all of these CONNUMs would fail the cost test and therefore not be used in the

10

margin calculations in any case.

Commerce's redetermination only has an effect on the anti-dumping margin because it shifts cost from non-prime plate to prime plate. By altering the properly reported CONNUM-specific actual costs for prime plate, Commerce increases the dumping margin. It is not clear why Commerce is so determined on shifting costs from non-prime plate to prime plate, but the record is clear that Dillinger has properly reported the actual CONNUM-specific production cost of prime plate and Commerce should not in any way change Dillinger's reported values.

Moreover, while Commerce rejects the actual costs of non-prime plate reported by Dillinger because they do not vary by CONNUM and physical characteristics, Commerce's imposed solution of writing down these average actual costs to the estimated selling price of the non-prime products similarly does not vary by CONNUM and physical characteristics. Commerce simply makes an across-the-board reduction in the actual average costs so that, in effect, the cost of each non-prime CONNUM is replaced by the same estimated selling price. This replacement of reported costs with the sales value is precisely what the CAFC found to be unlawful and remanded for correction. Dillinger France, 981 F.3d at 1324.

### G. The Court Should Remand This Matter Back To Commerce With Explicit Directions To Accept Dillinger's Costs As Reported

The Court should remand this matter back to Commerce with explicit directions to accept Dillinger's costs as reported and to stop shifting costs from non-prime to prime plate. As explained in Dillinger's motion for clarification of scope of remand, Commerce accomplished this cost shifting with only a few lines of code in its SAS program, and it is only these lines of code that need to be corrected. Motion for Clarification of Scope of Remand, To Stay Remand Proceedings and For Oral Argument Thereon, 3 & Ex. 2 (March 25, 2021) (ECF 74 & 75). The directions of the CAFC that Commerce not rely on the likely selling price of non-prime plate in

11

Dillinger's books and records are clear. Similarly, the actual costs allocated to non-prime plate in Dillinger's variance calculation are reasonable and fully supported by the administrative record. There is therefore no need for Commerce to make any additional findings and Commerce should implement the CAFC's decisions without any further delay.

## II.   Conclusion

For the reasons stated above, Commerce's Final Results of Redetermination are not supported by substantial evidence on the administrative record or in accordance with the law. We therefore respectfully request that the Court remand this case back to Commerce with explicit directions to accept Dillinger's costs as reported and to stop shifting costs from non-prime to prime plate.

Respectfully submitted,

/s/ *Marc E. Montalbine*
Marc E. Montalbine*
Gregory S. Menegaz
Alexandra H. Salzman**
**DEKIEFFER & HORGAN, PLLC**
1090 Vermont Ave., N.W.
Suite 410
Washington, DC 20005
Tel: (202) 783-6900
Fax: (202) 783-6909
email: montalbine@dhlaw.de

Date: September 24, 2021                         *Counsel to Plaintiff*

---

\* Admitted to Virginia Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).
\*\* Admitted to California Bar; practice supervised by attorneys of the firm who are active D.C. Bar members pursuant to D.C. Bar Rule 49(c)(8).

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2013 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with the Chambers Procedures of this Court, the undersigned certifies that this brief complies with the word limitations set forth.  Specifically, excluding those exempted portions of the brief, as set forth in section 2(B)(1) of the Chambers Procedures, I hereby certify that this brief contains **3,664** words.  In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ *Marc E. Montalbine*

Marc E. Montalbine
**DEKIEFFER & HORGAN, PLLC**
1090 Vermont Ave., N.W.
Suite 410
Washington, DC 20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  montalbine@dhlaw.de
*Counsel to Plaintiff*