Slip Op. 22-97

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **DILLINGER FRANCE S.A.,** | |
| Plaintiff, | |
| v. | **Before: Judge Gary S. Katzmann** |
| **UNITED STATES,** | **Court No. 17-00159** |
| Defendant, | |
| and | ***PUBLIC VERSION*** |
| **NUCOR CORPORATION and SSAB ENTERPRISES LLC,** | |
| Defendant-Intervenor. | |

## OPINION

[The court remands Commerce's Second Remand Results.]

Dated: August 18, 2022

Marc E. Montalbine, DeKieffer & Horgan PLCC, of Washington, D.C., argued for Plaintiff Dillinger France S.A. With him on the brief were Gregory S. Menegaz and Alexandra H. Salzman.

Kelly A. Krystyniak, Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant United States. With her on the brief were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Tara K. Hogan, Assistant Director. Of counsel on the brief was Ayat Mujais, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Stephanie M. Bell, Wiley Rein, LLP, of Washington, D.C., argued for Defendant-Intervenor Nucor Corporation. With her on the brief were Alan H. Price and Christopher B. Weld.

Roger B. Schagrin, Schagrin Associates, of Washington D.C., for Defendant-Intervenor, SSAB Enterprises LLC.

Katzmann, Judge:  Before the court is the U.S. Department of Commerce ("Commerce")'s second remand redetermination in the less-than-fair-value ("LTFV") investigation of certain carbon and alloy steel cut-to-length plate from France filed pursuant to this court's order.  See Final Results of Redetermination Pursuant to Ct. Remand, Aug. 25, 2021, ECF No. 85-1 ("Second Remand Results"); see also Remand Order, Feb. 18, 2021, ECF No. 73.  The sole issue on remand is whether Commerce's allocation of production costs between Respondent Dillinger France S.A. ("Dillinger")'s non-prime and prime plates comports with the Federal Circuit's directive in Dillinger France S.A. v. United States, 981 F.3d 1318 (Fed. Cir. 2020) ("Dillinger III").  For the reasons outlined below, the court remands to Commerce for further consideration consistent with this opinion.

## BACKGROUND

The court presumes familiarity with the facts and legal frameworks of this case, as set out in the previous opinions ordering remands to Commerce, and now recounts only that which is relevant to the court's review of the Second Remand Results.  See Dillinger France S.A. v. United States, 42 CIT __, __, 350 F. Supp. 3d 1349 (2018) ("Dillinger I"); Dillinger France S.A. v. United States, 43 CIT __, __, 393 F. Supp. 3d 1225 (2019) ("Dillinger II"); Dillinger III, 981 F.3d 1318.

On May 25, 2017, Commerce imposed an antidumping margin of 6.15 percent on Dillinger's cut-to-length plate products.  See Certain Carbon and Alloy Steel Cut-to-Length Plate from France: Final Determination of Sales at Less Than Fair Value, 82 Fed. Reg. 16,363 (Dep't Commerce Apr. 4, 2017), P.R. 451, and Mem. from J. Maeder to G. Taverman, re: Issues and Decision Mem. for the Final Affirmative Antidumping Duty Determination and Determination of Sales at Less Than Fair Value (Dep't Commerce Mar. 29, 2017), P.R. 445 ("IDM"); see also Certain Carbon and Alloy Steel Cut-to-Length Plate from Austria, Belgium, France, the Federal

Republic of Germany, Italy, Japan, the Republic of Korea, and Taiwan: Amended Final Affirmative Antidumping Determinations for France, the Federal Republic of Germany, the Republic of Korea and Taiwan, 82 Fed. Reg. 24,096 (Dep't Commerce May 25, 2017), P.R. 456 ("Final Determination"). Dillinger sells plates designated as prime and non-prime, with non-prime plates comprising plates that are rejected after the production process for failing to meet the standards for prime plate. See Dillinger III, 981 F.3d at 1321. In Dillinger I, Dillinger challenged several aspects of Commerce's Final Determination before this court, including Commerce's allocation of production costs between its prime and non-prime plates. See 350 F. Supp. 3d at 1374–77.

The parties agree that both types of plate undergo the same production process and use the same materials. See, e.g., Pl.'s Cmts. in Opp. to Second Remand Results at 9, Sept. 24, 2021, ECF No. 89 ("Pl.'s Br."); IDM at 58–60. Because non-prime plate is sold without certification as to grade, type, or chemistry and cannot be used in applications that require such certifications, it attracts a lower market value than prime plate. See IDM at 60. Accordingly, in its normal books and records, Dillinger values non-prime products at the likely selling price. See Second Remand Results at 2; IDM at 59. However, for the purposes of responding to Commerce's questionnaires in the LTFV investigation, Dillinger reported its costs of production for non-prime plates as the average cost of production for all prime plate sold during the period of investigation ("POI") -- a higher figure than the likely selling price. Second Remand Results at 2; IDM at 59.

In rendering its Final Determination, Commerce adjusted the reported costs for non-prime products back to the value recorded in Dillinger's normal books and records -- i.e., the lower estimated sales price -- and then allocated the difference between the reported and adjusted figure for non-prime products to the cost of production for prime products, pursuant to section

773(f)(1)(A) of the Tariff Act of 1930 ("the Act") on calculating normal value.[1] IDM at 59. This court sustained Commerce's cost adjustments in Dillinger I. See 350 F. Supp. 3d at 1374–77.

The Federal Circuit disagreed in Dillinger III, finding that Commerce's determination was erroneous because Dillinger's normal books and records reflect the estimated selling price of non-prime plates rather than costs of production, and thus failed to satisfy the requirement of section 1677b that an exporter's records "reasonably reflect the costs associated with the production and sale of the merchandise." See 981 F.3d at 1321–24 (discussing 19 U.S.C. § 1677b(f)(1)(A)). Accordingly, the Federal Circuit remanded to Commerce "to determine the actual costs of prime and non-prime plate." Id. at 1324.

To comply with the Federal Circuit's directive, on remand, Commerce reopened the administrative record and sent Dillinger a supplemental questionnaire requesting information on the physical characteristics and actual product-specific -- also known as CONNUM[2]-specific -- production costs of its non-prime plates. See Remand Questionnaire (Dep't Commerce Mar. 17, 2021), P.R.R. 9.[3] Dillinger responded to the agency that it was unable to identify all of the physical characteristics of its non-prime products and, consequently, Dillinger resubmitted approximate production costs for its non-prime products derived from the average cost of producing all prime

---

[1] Section 773(f)(1)(A) of the Tariff Act of 1930, as codified at 19 U.S.C. § 1677b(f)(1)(A), instructs in relevant part:

> Costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise.

[2] In LTFV investigations, products with identical physical characteristics are categorized by the same control number, or "CONNUM."

[3] P.R.R. refers to the Remand Redetermination public record; C.R.R. refers to the Remand Redetermination confidential record.

plates sold during the POI. See Dillinger Remand Redetermination Supplemental Questionnaire Resp. (June 23, 2021), P.R.R. 16; C.R.R. 5.

Commerce determined that Dillinger's response was insufficient to calculate actual costs of production and that it was, thus, necessary to invoke facts otherwise available under section 776(a)(1) of the Act.[4] Second Remand Results at 6–7. Because Commerce assessed that "not knowing the actual cost of producing the non-prime merchandise directly impacts the amount of costs assigned to the production of the prime products," Commerce relied upon the costs of non-prime and prime products as recorded in Dillinger's normal books and records -- to which the Federal Circuit previously objected -- as facts otherwise available to fill in the missing information. Id. at 6. As a result, Commerce continues to assess a weighted-average dumping margin of 6.15 percent against Dillinger's subject merchandise. Id. at 22.

Defendant the United States ("the Government") and Defendant-Intervenor Nucor Corporation ("Nucor") now ask this court to sustain the Second Remand Results as supported by substantial evidence and in accordance with law. See Def.'s Resp. to Cmts. in Opp. to Second Remand Results at 1, Nov. 8, 2021, ECF No. 96 ("Def.'s Br."); Def.-Inter.'s Resp. to Cmts. in Opp. to Second Remand Results at 1, Nov. 8, 2021, ECF No. 95 ("Def.-Inter.'s Br."). By contrast, Dillinger argues that the Second Remand Results contravene the Federal Circuit's order, necessitating further remand. See Pl.'s Br. at 1–2, 12.

---

[4] Section 776(a)(1) of the Act, as codified at 19 U.S.C. § 1677e(a)(1), instructs in relevant part:

> (a) IN GENERAL
> If—
> (1) necessary information is not available on the record,
> . . .
> the administering authority and the Commission shall, subject to section [1677m](d) of this title, use the facts otherwise available in reaching the applicable determination under this [sub]title.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(A)(i)(I) and (a)(2)(B)(iii). This court "will uphold [Commerce's] redetermination pursuant to the [c]ourt's remand unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" Consolidated Bearings Co. v. United States, 28 CIT 106, 106, 346 F. Supp. 2d 1343, 1344 (2004), aff'd 412 F.3d 1266, 1267 (Fed. Cir. 2005).

## DISCUSSION

Before this court, Dillinger lodges two overarching challenges to Commerce's Second Remand Results: Dillinger challenges (1) Commerce's invocation of facts available -- in general -- to supply Dillinger's costs of prime and non-prime plate production; as well as (2) Commerce's reliance on Dillinger's normal books and records -- in particular -- as facts available. The court finds Dillinger's latter argument availing and remands to Commerce for further consideration consistent with this opinion.

### I. *Commerce's General Invocation of Facts Available Accords with Law.*

On remand, because Commerce assessed that "necessary information" was missing from the record, the agency relied on Dillinger's normal books and records as facts available to derive costs of production for prime and non-prime merchandise pursuant to 19 U.S.C. § 1677e(a)(1).[5] Second Remand Results at 6–7. All parties agree that Dillinger did not supply at least some information requested by Commerce -- namely, the physical characteristics and product-specific costs of producing the non-prime products. See Second Remand Results at 2; Pl.'s Br. at 5; Def.-Inter.'s Br. at 2. However, the parties disagree as to the scope of the missing information to be filled via facts available and whether any such missing information was "necessary."

---

[5] Supra p. 5 n.4.

Specifically, Dillinger argues that there is no missing information with respect to the costs of prime plate, such that any adjustments Commerce makes on the basis of facts available must be limited to non-prime plate and cannot alter the properly reported costs of prime plate. Pl.'s Br. at 10. Moreover, Dillinger argues that because no non-prime plate was sold to the United States during the POI, the missing non-prime product-specific cost information is not "necessary," as required by 19 U.S.C. § 1677e(a)(1). Id. By contrast, Commerce argues that because "not knowing the actual cost of producing the non-prime merchandise directly impacts the amount of costs assigned to the production of the prime products" -- and thereby affects the margin calculation -- it is appropriate to use facts available to determine the cost of production for both non-prime and prime products. See Second Remand Results at 6, 16. The Defendant's position prevails.

Oral argument illuminated that all parties agree Dillinger knows the total production costs it incurred over the POI to produce prime and non-prime products, however, Dillinger does not know the actual division of these total costs among prime and non-prime products. See Oral Arg., Mar. 22, 2022, ECF No. 112. For instance, at oral argument, Dillinger's counsel explained: "You never know the actual cost of a specific plate. What you do know is . . . the total actual cost of making plate for that period. That's what you do know." Oral Arg. at 10:32–10:48; see also Pl.'s Post Oral Arg. Subm. at 1–2, Mar. 29, 2022, ECF No. 113. Dillinger further explained that it tracks actual total costs of producing two different types of plate -- line-pipe plate and regular plate -- which when added together equal the total actual production costs for the period. However, both prime and non-prime plate are produced within these two groups. See Oral Arg. at 10:50–11:35; Pl.'s Br. at 2. Accordingly, Dillinger estimated that around [[ ]] percent of the costs in each group were attributable to prime plate, and the remaining [[ ]] percent of the costs for each

group were attributable to non-prime plate. See Oral Arg. at 12:09–12:48; Pl.'s Br. at 2, 9; Pl.'s Post Oral Arg. Subm. at 3–4. While Dillinger maintains that these "yield rates were very specific, rounded to the fourth decimal place," Pl.'s Br. at 3, and comprised a "very reasonable assumption," see Oral Arg. at 12:48–12:53, nevertheless, Dillinger's counsel acknowledged that this method was "just an allocation; it's just an estimate," see id. at 16:03–16:18.

Section 1677e(a)(1) of 19 U.S.C. instructs that if "necessary information is not available on the record," Commerce "shall, subject to section 1677m(d) of this title, use the facts otherwise available in reaching the applicable determination under this subtitle." See 19 U.S.C. § 1677e(a)(1). The Federal Circuit has interpreted this provision to mean that "[t]he mere failure of a respondent to furnish requested information -- for any reason -- requires Commerce to resort to other sources of information to complete the factual record on which it makes its determination." Nippon Steel Corp. v. United States, 337 F.3d 1373, 1381 (Fed. Cir. 2003) ("The focus of [1677e(a)(1)] is respondent's failure to provide information. The reason for the failure is of no moment." (emphasis in original)).

Dillinger's description of its allocation process illuminates that there is indeed an informational gap in the record. As Defendant-Intervenor persuasively summarized, under either Dillinger's proposed method or Commerce's adopted one, "no matter what, we're in a world where we have total costs, and we don't know how to allocate [them]." See Oral Arg. at 1:01:14–1:01:18; see also Def.'s Post Oral Arg. Subm. at 3, Mar. 29, 2022, ECF No. 115 ("Dillinger France is also shifting costs." (emphasis in original)). And this missing information is "necessary." This is so because "however you allocate [the total costs], it is necessarily going to require taking some costs from prime and moving [them] to non-prime," see Oral Arg. at 1:01:18–1:01:25, which "affects the results of the sales-below-cost test and calculation of constructed value profit regardless of

whether non-prime products were sold in the United States," Second Remand Results at 16.[6] Thus, Commerce's determination that necessary cost information for prime and non-prime plate is missing is consistent with 19 U.S.C. § 1677e(a)(1) and record evidence.

---

[6] The court clarified its conceptual understanding of this point at oral argument through the use of a hypothetical Excel spreadsheet -- reproduced below -- in which the court assumed that 60 percent of plate produced during the POI was prime plate and 40 percent of the plate produced was non-prime. (The court notes that these numbers are purely hypothetical and do not reflect Dillinger's true production quantities or costs):

|   | Plate No. | Prime vs. Non-Prime | Cost |   |   |
|---|---|---|---|---|---|
|   | 1 | Prime | $2.00 |   |   |
|   | 2 | Prime | $4.00 |   |   |
|   | 3 | Prime | $6.00 |   |   |
|   | 4 | Prime | $8.00 |   |   |
|   | 5 | Prime | $10.00 |   |   |
|   | 6 | Prime | $12.00 |   |   |
|   | 7 | Non-Prime | $2.00 |   |   |
|   | 8 | Non-Prime | $4.00 |   |   |
|   | 9 | Non-Prime | $6.00 |   |   |
|   | 10 | Non-Prime | $8.00 |   |   |
|   |   | **Total Cost** | $62.00 |   |   |
|   |   | **Non-Prime Costs** | **Prime Costs** |   | **Total Cost** |
| **Percentage Yield Approach** (Assigning 60% of total costs ($62) to prime plate and assigning 40% of total costs ($62) to non-prime plate) |   | $24.80 | $37.20 |   | $62.00 |
| **Actual Cost Approach** (Adding together actual costs of producing non-prime plate and adding together actual costs of producing prime plate) |   | $20.00 | $42.00 |   | $62.00 |

See Suppl. Qs. for Oral Arg. at 1–2, Mar. 21, 2022, ECF No. 111. Responding to the court's hypothetical chart at oral argument, Dillinger's counsel explained:

> So basically in your example, Dillinger reported the $62.00. Everybody is happy with the $62.00. The $62.00 was verified. So the only question is how to split up the $62.00 between prime and non-prime. Because the $62.00 is in a group and they don't know specifically how to split it up between the two, so what Dillinger did was they said ok, from each of these groups -- the line-pipe and the regular -- how much in quantity was non-prime? So they figured out -- you'll see in the record it's a very exact number, it goes to four decimal places, but for each of them it's roughly [[ ]] percent . . . so they said that much of . . . the line-pipe group is

Dillinger, nevertheless, maintains that Commerce misapplied facts available in light of certain qualifications imposed by subsections 1677m(c)[7] and (e)[8] of 19 U.S.C. See Pl.'s Br. at 7–8. These arguments are unavailing.

---

> non-prime and then a similar thing for the regular group. So they said we will then say [[ ]] percent of the costs go to prime and [[ ]] percent go to non-prime. So at that point, it's a very reasonable assumption because . . . the prime and the non-prime have exactly the same costs. You don't know until the end of the . . . assembly line what's prime and non-prime.

Oral Arg. at 11:45–13:05 (cleaned up). In short, the discussion of the above chart illuminated that costs for prime and non-prime plate calculated under a "percentage yield approach" -- as advocated by Dillinger -- potentially differ from those calculated under an "actual cost approach" -- which Commerce cannot undertake here for lack of complete data. See Def.-Inter.'s Post Oral Arg. Subm. at 2, Mar. 29, 2022, ECF No. 114 ("[A]n allocation based on quantity does not necessarily result in an accurate calculation of costs."). In addition, how one chooses to allocate the costs does matter, as it necessarily impacts the costs of prime plate. Because Dillinger's percentage yield approach is concededly "just an estimate," see Oral Arg. at 16:16–16:18 -- even if a precise one -- Commerce permissibly determined that there was an informational gap to be filled with facts available under 19 U.S.C. § 1677e(a)(1). See Nippon Steel, 337 F.3d at 1381 (Fed. Cir. 2003) ("The focus of [1677e(a)(1)] is respondent's failure to provide information. The reason for the failure is of no moment." (emphasis in original)).

[7] Subsection 1677m(c) of 19 U.S.C. provides in relevant part:

> **(1) Notification by interested party**
> If an interested party, promptly after receiving a request from the administering authority or the Commission for information, notifies the administering authority or the Commission (as the case may be) that such party is unable to submit the information requested in the requested form and manner, together with a full explanation and suggested alternative forms in which such party is able to submit the information, the administering authority or the Commission (as the case may be) shall consider the ability of the interested party to submit the information in the requested form and manner and may modify such requirements to the extent necessary to avoid imposing an unreasonable burden on that party.

[8] Subsection 1677m(e) of 19 U.S.C. instructs:

> **(e) Use of certain information**
> In reaching a determination under section 1671b, 1671d, 1673b, 1673d, 1675, or 1675b of this title the administering authority and the Commission shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements established by the administering authority or the Commission, if—
>
>   (1) the information is submitted by the deadline established for its submission,

Concerning subsection 1677m(c), parties agree that Dillinger notified Commerce within fourteen days of receiving the agency's original questionnaire of its difficulties in reporting the requested non-prime information and suggested an alternative reporting method. See Pl.'s Br. at 5 (citing Notification of Difficulties in Responding to the Questionnaire at 1–2 (June 8, 2016), P.R. 96); see also Remand Results at 11. For their part, the Government and Nucor argue that irrespective of this notification, Commerce's ability to apply facts available under 19 U.S.C. § 1677e(a)(1) is not constrained by id. § 1677m(c), as it is under id. § 1677e(a)(2)(B).[9] See Def.-Inter.'s Br. at 7; Def.'s Br. at 8–9. The court need not here resolve whether subsection 1677m(c) is a "stand-alone provision" of the statute. See Pl.'s Resp. to Ct.'s Oral Arg. Qs. at 5, Mar. 16,

---

       (2) the information can be verified,
       (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,
       (4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by the administering authority or the Commission with respect to the information, and
       (5) the information can be used without undue difficulties.

[9] Compare 19 U.S.C. § 1677e(a)(1) with id. § 1677e(a)(2)(B):

    **(a) In general**
    If—
    (1) necessary information is not available on the record, or
    (2) an interested party or any other person—

        (A) withholds information that has been requested by the administering authority or the Commission under this subtitle,
        (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, <u>subject to subsections (c)(1) and (e) of section 1677m of this title</u>,
        (C) significantly impedes a proceeding under this subtitle, or
        (D) provides such information but the information cannot be verified as provided in section 1677m(i) of this title,

    the administering authority and the Commission shall, subject to section 1677m(d) of this title, use the facts otherwise available in reaching the applicable determination under this subtitle.

(emphasis added).

2022, ECF No. 106. This is so because even assuming arguendo that 1677m(c)(1) applies, Commerce was not required to modify its information request. See 19 U.S.C. § 1677m(c)(1) (instructing merely that Commerce "shall consider the ability of the interested party"[10] and "may modify such requirements" (emphasis added)).

Dillinger's additional argument that Commerce was required to accept its proposed cost allocations on the basis of subsection 1677m(e) is likewise unavailing. See Pl.'s Br. at 8. Subsection 1677m(e) instructs in part that "the administering authority . . . shall not decline to consider information that is submitted by an interested party" where "the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination." See 19 U.S.C. § 1677m(e)(3). Here, the Federal Circuit remanded to Commerce "to determine the actual costs of prime and non-prime products." Dillinger III, 981 F.3d at 1324 (emphasis added). As established above, Dillinger's proposed cost allocations were "just an estimate." Supra p. 9–10 n.6. Accordingly, Commerce permissibly determined that Dillinger's submitted information could not "serve as a reliable basis for reaching the applicable determination." See Second Remand Results at 7 ("The use of an 'average cost' would not, by definition, comply with the Federal Circuit's order to determine the 'actual costs of prime and non-prime products.'"); see also id. at 10 ("[T]he use of the overall average cost of all products as a proxy for the actual product-

---

[10] Record evidence suggests that Commerce considered Dillinger's ability to submit the requested information. See Telecon with Dillinger Counsel on Questionnaire Reporting (June 20, 2016), P.R. 129; see also Second Remand Results at 19 (asserting "[i]f Dillinger had wanted to present evidence of the specific non-prime products produced, it could have relied on production reports or finished goods inventory excerpts to show which production runs resulted in the production of non-prime plates. Dillinger chose not to do so.").

specific cost of production of the non-prime products cannot serve as a reliable basis for calculating an antidumping margin within the meaning of section 782(e)(3) of the Act.").[11]

In sum, the court sustains as supported by substantial evidence and in accordance with law Commerce's general invocation of facts available to supply the costs of production for Dillinger's prime and non-prime products. The court next considers whether Commerce's reliance on the costs recorded in Dillinger's normal books and records -- in particular -- as facts available is likewise permissible.

## II.     *Commerce's Particular Selection of Facts Available Does Not Accord with Law.*

As has been noted, on remand, the Federal Circuit directed Commerce "to determine the actual costs of prime and non-prime products." Dillinger III, 981 F.3d at 1324. In so ruling, Dillinger maintains the Federal Circuit prohibited Commerce from replacing reported costs with sales value, such that the agency's reliance on Dillinger's normal books and records as facts otherwise available was impermissible. See Pl.'s Br. at 1–2.[12] By contrast, the Government maintains that the Federal Circuit did not "prohibit" Commerce from relying on this data or order Commerce to rely on Dillinger's proposed cost allocation. See Def.'s Br. at 7. Rather the

---

[11] The court notes that whether Commerce was obligated to accept Dillinger's proposed cost allocation under 19 U.S.C. § 1677m(e) and whether Commerce permissibly relied upon the costs recorded in Dillinger's normal books and records as facts otherwise available under id. § 1677e(a)(1) are two separate inquiries. The court addresses the latter inquiry infra.

[12] The court finds unpersuasive Dillinger's additional argument that Commerce waived the opportunity to invoke Dillinger's normal books and records as facts otherwise available. Pl.'s Br. at 6. "The Department is allowed to 'change its conclusions from one review to the next based on new information and arguments.'" Evonik Rexim (Nanning) Pharm. Co. Ltd. v. United States, 42 CIT __, __, 296 F. Supp. 3d 1364, 1367 (2018) (sustaining Commerce's changed selection of surrogate values after the court directed it to consider a Respondent's brief on remand). Here, Commerce changed its conclusions following a court directive and articulated its basis for doing so -- namely, that upon reopening the administrative record, Dillinger failed to provide the actual cost information necessary to comply with the Federal Circuit's mandate. See Def.'s Br. at 12 n.2.

Government argues Commerce permissibly found that Dillinger's proposed methodology could not serve as a reliable basis for calculating the antidumping margin. See id. at 9 (citing Second Remand Results at 19). The court concludes that although the Federal Circuit did not strictly prohibit Commerce from relying on Dillinger's normal books and records as facts otherwise available, Commerce did not adequately explain its basis for doing so, necessitating remand.

First, the court does not interpret the Federal Circuit's holding to prohibit Commerce from relying on Dillinger's normal books and records as facts otherwise available. In vacating and remanding, the Federal Circuit explained that "[b]ecause Dillinger's books and records were based on 'likely selling price' rather than cost of production, Commerce erred in relying on them" in calculating normal value under 19 U.S.C. § 1677b(f)(1)(A). Dillinger III, 981 F.3d at 1324. While the Federal Circuit directed Commerce to "determine the actual costs of prime and non-prime products" to calculate normal value, id., this directive does not necessarily identify -- or cabin -- what information Commerce may or may not rely upon as facts otherwise available under 19 U.S.C. §1677e(a)(1), supra p. 11 n.9, once the agency concludes that it cannot "determine the actual costs of prime and non-prime products." See NEXTEEL Co., Ltd. v. United States, 46 CIT __, __, 569 F. Supp. 3d 1354, 1371 (2022) (declaring Commerce's "explanation [to be] inadequate in light of the Court of Appeals' precedent" in Dillinger III where Commerce used likely market value of non-prime product rather than actual costs of production to calculate constructed value and remanding for further explanation or reconsideration).

Here, Commerce inadequately explained why it relied on Dillinger's normal books and records as facts available. In the Second Remand Results, Commerce asserts that it "has an obligation to ensure that the reported costs of production reasonably reflect the cost of producing the merchandise under consideration." Second Remand Results at 13. In light of this obligation,

Commerce determined that "it was not appropriate to rely on the overall average cost of producing all prime products as a surrogate for the actual cost of producing the specific non-prime products produced," id. at 3–4 -- as advocated by Dillinger -- because doing so "assigns the same cost to products with varying physical characteristics," id. at 7.  Commerce then selected the estimated selling price of the non-prime products as facts otherwise available, while acknowledging "that the use of the non-prime cost information recorded in Dillinger's normal books and records (i.e., the estimated sales prices) does not vary by CONNUM and does not reflect cost differences attributable to the physical characteristics." Id. at 20.  Commerce maintains that its selected information is "preferrable because it is based on the actual costs Dillinger assigns to the non-prime products produced in its normal books and records." Id.

      This statement does nothing to illuminate why relying on Dillinger's normal books and records -- which reflect the likely selling price of non-prime pipe rather than the costs of production -- better accords with Commerce's "obligation to ensure that the reported costs of production reasonably reflect the cost of producing the merchandise under consideration." Id. at 3 (emphasis added).  The analytic deficiency is particularly apparent given that both data sets under consideration exhibit the same Commerce-identified flaw of assigning costs without variance for physical characteristics.  See SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("[A]gency action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations differently."); see also Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167–68 (1962) (An agency acts contrary to law if its decision-making is arbitrary or unreasoned).

      At oral argument and in its post oral argument submission to the court, the Government advanced a theory as to why adjusting the reported costs for non-prime products to the value recorded in Dillinger's normal books and records and then allocating the excess costs to prime

products better reflects actual production costs; namely, the Government contends that where Dillinger cannot produce [[ ]] perfect plate without producing [[ ]] "off-spec" plate, the lost value of those [[ ]] imperfect plate is actually a cost of producing the [[ ]] perfect ones and should be accounted for as such. See Oral Arg. at 31:15–33:36; see also Def.'s Post Oral Arg. Subm. at 3. While this theory may have merit, the agency itself did not articulate such reasoning in the Second Remand Results and the court cannot credit post-hoc rationalizations. See U.H.F.C. Co. v. United States, 916 F.2d 689, 700 (Fed. Cir. 1990) ("Post-hoc rationalizations of agency actions first advocated by counsel in court may not serve as the basis for sustaining the agency's determination.").

In short, Commerce inadequately explained its reliance on Dillinger's normal books and records as facts otherwise available to supply missing cost information. The court, therefore, remands to Commerce for further explanation or reconsideration consistent with this opinion.[13]

## CONCLUSION

For the foregoing reasons, the court remands Commerce's Second Remand Results. Commerce shall file with this court and provide to the parties its remand results within 90 days of the date of this order; thereafter, the parties shall have 30 days to submit briefs addressing the revised remand determination with the court, and the parties shall have 30 days thereafter to file reply briefs with the court.

**SO ORDERED.**

/s/ Gary S. Katzmann
Gary S. Katzmann, Judge

---

[13] Because Commerce might reconsider its selection of facts available on remand -- though the court currently takes no view on this point -- the court need not reach Dillinger's contention that "[b]y using the likely selling price of non-prime plate . . . Commerce . . . imposed an impermissible adverse inference." Pl.'s Br. at 8.

Dated: August 18, 2022
       New York, New York