UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: The Honorable Gary S. Katzmann, Judge

|  |  |  |
|---|---|---|
| DILLINGER FRANCE S.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | Ct. No. 17-00159 |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | **NONCONFIDENTIAL VERSION** |
| | ) | |
| SSAB ENTERPRISES LLC, *et. al.*, | ) | Confidential information deleted |
| | ) | from pages 2, 3, 6, 17, 20 and in |
| | ) | Exhibit 1. |
| Defendant-Intervenors. | ) | |

**PLAINTIFF'S BRIEF IN**
**OPPOSITION TO FINAL RESULTS OF REDETERMINATION**

Marc E. Montalbine
Gregory S. Menegaz
Alexandra H. Salzman
Merisa A. Horgan
**deKieffer & Horgan, PLLC**
1090 Vermont Ave., N.W.
Suite 410
Washington, D.C. 20005
Tel: (202) 783-6900
email:  montalbine@dhlaw.de
*Counsel to Plaintiff*

Dated: December 16, 2022

**TABLE OF CONTENTS**

I.  ARGUMENT .................................................................................................... 1

    A.  Commerce's Selection of Facts Available Does Not Accord with Law ............... 1

    B.  The Non-Prime Production Costs Reported by Dillinger Should Be Accepted .... 6

    C.  Commerce Erred in Shifting Production Costs from Non-Prime Products to
        Prime Products ........................................................................................... 8

    D.  Commerce Has Imposed an Impermissible Adverse Inference .......................... 14

II. CONCLUSION ............................................................................................... 22

## TABLE OF AUTHORITIES

**Cases**

Anderson v. U.S. Sec'y of Agric.,
   462 F. Supp. 2d 1333 (CIT 2006) ........................................................................... 14

Diamond Sawblades Mfrs. Coalition v. United States,
   986 F.3d 1351 (Fed. Cir. 2021) .............................................................................. 12

Dillinger France S.A. v. United States,
   350 F. Supp. 3d 1349 (CIT 2018) ............................................................................. 1

Dillinger France S.A. v. United States,
   981 F.3d 1318 (Fed. Cir. 2020) ........................................................................ *passim*

Husteel Co. v. United States,
   520 F. Supp. 3d 1296 (CIT 2021) ........................................................................... 12

Husteel Co. v. United States,
   552 F. Supp. 3d 1405 (CIT 2022) ........................................................................... 12

IPSCO, Inc. v. United States,
   965 F.2d 1056 (Fed. Cir. 1992) ........................................................................ 10, 11

Manifattura Emmepi S.p.A. v. United States,
   799 F. Supp. 110 (CIT 1992) .................................................................................... 5

National Steel Corp. v. United States,
   870 F. Supp. 1130 (CIT 1994) ................................................................................ 21

NEXTEEL Co. v. United States,
   Consol. No. 20-03898, slip op. 22-135 (CIT Dec. 6, 2022) .................................... 13

Nippon Steel Corp. v. United States,
   337 F.3d 1373 (Fed. Cir. 2003) .............................................................................. 14

Rhone Poulenc, Inc. v. United States,
   899 F.2d 1185 (Fed. Cir. 1990) .............................................................................. 21

Shandong Rongxin Imp. & Exp. Co., Ltd. v. United States,
   355 F. Supp. 3d 1365 (CIT 2019) ....................................................................... 5, 12

SKF USA Inc. v. United States,
   263 F.3d 1369 (Fed. Cir. 2001) .............................................................................. 14

Yangzhou Bestpak Gifts & Crafts Co. v. United States,
   716 F.3d 1370 (Fed. Cir. 2013) ................................................................................. 12

**Statutes**

19 U.S.C. § 1677b(b)(3) ................................................................................. 1, 8, 9

19 U.S.C. § 1677b(f)(1)(A) ................................................................................. 5, 14

19 U.S.C. § 1677e(b) ................................................................................. 14, 20

**Administrative Determinations:**

Polyethylene Retail Carrier Bags from Thailand: Final Results of Antidumping Duty
Administrative Review, 76 Fed. Reg. 12700 (March 8, 2011) .................................................... 9

Stainless Steel Wire Rod from the Republic of Korea: Final Results of Antidumping Duty
Administrative Review, 69 Fed. Reg. 19153 (Apr. 12, 2004) .................................................... 9

**Other Authorities**

Uruguay Round Agreements Act, Statement of Administrative Action,
   H.R. Doc. No. 103-316, vol. 1 (1994) reprinted in 1994 U.S.C.C.A.N 4040 .......................... 4, 5

Pursuant to the Court's opinion of August 18, 2022 (ECF 118), plaintiff, Dillinger France S.A. ("Dillinger"), hereby submits this brief in opposition to the Final Results of Redetermination filed by the U.S. Department of Commerce ("Commerce") in this case on November 16, 2022 (ECF 120-1) ("Final Results of Redetermination III").

## I.    ARGUMENT

Commerce's final results do not comply in any manner with the instructions of the U.S. Court of Appeals for the Federal Circuit ("CAFC") or this Court.  Rather, Commerce has not made any change in its original determination and continues to write down the reported costs of non-prime plate to its sales value and shift these costs to prime plate, the exact thing that the CAFC found to be unlawful.  Dillinger France S.A. v. United States, 981 F.3d 1318, 1321 & 1324 (Fed. Cir. 2020) ("Dillinger III") (stating that Commerce "adjusted Dillinger's reported costs for non-prime plate 'to reflect the sales values'" of the non-prime plate and that "Commerce erred in relying" on Dillinger's books and records because they "were based on 'likely selling price' rather than cost of production").

### A.  Commerce's Selection of Facts Available Does Not Accord with Law

As the Court has already determined in this proceeding, facts available is only used to fill an "informational gap" in the administrative record.  Dillinger France S.A. v. United States, 350 F. Supp. 3d 1349, 1364 (CIT 2018) ("Dillinger I").  The informational gap to be filled in this current situation is the actual costs of production of non-prime products.  The statute expressly details that the reported cost of production for a product "shall be an amount equal" to "the cost of materials and of fabrication or other processing of any kind employed in producing" the product.  19 U.S.C. § 1677b(b)(3).  Accordingly, the selection of facts available for the actual

costs of non-prime products must correspond, as closely as possible, to the cost of materials and of fabrication or other processing employed in producing the non-prime products.

In its final results of redetermination, Commerce uses the "likely selling price" of the non-prime products as facts available for their actual cost of production. Commerce fails to explain how this "likely selling price" in any way corresponds to the cost of materials and of fabrication or other processing employed in producing the non-prime products. The likely selling price used by Commerce as facts available amounts to only [      ] Euros/ton.[1]  *See* Final COP Calculation Memorandum at 2 (March 29, 2017); P.R. 447, C.R. 701; Preliminary COP Calculation Memorandum at 2 & Attachment 2 (Nov. 4, 2016); P.R. 366, C.R. 405. This dramatically low value obviously does not correspond to the full cost of materials and of fabrication or other processing employed in producing the non-prime products and therefore cannot properly be used as facts available for the actual costs of production. In fact, this per-ton value is far less than the total cost of manufacture (TOTCOM) of any of the reported CONNUMs and is even far lower than the direct material costs for any of the CONNUMs. *See* Dillinger Second Supplemental Section D Response Part II, App. SD-24 & COP data file dfcop03.sas7bdat (Sept. 28, 2016) (Barcode: 3510229); P.R. 289, C.R. 338 & 342 (with TOTCOM ranging from [      ] Euros/ton to [      ] Euros/ton and having a weighted-average of [      ] Euros/ton).

This is clearly shown by **Exhibit 1** attached to this brief. **Exhibit 1** contains a printout of the total cost of production for each CONNUM. The source of this information is the COP data file cited above. This information has been re-sorted so that it is arranged from the lowest total cost of manufacturing to the highest. The CONNUMs starting with "000" are the non-prime

---

[1] [      ] Euros / [      ] tons.

**PUBLIC VERSION**

products.  This list represents all products produced during the period of investigation and, therefore, any non-prime products must have resulted from the production of the prime plate in this list.

As shown by the list, the total cost of manufacture (TOTCOM) ranges from [          ] Euros/ton to [          ] Euros/ton.  Because non-prime plate cannot be identified until the end of production, it goes through the exact same production steps as prime plate, incurring the exact same costs.  It is therefore impossible for the actual cost of production of non-prime plate to be lower than the actual costs of production (TOTCOM) of any of the CONNUMs listed in **Exhibit 1**.  Nevertheless, in its final results of redetermination, Commerce has assigned non-prime plate a cost of less than 300 Euros/ton, which is far less than the TOTCOM of any of the reported CONNUMs.

Commerce claims that it is relying upon the cost assigned to non-prime products as recorded in Dillinger's normal books and records.  In this context, Commerce makes reference to the total inventory value assigned to non-prime ("2nd choice") products listed in Appendix SD-8 to Dillinger's August 17, 2016 Supplemental Section D questionnaire response.  *See* <u>Preliminary COP Calculation Memorandum</u> at Attachment 2 (Nov. 4, 2016); P.R. 366, C.R. 405.  This appendix is based upon the inventory values listed for the product code [          ] (Non-prime (2nd choice material)).  However, it is clear and uncontroverted that the values listed in this account are not the actual costs of production for non-prime products.  Rather, as detailed in Dillinger's June 23, 2021 remand supplemental questionnaire response, the non-prime material in this inventory account is valued at the estimated selling price.  <u>Remand Supplemental Questionnaire Response</u>, 8 (June 23, 2021) (Barcode: 4136797); REM2 P.R. 16, REM2 C.R. 5.

Valuing the inventory of non-prime material at the estimated selling price is simply an application of the lower of cost or market ("LCM") rule.  Under the LCM rule, inventory is normally valued on the balance sheet at its cost of production.  However, if the cost of the inventory is higher than its estimated selling price, the value of the inventory is written down to the estimated selling price.  It is important to understand that this reduction in the value of the inventory in no way changes the actual cost of production for the inventory.  This is clear from the name of the LCM rule itself; inventory is valued at the lower of its cost of production **or** its market value.  The market value is never used as a surrogate for the actual cost of production.  Rather, the LCM rule explicitly acknowledges that the actual costs of production are higher than the estimated selling price when a write-down in the inventory value is made.

Commerce's citations to the notes from Dillinger's financial statements are nothing more than a reiteration that inventories are valued at the lower of cost of production or market value under the LCM rule and that the inventory value of non-prime products is based upon the estimated resale value of those products.  *See* Final Results of Redetermination III, 15-16.

Thus, the inventory value of non-prime products, based as it is on resale value, bears no relationship with the actual costs of production.  Non-prime plate undergoes the same production process as prime plate and it does not become less costly to produce simply because it cannot be sold at full price.  Therefore, Commerce's use of resale value as the "best available information on the record" concerning the actual cost of production of non-prime products has no reasonable basis in the administrative record of this proceeding and must be rejected.

As stated in the Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA"), the information Commerce uses as facts available must be "reasonable to use under the circumstances."  *See* Statement of Administrative Action, H.R. Rep.

No. 103-316, at 869 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4198.  In fact, the SAA states

that in cases involving the use of facts available, Commerce "must make [its] determinations

based on all evidence of record, weighing the record evidence to determine that which is most

probative of the issue under consideration." Id.  Similarly, in *Shandong*, this Court explained:

> The provisions of § 1677e(a) are known as "facts available," or "neutral facts
> available," and the guiding principle for choosing what facts to apply is accuracy
> in the given case.

Shandong Rongxin Imp. & Exp. Co., Ltd. v. United States, 355 F. Supp. 3d 1365, 1370 (CIT

2019).

Commerce's use of the likely selling price of non-prime plate as facts available for the

actual costs of production of the non-prime plate violates these legal standards of reasonableness

and accuracy.  Commerce's "authority to select best information otherwise available is subject to

a rational relationship between data chosen and the matter to which they are to apply."

Manifattura Emmepi S.p.A. v. United States, 16 C.I.T. 619, 624, 799 F. Supp. 110, 115 (1992).

How an item is treated in a respondent's financial statements is not determinative.

Rather, the costs of production used in Commerce's antidumping duty calculations must

reasonably reflect a respondent's actual costs regardless of how costs are reported in a

respondent's books and records.  *See* 19 U.S.C. § 1677b(f)(1)(A).  This was the clear holding of

the CAFC in *Dillinger III* where it stated that Commerce erred in relying on Dillinger's books

and records because they "were based on 'likely selling price' rather than cost of production."

Dillinger III, 981 F.3d at 1324.  This was also Commerce's clear determination in *NEXTEEL*

where it stated:

> {I}n *Dillinger*, the U.S. Court of Appeals for the Federal Circuit (CAFC) held
> that Commerce's CV calculation must reasonably reflect a respondent's actual
> cost, whether or not the respondent's books and records reflect such costs.

Final Results of Redetermination Pursuant to Ct. Remand, 7 (July 18, 2022) (Case No. 1:20-cv-03898-CRK (ECF 96-1)).

### B.   The Non-Prime Production Costs Reported by Dillinger Should Be Accepted

The most reasonable calculation of the actual production costs of non-prime plate is the calculation reported by Dillinger.  Dillinger calculated the actual total production costs for non-prime plate using the specific yield rates for regular plate and line-pipe plate during the period of investigation (*i.e.*, [        ]% for regular plate and [        ]% for line-pipe plate).  *See* Supplemental Section D Response, App. SD-11 (Aug. 17, 2016); P.R. 203, C.R. 170.  This resulted in a reported amount of [      ] Euro/ton for the cost of production of non-prime plate.

This is the most accurate information on the administrative record regarding the total actual cost of production for non-prime plate.  This calculation allocates the actual cost of production based upon the specific yield rates for non-prime plate from each of the plate groups for which actual costs are tracked in Dillinger's books and records.  Because non-prime plate can only be distinguished from prime plate at the end of the production process, both types of plate use precisely the same materials and undergo precisely the same processing steps.  Therefore, it is reasonable to assume that their average costs of production will be the same.

Commerce attacks this allocation as an "estimate" citing to comments made by Plaintiff's counsel at oral argument.  *See* Final Results of Redetermination III, 6 & 12-16.  Commerce however takes the one word "estimate" completely out of context.  The comments made by Plaintiff's counsel during oral argument did not relate specifically to the allocation of actual costs to non-prime plate.  Rather, the comments related to the general allocation of actual costs to CONNUM-specific standard costs.  Plaintiff's counsel explained that "you never have actual costs on a CONNUM-specific basis."  Oral Arg. at 15:07-15:11.  The only actual costs are for

the broad product groups.  Id. at 15:11-15:15.  The CONNUM-specific costs are estimated

standard costs.  Id. at 15:15-15:48.  The actual costs, which are recorded only on a general

product basis, are allocated to specific products based upon the estimated standard costs.  For

example, if the standard costs of a product are 1% of total estimated standard costs, then the

product is allocated 1% of actual costs.  Id. at 15:48-15:57.  Plaintiff's counsel was making the

point that even when product-specific standard costs are known, "you are still not talking about

actual costs on a CONNUM-specific basis."  Id. at 15:57-16:04.  What you are talking about is

the actual costs on a broad basis and "how to allocate it down to the specific products, but that in

and of itself is just an allocation; it's just an estimate."  Id. at 16:04-16:18.

 The underlying facts of Dillinger's allocation of actual costs to non-prime plate are

undisputed.  Dillinger has taken the total actual costs of production as recorded in its books and

records and allocated a portion of these actual costs of production to non-prime plate based upon

the actual yield rates recorded in its books and records.  This is the most precise allocation of

actual costs that can be made based upon the record evidence in this case.

 Commerce also readily admits that its own allocation methodology is based upon

"estimated" sales values.  See Final Results of Redetermination III, 2.  Commerce however fails

to explain how "estimated" sales values bear any relation to the actual costs of production.  It is

therefore an error for Commerce to replace the specific allocation of actual costs of production to

non-prime plate with the likely selling price of non-prime plate.  The likely selling price of non-

prime plate does not correspond to the plate's cost of production and the use of the likely selling

price in place of the cost of production was specifically prohibited by the CAFC.  See Dillinger

III, 981 F.3d at 1321 & 1324 (stating that Commerce "adjusted Dillinger's reported costs for

non-prime plate 'to reflect the sales values'" of the non-prime plate and that "Commerce erred in

relying" on Dillinger's books and records because they "were based on 'likely selling price' rather than cost of production").

### C. Commerce Erred in Shifting Production Costs from Non-Prime Products to Prime Products

In its final results of redetermination, Commerce has expressly shifted production costs from non-prime products to prime products. Commerce's stated rational is that the "lost value" on the non-prime products is a cost of producing the prime products. By lost value, Commerce apparently means the fact that the sales price of the non-prime products does not cover the costs of production of those products, thereby resulting in a loss on the sale.

The fact that non-prime plate is sold at a loss does not in any way reduce the actual costs of producing that plate. As explained above, the statute is clear that the reported costs of production "shall be an amount equal to" the cost of materials and of fabrication or other processing employed in producing the merchandise. 19 U.S.C. § 1677b(b)(3). There is no provision in the statute to reduce the costs of materials, fabrication and processing employed in producing the merchandise by the "lost value" resulting from the sale of the merchandise. Nor is there any provision in the statute to increase the costs of materials, fabrication and processing employed in producing the merchandise by the "lost value" resulting from the sale of other merchandise. Commerce's shifting of production costs from non-prime products to prime products is therefore contrary to the express wording of the statute and not in accordance with law.

Indeed, the increase of production costs to account for "lost value" is contrary to Commerce's longstanding practice of excluding inventory write-downs in the costs of production. As Commerce stated in its Issues and Decision Memorandum for the final determination in this investigation,:

8

> Our practice is to exclude inventory write-downs that are attributable to finished goods from a respondent's COP because we consider the write-down of finished goods to be more clearly related to the sale of merchandise rather than to its production.

Final IDM at 57 & n.184 (citing Polyethylene Retail Carrier Bags from Thailand: Final Results of Antidumping Duty Administrative Review, 76 Fed. Reg. 12700 (March 8, 2011) and accompanying IDM; Stainless Steel Wire Rod from the Republic of Korea: Final Results of Antidumping Duty Administrative Review, 69 Fed. Reg. 19153 (Apr. 12, 2004), and accompanying IDM at Comment 7); P.R. 445.

In its final results of redetermination, Commerce admits that this is its established practice and that this established practice relates to the write-down of finished goods to below their cost of production. This is precisely what Commerce is doing in its calculation of "lost value" in this case. It is taking a write-down of the finished goods inventory for non-prime plate based upon the difference between the cost of production of that plate and its estimated selling price and then applying this write-down to the cost of prime products.

Commerce's attempt to label the write-down in the value of the non-prime plate finished goods inventory as "indirect costs" for the production of prime products finds no support in law, and Commerce cites to no statute, regulation, court decision or prior administrative determination supporting this categorization. As explained above, the statute expressly details that the reported cost of production for a product "shall be an amount equal" to "the cost of materials and of fabrication or other processing of any kind employed in producing" the product. 19 U.S.C. § 1677b(b)(3). Under this clear definition, the actual costs of non-prime products must correspond, as closely as possible, to the cost of materials and of fabrication or other processing employed in producing the non-prime products. The same is true for the costs of production reported for prime products. The reported cost of prime products must be equal to

9

the cost of materials fabrication and processing employed in producing those products.  Both prime and non-prime plate meet the definition of merchandise under consideration and there is no provision in the statute that would permit the shifting of the cost of production from one product of merchandise under consideration to another product of merchandise under consideration.

Commerce's shifting of production costs from non-prime products to prime products is also contrary to the CAFC's in *Dillinger III*.  In that decision, the Court explained the problem with Commerce's original determination regarding the treatment of non-prime plate as follows:

> Commerce accordingly adjusted Dillinger's reported costs for non-prime plate "to reflect the sales values recorded in {Dillinger's} normal books and records" and allocated the difference to the costs for Dillinger's prime plate.  In doing so, Commerce reduced the cost of non-prime plate and allocated a greater portion of cost to prime plate based on the selling price of non-prime plate.

Dillinger III, 981 F.3d at 1321 (citations omitted).  In striking down Commerce's determination, the CAFC specifically held that Commerce erred in relying on "likely selling price" in Dillinger's books and records, explaining:

> Dillinger's records that Commerce relied on for the cost of non-prime and prime plate were based on "likely selling price" rather than costs of producing and selling the merchandise.  Because Dillinger's books and records were based on "likely selling price" rather than cost of production, Commerce erred in relying on them.

Id. at 1324 (citations omitted) (emphasis added).  The CAFC remanded the case with specific instructions for "Commerce to determine the actual costs of prime **and** non-prime products."  Id. (emphasis added)

Moreover, the reporting of a non-prime product's production costs based upon sales value was expressly struck down by the CAFC in IPSCO, Inc. v. United States, 965 F.2d 1056 (Fed. Cir. 1992).  In that case, the court struck down as "unreasonable" a methodology that would allocate production costs to the non-prime merchandise based upon market value, thereby

reducing the allocated production costs for non-prime merchandise to below its actual cost of production. Id. at 1058-59. The court explicitly found that "{b}y its terms, the statute expressly covers actual production costs" and the statute's broad language does not "authorize adjustment of these production costs to account for products of a lower grade or less value." Id. at 1059-60. The court in *IPSCO* also found that reducing a product's cost of production to that product's ultimate selling price amounted to "circular reasoning" that "contravened the express requirements of the statute which set forth the cost of production as an independent standard for fair value." IPSCO, 965 F.2d at 1061.

*IPSCO* was expressly reaffirmed by the CAFC in *Dillinger III* with respect to precisely the same shifting of production costs from non-prime products to prime products done by Commerce in this case. In *Dillinger III*, the CAFC stated:

> Here, there is no dispute that Commerce relied on the likely selling price of non-prime plate in its determination of cost. Thus, if *IPSCO* governs, Commerce's reliance on Dillinger's books and records was impermissible.

Dillinger III, 981 F.3d at 1322. The Court went on to explain how *IPSCO* does govern this case and that Commerce's actions in shifting production costs from non-prime products to prime products is unlawful. Id. at 1322-24.

Commerce simply ignores the CAFC's decisions in *Dillinger III* and *IPSCO* stating that the cases do not "limit the nature of information Commerce may rely on as facts otherwise available." *See* Final Results of Redetermination III, 11. However, the resort to facts available does not give Commerce unbridled authority to apply any information it desires as facts available. Rather, Commerce must apply information that fills the gap as to the actual costs of production for non-prime products. As such, Commerce must follow all statutory and judicial authorities concerning what properly constitutes actual costs of production. As explained by the CAFC, "[a]n overriding purpose of Commerce's administration of antidumping laws is to

11

calculate dumping margins as accurately as possible." <u>Diamond Sawblades Mfrs. Coalition v. United States</u>, 986 F.3d 1351, 1365 (Fed. Cir. 2021) (quoting <u>Yangzhou Bestpak Gifts & Crafts Co. v. United States</u>, 716 F.3d 1370, 1379 (Fed. Cir. 2013). Similarly, in *Shandong*, this Court explained that "the guiding principle for choosing what facts to apply is accuracy in the given case." <u>Shandong Rongxin Imp. & Exp. Co., Ltd. v. United States</u>, 355 F. Supp. 3d 1365, 1370 (CIT 2019).

Commerce's shifting of production costs from non-prime products to prime products also conflicts with its recent remand determination in *Husteel*. In that case, the court found "problematic" "Commerce's explanation of how a methodology that calculates costs of non-prime products based on its resale value and reallocates the difference between the resale value and actual costs of producing non-prime products to the costs of prime products accords with the Court of Appeals' instruction to use actual costs when calculating constructed value." <u>Husteel Co. v. United States</u>, 520 F. Supp. 3d 1296, 1309 (CIT 2021) (citing <u>Dillinger III</u>, 981 F.3d at 1321-24) (hereinafter "<u>Husteel II</u>"). The Court therefore refused to sustain Commerce's determination and remanded the matter back to Commerce with respect to the costs of non-prime products for the respondent NEXTEEL.

On remand, Commerce stopped reducing NEXTEEL's reported costs of non-prime products based on resale value and instead accepted NEXTEEL's cost reporting that assigned prime and non-prime products the same full cost. *See* <u>Husteel Co. v. United States</u>, 552 F. Supp. 3d 1405 (CIT 2022) (hereinafter "<u>Husteel III</u>"). From its questionnaire responses, it is clear that NEXTEEL did not separately track the actual costs of prime and non-prime products but rather reported the same average cost of manufacture for both prime and non-prime products.

NEXTEEL Supplemental Section D Response, 6 (July 3, 2018); Joint Appendix (Case No. 1:19-cv-00112-CRK (ECF 73-1)) at p. 347.

> In its remand redetermination in *NEXTEEL*, Commerce stated:
>
> {I}n Dillinger, the U.S. Court of Appeals for the Federal Circuit (CAFC) held that Commerce's CV calculation must reasonably reflect a respondent's actual cost, whether or not the respondent's books and records reflect such costs. In the instant case, NEXTEEL does not separately classify prime products differently for inventory purposes, but rather assigns the same manufacturing costs to both prime and non-prime products. Moreover, in its normal books and records, NEXTEEL calculates the cost for non-prime products in the same manner as prime products. Consequently, NEXTEEL's reported costs reflect the full actual costs of producing its prime and non-prime products as required in *Husteel*. Therefore, for purposes of this remand and consistent with the CAFC's decision in *Dillinger*, we have reversed the adjustment made in the Final Results and rely on what the CAFC referred to as the actual costs of prime and non-prime products as reported by NEXTEEL.

Final Results of Redetermination Pursuant to Ct. Remand, 7-8 (July 18, 2022) (Case No. 1:20-cv-03898-CRK (ECF 96-1)) (footnotes omitted). The Court recently sustained Commerce's remand redetermination on this point. NEXTEEL Co. v. United States, Consol. No. 20-03898, slip op. 22-135 (CIT Dec. 6, 2022).

This is analogous to Dillinger's situation in this case. Dillinger does not separately track the actual costs of prime and non-prime products. Rather, Dillinger's normal books and records assign manufacturing costs based only on two broad groups of plate (*i.e.*, regular plate and line-pipe plate) without any distinction between prime and non-prime merchandise. *See* Section D Response, App. D-21 (July 15, 2016); P.R. 178, C.R. 110; Supplemental Section D Response, App. SD-11 (Aug. 17, 2016); P.R. 203, C.R. 170.

The fact that the inventory value later assigned to non-prime plate is based upon the estimated selling price cannot properly serve to distinguish *NEXTEEL* from this current case. As explained above, how an item is treated in a respondent's financial statements is not determinative. Rather, the costs of production used in Commerce's antidumping duty

13

calculations must reasonably reflect a respondent's actual costs regardless of how costs are reported in a respondent's books and records.  *See* 19 U.S.C. § 1677b(f)(1)(A).  This was the clear holding of the CAFC in *Dillinger III* where it stated that Commerce erred in relying on Dillinger's books and records because they "were based on 'likely selling price' rather than cost of production."  Dillinger III, 981 F.3d at 1324.  This was also Commerce's clear determination in *NEXTEEL* where it stated that Commerce's cost calculation "must reasonably reflect a respondent's actual cost, whether or not the respondent's books and records reflect such costs." Final Results of Redetermination Pursuant to Ct. Remand, 7 (July 18, 2022) (Case No. 1:20-cv-03898-CRK (ECF 96-1)).

As the CAFC has stressed, "[a]n agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently."  SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001).  Similarly, this Court has made clear that a "fundamental principle of law and justice is that like cases should be treated alike."  Anderson v. U.S. Sec'y of Agric., 30 CIT 1742, 1748, 462 F. Supp. 2d 1333, 1339 (2006).

### D.  Commerce Has Imposed an Impermissible Adverse Inference

By using the likely selling price of non-prime plate rather than the actual cost of production allocated to non-prime plate in Dillinger's verified cost calculation, Commerce has imposed an impermissible adverse inference.  Under the statute, Commerce may only impose an adverse inference when it "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with the request for information."  19 U.S.C. § 1677e(b).  All of the record evidence in this case shows that Dillinger put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in this investigation.  *See* Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  Dillinger responded in a prompt, careful and comprehensive manner to all of Commerce's requests for information.

14

For example, within 14 days of receiving the original questionnaire in the investigation back in 2016, Dillinger notified Commerce of its difficulties in reporting all of the physical characteristics for non-prime plate and suggested that it report sales of non-prime merchandise by indicating a zero ("0") for any items, such as specification, that cannot be identified.  *See* Notification of Difficulties in Responding to the Questionnaire, 1-2 (Jun. 8, 2016); P.R. 96.  In a conference call on June 17, 2016, Commerce informed Dillinger that, "if Dillinger required specific guidance or acceptance of its reporting methodology, we would need to consider additional information that we expected Dillinger to include in its questionnaire responses." Telecon with Dillinger Counsel on Questionnaire Reporting (June 20, 2016); P.R. 129.  Dillinger provided additional information concerning its reporting of non-prime material in its questionnaire responses, and this information was verified by Commerce.

Commerce noted no problems with Dillinger's reporting of the product characteristics for non-prime material or the actual costs for prime and non-prime material reported in Dillinger's verified variance calculation.  Rather, Commerce's only objection was that the reported COP should be based upon the sales value of non-prime material because prime and non-prime products could not be used in the same general applications and because Dillinger's normal books and records valued non-prime products at their likely selling price.  *See* Final Issues & Decision Memorandum, 60 (March 29, 2017); P.R. 445 (hereinafter "Final IDM").

Thus, Dillinger promptly informed Commerce of the limitations on its ability to report the product characteristics and cost of production for non-prime material at the very beginning of the investigation.  When, some five years later, Commerce issued Dillinger a supplemental questionnaire in relation to this Court's second remand, Dillinger timely and completely responded to this questionnaire.  In its questionnaire response, Dillinger demonstrated through

the submission of invoices, commercial orders, journal entries and inventory schedules that it

does not track the actual production costs of non-prime plate on a product-specific basis.

Remand Questionnaire Response, 6-10 and Apps. R-1, R-2, R-7 & R-8 (June 23, 2021); REM2

P.R. 16, REM2 C.R. 5.

Non-prime plate results from the normal production of making plate for a specific

customer order.  Accordingly, non-prime plate can come from any steel grade and customer

order.  Id. at 10.  At the end of production, the plate is examined for conformity with the

customer specifications.  Any plate that does not meet the agreed customer specifications (e.g.,

plates having defects such as surface cracks, nonconformity of weight or dimensions,

nonconformity of physical or mechanical properties, etc.) is classified as non-prime and placed

in stacks/piles at the mill.  Id. at 11-12.  Once non-prime plate is placed in this pile, it loses all

traceability to the original production order.  After a stack becomes sufficiently large, Dillinger's

sales staff will contact certain customers (e.g., distributors) known to purchase non-prime plate.

The entire stack is sold to the customer for one price per ton as "PLAQUES II CHOIX" ("plates

2nd choice") without any reference to steel grade or specification and without any

certification/warranty as to grade, type or chemistry.  Id.; Reply Brief, 22 (ECF 43).

In its final results of redetermination for the second remand, Commerce acknowledged

this record evidence, stating:.

> In particular, Dillinger has explained that its system does not record the physical
> characteristics of the non-prime products produced or the actual product-specific
> costs of producing the non-prime products.  Indeed, we acknowledge that
> Dillinger informed us of its inability to report the physical characteristics of non-
> prime products during the investigation.  Moreover, there is no evidence on the
> record to demonstrate that Dillinger does, in fact, track the physical characteristics
> of non-prime products produced or the actual product-specific costs of the non-
> prime products.

Final Results of Redetermination, 11 (Aug. 25, 2021) (footnotes omitted) (ECF 85) ("Final Results of Redetermination II").  Thus Commerce explicitly determined that there is "no evidence on the record" to demonstrate that Dillinger's system records the physical characteristics of the non-prime products produced or the actual product-specific costs of producing the non-prime products.

Rather, Dillinger's system tracks actual production costs only for broad product groups of regular plates and line-pipe plates, not individual products.  Remand Questionnaire Response, 7-8; REM2 P.R. 16, REM2 C.R. 5.  The actual costs for these product groups are also not differentiated between prime and non-prime merchandise.  Id.  The later inventory valuation of non-prime plate is not based upon actual costs of production but rather the estimated selling price of the non-prime plate.  Id. at 8.

Accordingly, Dillinger used the available information on the actual costs of production to allocate the total actual costs to non-prime plate.  Dillinger calculated the actual costs for the two groups of plate for which actual costs are tracked in its normal books and records (*i.e.*, regular plate and line-pipe plate).  *See* Section D Response, App. D-21 (July 15, 2016); P.R. 178, C.R. 110; Supplemental Section D Response, App. SD-11 (Aug. 17, 2016); P.R. 203, C.R. 170.  Because the actual costs for each of the two product groups do not differentiate between prime and non-prime merchandise, Dillinger then allocated a portion of the actual cost of each group to non-prime plate based upon the specific yield rate for each group.  Id.  For example, of the total quantity of regular plate produced during the period of investigation, [        ]% was non-prime plate.  Id.  Therefore, [        ]% of the actual costs for the regular plate group were allocated to non-prime plate.  The same was done for line-pipe plate, with [        ]% of the actual costs of that group being allocated to non-prime plate.  Id.  In total, [        ] Euros in actual costs

were allocated to non-prime plate based upon the actual yield rates for each of the plate groups. Id.

In its final results of redetermination for this third remand, Commerce attempts to retreat from its clear, unequivocal determination that there is "no evidence on the record" to demonstrate that Dillinger's system records the physical characteristics of the non-prime products produced or the actual product-specific costs of producing the non-prime products. However, the reasons given by Commerce in attempting to qualify its earlier unequivocal determination make no sense.  Commerce asserts that even though the information is not tracked in Dillinger's system, Dillinger could have "reviewed its records to ascertain the requested information."  See Final Results of Redetermination III, 14.  How can information be found in the records, if the information is not tracked?

Commerce also fails to identify any specific records where it believes actual product-specific costs of producing non-prime plate could be found.  Commerce claims that Dillinger "could have submitted the product-specific information it uses in its annual review of product-specific standards," citing to page 7 of Dillinger's cost verification report.  See id. at 14. However, page 7 of the cost verification report relates to product-specific standard costs and not to actual costs.  See Cost Verification Report, 7 (Jan. 12, 2016); P.R. 413, C.R. 678.  Page 7 of the cost verification report also confirms that actual production costs are calculated for only two groups of finished product codes and that production quantities are only tracked at a broad level for these products groups.  Id.  The product-specific standard costs are estimated based upon the standard costs for each process cost center through which a particular product passes using standard quantities, yield rates and throughput rates.  Id.  The product-specific standard costs system also does not capture product-specific production quantities.  Id.  Commerce is therefore

incorrect in claiming that the physical characteristics of non-prime products and their actual product-specific costs of production could have been ascertained from this information.

Similarly, Commerce's statement that "production records . . .would likely contain information on the physical characteristics of the products" is also without any factual support on the record.  *See* <u>Final Results of Redetermination III</u> 14.  The final results of redetermination cite only to page 10 of Dillinger's remand questionnaire response in support of this statement.  <u>Id</u>.  However, page 10 of Dillinger's remand questionnaire response makes no reference to any production records.  Thus, Commerce's claim that Dillinger has information "in its control" on the physical characteristics of non-prime products and their actual product-specific COPs is baseless and is not supported by any evidence on the administrative record.

Commerce's statement that Dillinger "chose not to review its records to supply Commerce with the requested information" is also not supported by any evidence on the administrative record.  Rather, the evidence demonstrates that Dillinger promptly and carefully reviewed its records, explaining to Commerce in detail the manner and type of information recorded in its system and provided Commerce with all of the information in its control.  Accordingly, Commerce's assertion that Dillinger "did not act to the best of its ability" is not supported by substantial evidence on the administrative record and must be rejected.

A neutral and reasonable application of facts available would apply the total cost of production for non-prime plate reported in Dillinger's verified cost calculation.  As explained above, this calculation allocates the actual cost of production based upon the specific yield rates for non-prime plate from each of the plate groups for which actual costs are tracked in Dillinger's books and records.  Because non-prime plate can only be distinguished from prime plate at the end of the production process, both types of plate use precisely the same materials

and undergo precisely the same processing steps. Therefore, it is reasonable to assume that their average costs of production will be the same. Commerce's assumption that the actual costs for non-prime plate are only half as high as those for prime plate based on the likely selling price of non-prime plate is simply unreasonable and is unsupported by any evidence on the administrative record.

As detailed above, all of the cost information on the administrative record shows an actual cost of production far higher than the [        ] Euros/ton likely selling price imposed by Commerce as the cost of production for non-prime plate. For example, the weighted-average total cost of manufacturing (TOTCOM) for all CONNUMs is [        ] Euros/ton and the total actual cost of production allocated to non-prime products under the cost calculation and actual yield rates is [      ] Euro/ton. In fact, there is no product sold during the POI that has a TOTCOM below [        ] Euros/ton.

By rejecting all of these other cost of production figures and applying an unreasonably low cost of production to non-prime plate based upon resale value, Commerce is applying an adverse inference that impermissibly shifts costs from non-prime plate to prime plate and thereby increases the dumping margin. Non-prime plate can come from any steel grade and customer order. Thus, there is no way that the actual cost of production for non-prime plate can be lower than the total cost of production for any of the CONNUMs produced during the POI.

The final results of redetermination are unclear as to whether Commerce is applying an adverse inference under 19 U.S.C. 1677e(b). Although, as discussed above, Commerce wrongly claims that Dillinger did not act to the best of its ability, Commerce nowhere makes reference to 19 U.S.C. 1677e(b). Moreover, while Commerce claims that Dillinger is mistaken that Commerce's reliance on Dillinger's books and records is "an impermissible adverse inference,"

it is not clear whether Commerce is arguing that its reliance on the books and records is a permissible adverse inference.  *See* <u>Final Results of Redetermination III</u>, 17-18.

In any event, the fact that Commerce is relying upon the estimated resale value recorded in Dillinger's books and records does not render Commerce's application of facts available non-adverse or permissible.  As detailed above, the inventory value of non-prime products, based as it is on resale value, bears no relationship with the actual costs of production.  By rejecting all of the cost of production figures on the administrative record and applying an unreasonably low cost of production to non-prime plate based upon resale value, Commerce is applying an adverse inference that impermissibly shifts costs from non-prime plate to prime plate and thereby increases the dumping margin.

As the Court stressed in *National Steel Corp.*, Commerce must be reasonable in its application of its chosen methodology, and Commerce's actions may become unreasonable in nature if it rejects low-margin information in favor of high-margin information that is demonstrably less probative.  <u>National Steel Corp. v. United States</u>, 18 C.I.T. 1126, 1132, 870 F. Supp. 1130, 1136 (1994) (citing <u>Rhone Poulenc, Inc. v. United States</u>, 899 F.2d 1185, 1190 (Fed. Cir. 1990)).

## II.     CONCLUSION

For the reasons stated above, Commerce's Final Results of Redetermination are not supported by substantial evidence on the administrative record or in accordance with the law. We therefore respectfully request that the Court remand this case back to Commerce with explicit directions to accept Dillinger's costs as reported and to stop shifting costs from non-prime to prime plate.

Respectfully submitted,

/s/ Marc E. Montalbine
Marc E. Montalbine*
Gregory S. Menegaz
Alexandra H. Salzman**
Merisa A. Horgan
**DEKIEFFER & HORGAN, PLLC**
1090 Vermont Ave., N.W.
Suite 410
Washington, DC 20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  montalbine@dhlaw.de
*Counsel to Plaintiff*

Date: December 16, 2022

_____

\* Admitted to Virginia Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).
\*\* Admitted to California Bar; practice supervised by attorneys of the firm who are active D.C. Bar members pursuant to D.C. Bar Rule 49(c)(8).

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word for Microsoft 365 MSO using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with the Chambers Procedures of this Court, the undersigned certifies that this brief complies with the word limitations set forth.  Specifically, excluding those exempted portions of the brief, as set forth in section 2(B)(1) of the Chambers Procedures, I hereby certify that this brief contains **6,619** words.  In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ *Marc E. Montalbine*

Marc E. Montalbine
**DEKIEFFER & HORGAN, PLLC**
1090 Vermont Ave., N.W.
Suite 410
Washington, DC 20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  montalbine@dhlaw.de
*Counsel to Plaintiff*

23

# Exhibit 1

Dillinger France S.A.
Total Cost of Manufacture by CONNUM

Source:

Dillinger Second Supplemental Section D Response Part II, App. SD-24 & COP data file
dfcop03.sas7bdat (Sept. 28, 2016) (Barcode: 3510229); P.R. 289, C.R. 338 & 342

PUBLIC VERSION

**Dillinger France S.A.**

**Total Cost of Manufacture by CONNUM**

| CONNUM | PRODQTY | QTYCNV | DIRMAT | DIRLAB | VOH | FOH | TOTCOM | GNA | INTEX |
|--------|---------|--------|--------|--------|-----|-----|--------|-----|-------|
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |

1

PUBLIC VERSION

| CONNUM | PRODQTY | QTYCNV | DIRMAT | DIRLAB | VOH | FOH | TOTCOM | GNA | INTEX |
|--------|---------|--------|--------|--------|-----|-----|--------|-----|-------|
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |

**PUBLIC VERSION**

| CONNUM | PRODQTY | QTYCNV | DIRMAT | DIRLAB | VOH | FOH | TOTCOM | GNA | INTEX |
|--------|---------|--------|--------|--------|-----|-----|--------|-----|-------|
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |

**PUBLIC VERSION**

| CONNUM | PRODQTY | QTYCNV | DIRMAT | DIRLAB | VOH | FOH | TOTCOM | GNA | INTEX |
|--------|---------|--------|--------|--------|-----|-----|--------|-----|-------|
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |

4

**PUBLIC VERSION**

| CONNUM | PRODQTY | QTYCNV | DIRMAT | DIRLAB | VOH | FOH | TOTCOM | GNA | INTEX |
|--------|---------|--------|--------|--------|-----|-----|--------|-----|-------|
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |

PUBLIC VERSION

| CONNUM | PRODQTY | QTYCNV | DIRMAT | DIRLAB | VOH | FOH | TOTCOM | GNA | INTEX |
|--------|---------|--------|--------|--------|-----|-----|--------|-----|-------|
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |

**PUBLIC VERSION**

| CONNUM | PRODQTY | QTYCNV | DIRMAT | DIRLAB | VOH | FOH | TOTCOM | GNA | INTEX |
|--------|---------|--------|--------|--------|-----|-----|--------|-----|-------|
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |