Slip Op. 23-114

## UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

**DILLINGER FRANCE S.A.,**

        **Plaintiff,**

    **v.**

**UNITED STATES,**

        **Defendant,**

   **and**

**NUCOR CORPORATION and SSAB ENTERPRISES LLC,**

        **Defendant-Intervenors.**

</td><td>

**Before: Judge Gary S. Katzmann
Court No. 17-00159**

*PUBLIC VERSION*

</td></tr>
</table>

## OPINION

[The court sustains Commerce's Third Remand Results.]

Dated: August 15, 2023

Marc E. Montalbine, DeKieffer & Horgan PLCC, of Washington, D.C., argued for Plaintiff Dillinger France S.A. With him on the briefs were Gregory S. Menegaz, Alexandra H. Salzman, Merisa A. Horgan, and Alexandra H. Salzman.

Kara M. Westercamp, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant United States. With her on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and Tara K. Hogan, Assistant Director. Of counsel on the brief was Ayat Mujais, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Stephanie M. Bell, Wiley Rein, LLP, of Washington, D.C., argued for Defendant-Intervenor Nucor Corporation. With her on the brief were Alan H. Price and Christopher B. Weld.

Roger B. Schagrin, Schagrin Associates, of Washington D.C., for Defendant-Intervenor SSAB Enterprises LLC.

Katzmann, Judge: The court returns to the less-than-fair-value ("LTFV") investigation of certain carbon and alloy steel cut-to-length plate from France to consider the U.S. Department of

Commerce ("Commerce")'s latest remand results.  See Certain Carbon and Alloy Steel Cut-to-Length Plate from Austria, Belgium, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, and Taiwan: Amended Final Affirmative Antidumping Determinations for France, the Federal Republic of Germany, the Republic of Korea and Taiwan, 82 Fed. Reg. 24096 (Dep't Com. May 25, 2017), P.R. 456 ("Am. Final Determination"); see also Final Results of Redetermination Pursuant to Court Remand (Dep't Com. Nov. 15, 2022), Nov. 16, 2022, ECF No. 120-1 ("Third Remand Results").  The sole issue is whether -- following the Federal Circuit's ruling in Dillinger France S.A. v. United States, 981 F.3d 1318 (Fed. Cir. 2020) ("Dillinger III") -- Commerce permissibly relied on Plaintiff Dillinger France S.A. ("Dillinger")'s normal books and records to supply missing cost information in calculating antidumping duties.

For the reasons outlined below, the court sustains Commerce's Third Remand Results.

## BACKGROUND

While the court presumes familiarity with Dillinger France S.A. v. United States, 42 CIT __, 350 F. Supp. 3d 1349 (2018) ("Dillinger I"), Dillinger France S.A. v. United States, 43 CIT __, 393 F. Supp. 3d 1225 (2019) ("Dillinger II"), Dillinger III, 981 F.3d 1318, and Dillinger France S.A. v. United States, 46 CIT __, 589 F. Supp. 3d 1252 (2022) ("Dillinger IV"), for ease of reference, the court sets out the relevant legal, factual, and procedural background below.

### I.    *Legal Background*

#### A.    *Normal Value*

When a foreign firm sells a product for less than fair value in the United States, such a product is deemed to be "dumped."  See Saha Thai Steel Pipe (Pub.) Co. v. United States, 635 F.3d 1335, 1338 (Fed. Cir. 2011).  Commerce identifies "dumping" by assessing whether an investigated product ("subject merchandise")'s export price -- as measured by U.S. sales price --

is lower than the product's normal value, which is typically measured by the price of the product in the home market.  See Maverick Tube Corp. v. Toscelik Profil, 861 F.3d 1269, 1271 (Fed. Cir. 2017); see also 19 U.S.C. § 1677b(a)(1)(B)(i).  Where Commerce identifies dumping,[1] the agency imposes antidumping duties on the foreign merchandise proportional to the amount by which normal value exceeds the export price.  See 19 U.S.C. § 1673; id. § 1677(35)(A).

To complete these assessments and calculations, Commerce must establish the normal value of the investigated foreign merchandise, which again, generally requires establishing the home market sales price.  In determining home market sales price, "Commerce may disregard sales made at less than the manufacturer's cost of production."  Saha Thai, 635 F.3d at 1338 (citing 19 U.S.C. § 1677b(b)(1)).  "Cost of production" is defined as

[A]n amount equal to the sum of—

> (A) the cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product, during a period which would ordinarily permit the production of that foreign like product in the ordinary course of business;

> (B) an amount for selling, general, and administrative expenses based on actual data pertaining to production and sales of the foreign like product by the exporter in question; and

> (C) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the foreign like product in condition packed ready for shipment.

19 U.S.C. § 1677b(b)(3).

"If no sales in the exporting country remain after disregarding sales below [cost of production], then Commerce will alternatively base [normal value] on the constructed value . . . of

---

[1] And where the United States International Trade Commission makes the additional requisite finding -- not at issue in the case at bar -- that the sale of such merchandise below fair value is materially injuring, threatening, or impeding the establishment of an industry in the United States. See Diamond Sawblades Mfrs. Coal. v. United States, 866 F.3d 1304, 1306 (Fed. Cir. 2017).

the merchandise." <u>Saha Thai</u>, 635 F.3d at 1338.  The Federal Circuit has explained that cost of production and constructed value "are closely related." <u>Id.</u>  Constructed value "includes the same or similar elements as [cost of production]" -- namely, "(1) the cost of manufacture; (2) 'selling, general, and administrative expenses;' and (3) packaging expenses" -- "but with the additional component of profit." <u>Id.</u> (quoting 19 U.S.C. § 1677b(b)(3), (e)).

"The statute further explains that such '[c]osts shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles [GAAP] of the exporting country . . . and reasonably reflect the costs associated with the production and sale of the merchandise.'" <u>Id.</u> at 1341–42 (alterations in original) (quoting 19 U.S.C. § 1677b(f)(1)(A)).  The Federal Circuit has interpreted "the legislative history of section 1677b(f) . . . [and] its plain meaning[] [to] indicate[] Congress intended that Commerce rely on a producer's or exporter's books and records if they . . . reasonably reflect the costs of production." <u>Dillinger III</u>, 981 F.3d at 1323.

### B.      *Facts Otherwise Available & Adverse Inferences*

If an interested party "withholds information" or otherwise does not comply with Commerce's requests, <u>see</u> 19 U.S.C. § 1677e(a)(2), or if "necessary information is not available on the record," <u>id.</u> § 1677e(a)(1), Commerce "shall . . . use facts otherwise available" to fill informational gaps and render determinations, <u>id.</u> § 1677e(a).  The Federal Circuit has interpreted this provision to mean that "[t]he mere failure of a respondent to furnish requested information -- for any reason -- requires Commerce to resort to other sources of information to complete the factual record on which it makes its determination." <u>Nippon Steel Corp. v. United States</u>, 337 F.3d 1373, 1381 (Fed. Cir. 2003) ("The focus of [1677e(a)(1)] is respondent's <u>failure to provide information</u>.  The reason for the failure is of no moment." (emphasis in original)).

Moreover, where Commerce makes a "valid decision to use facts otherwise available,"

Shandong Huarong Mach. Co. v. United States, 30 CIT 1269, 1301, 435 F. Supp. 2d 1261, 1289

(2006), Commerce may then make the additional decision to "use an inference that is adverse to

the interests of [a respondent] in selecting from among the facts otherwise available" provided that

Commerce supportably finds the respondent "has failed to cooperate by not acting to the best of

its ability," Nippon Steel, 337 F.3d at 1380–81 (alteration in original) (quoting 19 U.S.C.

§ 1677e(b)(1)).

## II.    *Factual Background*

On May 25, 2017, Commerce imposed an antidumping margin of 6.15 percent on

Dillinger's cut-to-length plate products.  See Certain Carbon and Alloy Steel Cut-to-Length Plate

from France: Final Determination of Sales at Less than Fair Value, 82 Fed. Reg. 16363 (Dep't

Com. Apr. 4, 2017), P.R. 451; Mem. from J. Maeder to G. Taverman, re: Issues and Decision

Memorandum for the Final Affirmative Antidumping Duty Determination and Determination of

Sales at Less Than Fair Value (Dep't Com. Mar. 29, 2017), P.R. 445 ("IDM"); see also Am. Final

Determination, 82 Fed. Reg. at 24098.  Dillinger sells plate designated as prime and non-prime,

with non-prime plate comprising plates that are rejected for failing to meet the standards for prime

plate.  See Dillinger III, 981 F.3d at 1321.  Such non-prime products are an inevitable consequence

of the production process of prime products.  Because non-prime plate are sold without

certification as to grade, type, or chemistry and cannot be used in applications that require such

certifications, non-prime plate attract a lower market value than prime plate.  See IDM at 58–60.

In its normal books and records, Dillinger values non-prime products at their likely selling

price -- which comes out to [[        ]] Euros/ton.  See IDM at 59; see also Mem. from R.B. Greger

to N.M. Harper, re: Cost of Production and Constructed Value Calculation Adjustments for the

Final Determination (Dep't Com. Mar. 29, 2017), P.R. 447, C.R. 701; Mem. from R.B. Greger to

N.M. Halper, re: Cost of Production and Constructed Value Calculation Adjustments for the

Preliminary Determination at attach. 2 (Dep't Com. Nov. 4, 2016), P.R. 366, C.R. 405.  However,

when responding to Commerce's questionnaires in the LTFV investigation, Dillinger reported its

costs of production for non-prime plate as the average cost of production for all prime plate sold

during the period of investigation ("POI") of [[          ]] Euros/ton -- a figure higher than the likely

selling price.  See IDM at 59; see also Dillinger Second Supplemental Section D Response Part II

at app. SD-24 (Sept. 28, 2016), P.R. 289, C.R. 338 & 342.

　　　　For its part, when calculating normal value, Commerce adjusted the reported costs for non-

prime products back to the value recorded in Dillinger's normal books and records -- i.e., the lower

estimated sales price of [[          ]] Euros/ton -- and then allocated the difference between the

reported and adjusted figure for non-prime products to the cost of production for prime products.

IDM at 59.

### III.　　Procedural Background

#### A.　　The Federal Circuit's Remand

　　　　Dillinger challenged several aspects of Commerce's determination before this court in

Dillinger I, including the agency's reliance on Dillinger's normal books and records to reallocate

production costs between prime and non-prime plate in calculating normal value.  See 350 F. Supp.

3d at 1374–77.  This court sustained Commerce's cost adjustments.  See id.  However, the Federal

Circuit disagreed, ruling in Dillinger III that Commerce's determination was erroneous because

Dillinger's normal books and records reflect the estimated selling price of non-prime plate rather

than costs of production, and thus failed to satisfy the requirement of § 1677b(f) that an exporter's

records "reasonably reflect the costs associated with the production and sale of the merchandise."

<u>See</u> 981 F.3d at 1321–24 (discussing 19 U.S.C. § 1677b(f)(1)(A)).[2]  Accordingly, the Federal

Circuit remanded to Commerce "to determine the actual costs of prime and non-prime products."

<u>Id.</u> at 1324.

## B.    *Reopening the Administrative Record*

To comply with the directive of the Federal Circuit "to determine the actual costs of prime

and non-prime products," <u>id.</u>, on remand, Commerce reopened the administrative record and sent

Dillinger a supplemental questionnaire requesting information on the physical characteristics and

corresponding actual product-specific -- also known as CONNUM[3]-specific -- production costs of

its non-prime plates.  <u>See</u> Letter from T.A. Slaughter to Dillinger, re: Remand Redetermination at

3–5 (Dep't Com. Mar. 17, 2021), P.R.R. 9.[4]  Dillinger responded to the agency that it was unable

to identify all of the physical characteristics of its non-prime products; as such, Dillinger

---

[2] As the Federal Circuit noted in <u>Dillinger III</u>:

> It is unclear . . . whether Commerce's calculation of normal value involved
> determining constructed value (determining the sum of "the cost of materials and
> fabrication or other processing of any kind employed in producing the
> merchandise" and other factors under 19 U.S.C. § 1677b(e)), or involved
> determining cost of production so as to exclude home market sales made below cost
> of production under § 1677b(b)(3).  In either event, § 1677b(f) applies . . . .

981 F.3d at 1321 n.1.  Recall that § 1677b(f)(1)(A) instructs:

> Costs shall normally be calculated based on the records of the exporter or producer
> of the merchandise, if such records are kept in accordance with the generally
> accepted accounting principles of the exporting country (or the producing country,
> where appropriate) and reasonably reflect the costs associated with the production
> and sale of the merchandise.

19 U.S.C. § 1677b(f)(1)(A).

[3] In LTFV investigations, products with identical physical characteristics are categorized by the
same control number, or "CONNUM."

[4] P.R.R. refers to the public Remand Redetermination record; C.R.R. refers to the confidential
Remand Redetermination record.

resubmitted production costs for its non-prime products derived from the average cost of producing all prime plate sold during the POI, namely the [[      ]] Euros/ton figure.  See Letter from Dillinger to G.M. Raimondo, re: Supplemental Questionnaire Response at 7–13 (June 23, 2021), P.R.R. 16, C.R.R. 5.

Commerce determined that Dillinger's response was insufficient to calculate actual costs of production -- as required by the Federal Circuit in Dillinger III -- and that it was, thus, necessary to invoke facts otherwise available under § 1677e(a)(1)[5] in rendering the remand results.  See Final Results of Redetermination Pursuant to Court Remand at 6–7 (Dep't Com. Aug. 24, 2021), Aug. 25, 2021, ECF No. 85-1 ("Second Remand Results").  Because Commerce determined that "not knowing the actual cost of producing the non-prime merchandise directly impacts the amount of costs assigned to the production of the prime products," the agency found that cost information for both non-prime and prime products was missing.  Id. at 6.  Commerce utilized Dillinger's normal books and records -- the data source to which the Federal Circuit had previously objected -- as facts otherwise available to fill the informational gap.  Id.  As a result, Commerce continued to assess a weighted-average dumping margin of 6.15 percent on Dillinger's subject merchandise in the Second Remand Results.  Id. at 22.

---

[5] Recall that 19 U.S.C. § 1677e(a)(1) instructs in relevant part:

(a) In general

If . . . necessary information is not available on the record . . . , the administering authority and the Commission shall, subject to section [1677m](d) of this title, use the facts otherwise available in reaching the applicable determination under this [sub]title.

19 U.S.C. § 1677e(a)(1).

### C.    This Court's Further Remand

Upon review of the <u>Second Remand Results</u> in <u>Dillinger IV</u>, this court first sustained Commerce's <u>general</u> invocation of facts otherwise available to supply the costs of production for both non-prime <u>and</u> prime products, but remanded for further explanation Commerce's <u>particular</u> selection of Dillinger's normal books and records as the facts otherwise available.

### 1.    General Reliance on Facts Otherwise Available

Concerning the former ruling, this court held that where Dillinger knows the <u>total</u> costs it incurred over the POI to produce all of its plate products, but does not know the actual division of these total costs <u>among</u> prime and non-prime products, substantial evidence justified Commerce's conclusion that it was necessary to rely on facts otherwise available to supply the costs of production for both non-prime <u>and</u> prime plate.  589 F. Supp. 3d at 1260.  The court noted that, as Plaintiff itself acknowledges, Dillinger tracks only actual <u>total</u> costs of producing two different types of plate -- line-pipe plate and regular plate -- which when added together equal the actual total costs of producing all plate over the period.  <u>Id.</u> at 1257.  However, prime <u>and</u> non-prime plate are produced within each of the line-pipe and regular groups, and Dillinger does not track the costs of prime versus non-prime products within these subgroups.  <u>Id.</u>

Dillinger, nevertheless, maintained before this court that there was no missing information with respect to the costs of prime plate, such that any adjustments Commerce made on the basis of facts otherwise available must be limited to non-prime plate and cannot alter the properly reported costs of prime plate.  <u>Id.</u> at 1256–57.  But as Plaintiff itself explained, in its submissions to Commerce, Dillinger allocated costs between prime and non-prime products based on a "percentage yield" approach.  <u>See id.</u> at 1258 n.6.  This means that where [[      ]] percent of the total quantity of regular plate produced during the POI was non-prime, Dillinger allocated

[[      ]] percent of the actual total costs of producing all regular plate to non-prime plate (and

the remainder to prime); and where [[      ]] percent of the total quantity of line-pipe plate

produced during the POI was non-prime, Dillinger allocated [[      ]] percent of the actual total

costs of producing all line-pipe plate to non-prime plate (and the remainder to prime). Id. at 1257.

At oral argument on Commerce's Second Remand Results, this court asked the parties to

consider the below Excel spreadsheet -- in which the court assumed for hypothetical purposes that

60 percent of the plate Dillinger produced during the POI was prime and 40 percent was non-prime

-- to inform the court's understanding that costs calculated for prime and non-prime plate under

Plaintiff's "percentage yield" approach could potentially differ from those calculated under an

"actual cost" approach:

| | Plate No. | Prime vs. Non-Prime | Cost | |
|---|---|---|---|---|
| | 1 | Prime | $2.00 | |
| | 2 | Prime | $4.00 | |
| | 3 | Prime | $6.00 | |
| | 4 | Prime | $8.00 | |
| | 5 | Prime | $10.00 | |
| | 6 | Prime | $12.00 | |
| | 7 | Non-Prime | $2.00 | |
| | 8 | Non-Prime | $4.00 | |
| | 9 | Non-Prime | $6.00 | |
| | 10 | Non-Prime | $8.00 | |
| | | | | |
| | | **Total Cost** | $62.00 | |
| | | | | |
| | | **Non-Prime Costs** | **Prime Costs** | **Total Cost** |
| **Percentage Yield Approach** (Assigning 60% of total costs ($62) to prime plate and assigning 40% of total costs ($62) to non-prime plate) | | $24.80 | $37.20 | $62.00 |
| **Actual Cost Approach** (Adding together actual costs of producing non-prime plate and adding together actual costs of producing prime plate) | | $20.00 | $42.00 | $62.00 |

Id. at 1258 n.6.  While it is undisputed that Dillinger does not track costs on the plate-specific basis

necessary to complete the "actual cost" approach,[6] the above hypothetical illuminates that not

knowing the actual cost of producing the non-prime merchandise directly impacts the amount of

costs allocated to the production of the prime products.  Relying on the Federal Circuit's instruction

that "[t]he focus of [§ 1677e(a)(1)] is [a] respondent's failure to provide information," such that

"[t]he mere failure of a respondent to furnish requested information -- for any reason -- requires

Commerce to resort to other sources of information to complete the factual record on which it

makes its determination," Nippon Steel, 337 F.3d at 1381 (emphasis in original), this court

sustained Commerce's general invocation of facts otherwise available to supply the costs of

production for both non-prime and prime products.  See 589 F. Supp. 3d at 1257.[7,8]

---

[6] Though, as this court noted, parties disagree as to whether Dillinger in fact could have supplied such plate-specific cost information.  See, e.g., id. at 1260 n.10 ("[I]f Dillinger had wanted to present evidence of the specific non-prime products produced, it could have relied on production reports or finished goods inventory excerpts to show which production runs resulted in the production of non-prime plates.  Dillinger chose not to do so." (quoting Second Remand Results at 19)); see also Third Remand Results at 13–14.

[7] While acknowledging "the doctrine of law of the case generally bars retrial of issues that were previously resolved," Pl.'s Resp. to Ct.'s Apr. 11, 2023 Qs. for Oral Arg at 6, Apr. 26, 2023, ECF No. 143 ("Pl.'s Oral Arg. Subm.") (citing Intergraph Corp. v. Intel Corp., 253 F.3d 695, 697 (Fed. Cir. 2001)), Dillinger continues to argue "[t]he informational gap to be filled in this current situation is [only] the actual costs of production of non-prime products," id.  As support, Dillinger maintains that the court's above hypothetical does not "accurately portray how . . . actual costs were allocated," id., and urges the court to rely on the following hypothetical (which uses generalized, non-proprietary figures from Dillinger's questionnaire submissions):

**Step 1:  Actual Production Costs**

| Product Group | Total Actual COP | |
|---|---|---|
| Regular Plate (all choices) | € 205,000,000 | **a** |
| Line-pipe Plate (all choices) | € 90,000,000 | **b** |
| Total | € 295,000,000 | **c** |

**Step 2:  Standard Production Costs & Variance**

| Product Group | Total Standard COP | |
|---|---|---|
| Regular Plate (all choices) | € 210,000,000 | **d** |
| Line-pipe Plate (all choices) | € 92,000,000 | **e** |
| Total | € 302,000,000 | **f** |

| Product Group | Variance | |
|---|---|---|
| Regular Plate (all choices) | 0.9762 | **g = a/d** |
| Line-pipe Plate (all choices) | 0.9783 | **h = b/e** |
| Total | 0.9768 | **i = c/f** |

**Step 3:  Allocate Actual Costs to prime & non-prime plate**

| | | |
|---|---|---|
| Regular Plate (non-prime yield rate) | 2.30% | **j** |
| Line-pipe Plate (non-prime yield rate) | 2.60% | **k** |

| Product Group | Prime | Non-prime | |
|---|---|---|---|
| Regular Plate | € 200,285,000 | € 4,715,000 | **a x j** |
| Line-pipe Plate | € 87,660,000 | € 2,340,000 | **b x k** |
| Total | € 287,945,000 | € 7,055,000 | **€ 295,000,000** |

**Step 4:  Allocate Actual Costs to individual products (CONNUMs)**

**Prime Plate**

| CONNUM | A<br>standard costs/ton | A x variance (i)<br>actual costs/ton |
|---|---|---|
| 785-1-1-1-4-1-4-1-40-2-2 | € 1,100.57 | € 1,075.04 |
| 765-1-1-1-2-3-1-3-1-40-2-2 | € 998.63 | € 975.46 |
| 760-1-1-1-2-3-1-4-1-40-2-2 | € 926.35 | € 904.86 |
| 480-1-1-1-2-1-4-1-40-2-2 | € 886.32 | € 865.76 |
| 480-1-2-1-1-2-1-3-1-40-2-2 | € 721.45 | € 704.71 |
| 765-1-1-1-2-3-5-4-1-40-2-1 | € 628.64 | € 614.06 |
| 772-1-1-1-2-2-1-6-1-40-2-2 | € 563.21 | € 550.14 |
| * * * | *** | *** |
| 765-1-1-1-2-4-5-5-1-40-2-2 | € 500.23 | € 488.62 |
| Total actual costs allocated to prime plate | | € 287,945,000 |

**Non-Prime Plate**

| CONNUM | Standard costs/ton | Actual costs/ton |
|---|---|---|
| 000-1-1-1-1-1-1-1-1-40-2-2 | | € 542.69 |
| 000-1-1-1-1-1-1-3-1-40-2-2 | | € 542.69 |
| 000-1-1-1-1-1-1-4-1-40-2-2 | | € 542.69 |
| 000-1-1-1-1-1-1-5-1-40-2-2 | | € 542.69 |
| 000-1-1-1-1-3-1-5-1-40-2-2 | | € 542.69 |
| Total actual costs allocated to non-prime plate | | € 7,055,000 |

| | | |
|---|---|---|
| Non-prime plate actual costs | € 7,055,000 | **m** |
| Non-prime plate quantity | 13,000 | **n** |
| Non-prime plate actual cost/ton | € 542.69 | **m/n** |

## 2.    *Particular Selection of Facts Otherwise Available*

The court next considered Commerce's use of the costs assigned in Dillinger's normal

books and records as the agency's <u>particular</u> selection of facts otherwise available to supply the

missing cost information for prime and non-prime products.  As a threshold matter, this court held

that the Federal Circuit's ruling in <u>Dillinger III</u> had "not strictly prohibit[ed] Commerce from

---

<u>Id.</u> at annex A.  The problem for Dillinger is that Step 3 of its hypothetical still employs a
"percentage yield" approach to derive "actual" total costs of prime and non-prime plate.  And from
there, Step 4 allocates those "actual" total costs of prime and non-prime plate -- as derived from
the "percentage yield" approach -- on a plate-specific basis.  Thus, Dillinger's alternative
hypothetical does not overcome the fundamental takeaway of the court's simplified hypothetical,
which is that: (1) costs calculated for prime and non-prime plate using a "percentage yield"
approach potentially differ from those calculated using an "actual cost" approach; and (2) not
knowing the actual cost of producing the <u>non</u>-prime merchandise directly impacts the amount of
costs assigned to the production of the <u>prime</u> products.

It may be -- as Dillinger suggests -- that it is "impossible to track the actual costs of an
individual plate." <u>Id.</u> at 1.  Nevertheless, the Federal Circuit has been clear that "[t]he focus of [19
U.S.C. § 1677e(a)(1)] is [a] respondent's <u>failure to provide information</u>.  The reason for the failure
is of no moment." <u>Nippon Steel</u>, 337 F.3d at 1381 (emphasis in original).  Thus, in light of the
foregoing, no "most cogent of reasons" compel this court to reconsider its prior ruling upholding
Commerce's <u>general</u> invocation of facts otherwise available to supply the costs of production for
both non-prime <u>and</u> prime products. <u>Intergraph Corp.</u>, 253 F.3d at 697 (quoting <u>Delong Equip.
Co. v. Washington Mills Electro Mins. Corp.</u>, 990 F.2d 1186, 1196 (11th Cir. 1993)).

[8] Furthermore, in its briefing contesting the <u>Third Remand Results</u>, Dillinger argues that
Commerce "arbitrar[ily] . . . treat[ed] similar situations differently" when it determined that a
respondent in another LTFV investigation, NEXTEEL, "reported costs reflect[ing] the full <u>actual
costs</u> of producing its prime and non-prime products."  Pl.'s Cmts. in Opp. to Third Remand
Results at 12–14, Dec. 16, 2022, ECF No. 123 ("Pl.'s Br.") (emphasis added) (discussing <u>Husteel
Co. v. United States</u>, 46 CIT __, 552 F. Supp. 3d 1405 (2022)).  First, such an argument seeks
retrial of an issue already resolved -- namely, whether Commerce here permissibly determined that
it lacked "actual costs" such that reliance on facts otherwise available was appropriate.  Second,
the court briefly notes that Dillinger has not even alleged that NEXTEEL derived the cost data that
it submitted to Commerce -- and that Commerce deemed reflective of "actual costs" -- via a
"percentage yield" approach, as Dillinger did.  Where this court has already established that
Dillinger's "percentage yield" approach gave rise to a cost-related informational gap, <u>supra</u>, and
where Dillinger has not shown that NEXTEEL likewise employed such a "percentage yield"
approach, here too, the court is not persuaded to reconsider its prior ruling sustaining Commerce's
<u>general</u> invocation of facts otherwise available to supply the costs of production for both non-
prime <u>and</u> prime products.

relying on Dillinger's normal books and records as facts otherwise available." Id. at 1261.  This

was so -- in this court's estimation -- because at issue before the Federal Circuit in Dillinger III

was only Commerce's reliance on Dillinger's normal books and records in calculating normal

value under 19 U.S.C. § 1677b; accordingly, the Federal Circuit had no reason or occasion to

consider what sources Commerce could or could not rely on as facts otherwise available under 19

U.S.C. § 1677e once the agency concluded that it did not have the information it needed to

determine the actual costs of prime and non-prime products.

Nevertheless, this court determined that it could not sustain reliance on Dillinger's normal

books and records as facts otherwise available where the agency's proffered explanation consisted

solely of a rejection of Dillinger's proposed dataset for a flaw that Commerce's selected dataset

likewise exhibited.  Dillinger IV, 589 F. Supp. 3d at 1262.  Specifically, Commerce concluded that

"it was not appropriate to rely on the overall average cost of producing all prime products as a

surrogate for the actual cost of producing the specific non-prime products produced," Second

Remand Results at 3–4 -- as advocated by Dillinger -- because doing so "assigns the same cost to

products with varying physical characteristics," id. at 7.  Yet, Commerce selected as facts

otherwise available "the non-prime cost information recorded in Dillinger's normal books and

records (i.e., the estimated sales prices)," while acknowledging that such data "does not vary by

CONNUM and does not reflect cost differences attributable to the physical characteristics," id. at

20.  Finding a foundational violation of administrative law principles -- namely, that "agency

action is arbitrary," and thereby contrary to law, "when the agency offers insufficient reasons for

treating similar situations differently" -- this court remanded to Commerce for an affirmative

explanation of its selected facts otherwise available to supply the missing cost information.

Dillinger IV, 589 F. Supp. 3d at 1262 (cleaned up) (quoting SKF USA Inc. v. United States, 263

F.3d 1369, 1382 (Fed. Cir. 2001)).  Accordingly, this court did not reach or resolve whether the

Federal Circuit's ruling in <u>Dillinger III</u> otherwise foreclosed use by Commerce of Dillinger's

normal books and records as facts otherwise available.

### D.     Commerce's *<u>Third Remand Results</u>*

Commerce issued the <u>Third Remand Results</u> -- the focus of this court's instant review --

on November 16, 2022.  In said results, Commerce continues to rely on Dillinger's normal books

and records as facts otherwise available to supply the missing cost information for prime and non-

prime plate, but now provides a two-fold justification for such reliance:

> Commerce first submits that
>
> [r]elying on Dillinger's normal books and records, as facts available, to value both
> the prime and non-prime merchandise is the only reasonable approach because it
> recognizes that, where Dillinger cannot produce 98 perfect plates without
> producing two imperfect plates, the lost value of the two imperfect plates is actually
> a cost of producing the 98 perfect ones and should be accounted for as such.

<u>Third Remand Results</u> at 6.  Second, Commerce explains that Dillinger's objections to reliance on

the normal books and records as facts otherwise available hinge on unsubstantiated assumptions;

namely that "the likely selling price [of non-prime plate] must be lower than the cost of producing

the product" and that Dillinger's "costs of producing non-prime products cannot be lower than its

cost[s] of producing its prime products."  <u>Third Remand Results</u> at 13.  Commerce maintains that

"[a]bsent the physical characteristics and actual [cost of production] information for the non-prime

products produced, which are solely in the possession of Dillinger, none of the above assumptions

are supported by record information."  <u>Id.</u>  In light of the foregoing, Commerce continues in the

<u>Third Remand Results</u> to rely on Dillinger's normal books and records as facts otherwise available

and to assign Dillinger a weighted-average dumping margin of 6.15 percent.  <u>Id.</u> at 2–3.

On December 16, 2022, Dillinger filed with this court comments in opposition to Commerce's Third Remand Results, see Pl.'s Br., to which Defendant the United States ("the Government") and Defendant-Intervenor Nucor Corporation ("Nucor") responded on January 17, 2023, see Def.'s Resp. to Cmts. in Opp. to Third Remand Results, Jan. 17, 2023, ECF No. 124 ("Def.'s Br."); Def.-Inter.'s Resp. to Cmts. in Opp. to Third Remand Results, Jan. 17, 2023, ECF No. 125 ("Def.-Inter.'s Br.").  The court ordered oral argument on the Third Remand Results, see Order Scheduling Oral Arg., Apr. 25, 2023, ECF No. 139, and issued questions to the parties for answers in writing, see Ct.'s Qs. for Oral Arg., Apr. 11, 2023, ECF No. 133; see also Pl.'s Oral Arg. Subm.; Def.'s Resp. to Ct.'s Apr. 11, 2023 Qs., Apr. 26, 2023, ECF No. 141 ("Def.'s Oral Arg. Subm."); Def.-Inter.'s Resp. to Ct.'s Apr. 11, 2023 Qs., Apr. 26, 2022, ECF No. 145 ("Def.-Inter.'s Oral Arg. Subm.").   Upon examination of the parties' submissions, the court issued supplemental questions for further written response.  See Ct.'s Supp. Qs. for Oral Arg., May 1, 2023, ECF No. 146; see also Pl.'s Resp. to Ct.'s May 1, 2023 Suppl. Qs., May 8, 2023, ECF No. 150 ("Pl.'s Suppl. Qs. Resp."); Def.'s Resp. to Ct.'s May 1, 2023 Suppl. Qs., May 8, 2023, ECF No. 147 ("Def.'s Suppl. Qs. Resp."); Def.-Inter.'s Resp. to Ct.'s May 1, 2023 Suppl. Qs., May 8, 2023, ECF No. 148 ("Def.- Inter.'s Suppl. Qs. Resp.").

Oral argument was held on May 10, 2023.  See ECF No. 151.  Following oral argument, the parties submitted post-oral argument briefing to the court.  See Pl.'s Post-Arg. Subm., May 19, 2023, ECF No. 155 ("Pl.'s Suppl. Br."); Def.'s Post-Arg. Subm., May 19, 2023, ECF No. 153; Def.-Inter.'s Post-Arg. Subm., May 19, 2023, ECF No. 154.  With these cumulative submissions in hand, the case is now decision ready.

## JURISDICTION AND STANDARD OF REVIEW

Dillinger brings this action under 19 U.S.C. § 1516a(a)(2)(A)(i)(I) and (a)(2)(B)(iii), and the court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  The court "will uphold [Commerce's] redetermination pursuant to . . . remand unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'"  Consolidated Bearings Co. v. United States, 28 CIT 106, 106, 346 F. Supp. 2d 1343, 1344 (2004), aff'd 412 F.3d 1266, 1267 (Fed. Cir. 2005).

A determination by Commerce is "supported by substantial evidence" if, after accounting for detracting evidence, Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951), "more than a mere scintilla" underpins the agency's decision such that "a reasonable mind might accept [it] as adequate to support [the agency's] conclusion," Elbit Sys. of Am., LLC v. Thales Visionix, Inc., 881 F.3d 1354, 1355 (Fed. Cir. 2018) (quoting In re Nuvasive, Inc., 842 F.3d 1376, 1379 (Fed. Cir. 2016)).  Commerce's determination "accords with law" if it abides by all relevant statutes, regulations, and judicial precedent and "the agency's decisional path is reasonably discernable." Wheatland Tube Co. v. United States, 161 F.3d 1365, 1369–70 (Fed. Cir. 1998) (citing Ceramica Regiomontana, S.A. v. United States, 810 F.2d 1137, 1139 (Fed. Cir. 1987)).

## DISCUSSION

The Government and Defendant-Intervenor Nucor once again ask this court to sustain Commerce's remand results.  See Def.'s Br. at 12; Def.-Inter.'s Br. at 9.  By contrast, Dillinger argues that Commerce's remand results contravene the Federal Circuit's ruling in Dillinger III, such that this court should "remand th[e] case back to Commerce with explicit directions to accept Dillinger's costs as reported and to stop shifting costs from nonprime to prime plate," Pl.'s Br. at 22; in the alternative, Plaintiff argues that Commerce's reliance on Dillinger's normal books and records as facts otherwise available imposes an impermissible adverse inference, id. at 14–21.

This court will uphold Commerce's selection of facts otherwise available so long as it is supported by substantial evidence and otherwise in accordance with law.  Ningbo Dafa Chem. Fiber Co. v. United States, 580 F.3d 1247, 1258 n.5 (Fed. Cir. 2009); see also Pl.'s Oral Arg. Subm. at 4; Def.'s Oral Arg. Subm. at 3; Def.-Inter.'s Oral Arg. Subm. at 2–3.  Concluding that Commerce's selection satisfies both requirements, the court sustains Commerce's Third Remand Results.

> **I.      Commerce's Selection of Facts Otherwise Available Does Not Contravene _Dillinger III_ and Otherwise Accords with Law.**

In Dillinger IV, this court held that -- strictly speaking -- the Federal Circuit's ruling in Dillinger III did not prohibit Commerce from relying on Dillinger's normal books and records as facts otherwise available to supply missing cost information for Dillinger's prime and non-prime plate.[9]  However, since -- in accordance with this court's most recent remand -- Commerce has now affirmatively explained its reliance on Dillinger's normal books and records as facts otherwise available to supply the missing cost information, this court must proceed to consider in the first instance whether -- practically speaking -- the Federal Circuit's holding in Dillinger III precludes such reliance by necessary implication.  The court concludes that it does not after review of the relevant statutory language, legislative history, and caselaw.  As such, Commerce's reliance on Dillinger's normal books and records as facts otherwise available accords with law.

> **A.      The Plain Text of the Statute Does Not Constrain Commerce's Selection of Facts Otherwise Available as Plaintiff Suggests.**

Dillinger argues that because the "cost of production" is the "the informational gap that is being filled," section 1677b(b)(3) of 19 U.S.C. -- which lays out the requirements of "cost of production" -- constrains what may be used as facts otherwise available under 19 U.S.C.

---

[9] Supra pp. 13–14.

§ 1677e(a)(1), see Pl.'s Oral Arg. Subm. at 8; where the Federal Circuit held that Dillinger's

normal books and records -- which value non-prime plate at their "likely selling price" -- do not

correspond to the "costs of producing . . . the merchandise" under § 1677b,[10] Plaintiff maintains

the necessary implication is that such normal books and records cannot be used as facts otherwise

available to supply such missing cost information under § 1677e(a)(1).  Pl.'s Oral Arg. Subm. at

7.  By contrast, the Government and Nucor submit that 19 U.S.C. § 1677e(a) is an independent

statutory provision and that § 1677b(b)(3) does not constrain what Commerce may use as facts

otherwise available under § 1677e(a)(1).   Def.'s Oral Arg. Subm. at 4; Def.-Inter.'s Oral Arg.

Subm. at 5.  The court agrees with the Government and Nucor that the plain language of the statute

does not constrain Commerce's selection as Plaintiff so suggests.

> As noted, the statutory text on facts otherwise available reads in relevant part:

> > If —

> > > (1) necessary information is not available on the record . . .

> > the administering authority and the Commission shall, subject to section
> > 1677m(d)[11] of this title, use the facts otherwise available in reaching the
> > applicable determination under this subtitle.

19 U.S.C. § 1677e(a)(1) (footnote not in original).  The statute does not define the phrase "the facts

otherwise available."  Nor does the plain language of § 1677e(a)(1) appear to prescribe or constrain

the sources that Commerce may rely upon in applying "the facts otherwise available" at all, let

alone impute the requirements of § 1677b(b)(3) as a constraint.

---

[10] Supra note 2.

[11] No party has identified as relevant to the resolution of this issue 19 U.S.C. § 1677m(d), which
outlines Commerce's obligation to afford parties an opportunity to remedy deficient submissions.

Nor does 19 U.S.C. § 1677b(b)(3) expressly limit what Commerce may rely upon as facts

otherwise available under § 1677e(a)(1).  Section 1677b(b)(3) reads:

(3) Calculation of cost of production

For purposes of this part, the cost of production shall be an amount equal to the sum
of—

> (A) the cost of materials and of fabrication or other processing of any kind
> employed in producing the foreign like product, during a period which
> would ordinarily permit the production of that foreign like product in the
> ordinary course of business;

> (B) an amount for selling, general, and administrative expenses based on
> actual data pertaining to production and sales of the foreign like product by
> the exporter in question; and

> (C) the cost of all containers and coverings of whatever nature, and all other
> expenses incidental to placing the foreign like product in condition packed
> ready for shipment.

For purposes of subparagraph (A), if the normal value is based on the price of the
foreign like product sold for consumption in a country other than the exporting
country, the cost of materials shall be determined without regard to any internal tax
in the exporting country imposed on such materials or their disposition which are
remitted or refunded upon exportation.

19 U.S.C. § 1677b(b)(3).  The court notes that § 1677b(b)(3) says "[f]or purposes of this part, the

cost of production shall be . . .," 19 U.S.C. § 1677b(b)(3) (emphasis added), and that both § 1677b

and § 1677e fall within Part IV of Subtitle IV of Title 19 of the United States Code.  Because the

"Definition; special rules" section of 19 U.S.C § 1677(1)–(36) does not otherwise define "cost of

production," the court assesses that § 1677b(b)(3) supplies the definition of "cost of production"

for every occurrence of that term throughout Part IV.  But as established above, § 1677e(a)(1) does

not contain the phrase "cost of production" or otherwise cite § 1677b.

That said, § 1677b(b)(3)'s definition is still relevant to § 1677e(a)(1), as by the statute's

plain terms, Commerce can invoke facts otherwise available only when "necessary information is

not available on the record;" and the definitional requirements of § 1677b(b)(3) establish what is

"necessary information" with regards to "cost of production."  Accordingly, this court discerns

that § 1677b(b)(3) supplies the criteria by which to assess if there is an <u>informational gap</u> with

regards to "cost of production."  However, where § 1677b(b)(3) does not mention or otherwise

cross-reference § 1677e(a), the court finds no textual support for Plaintiff's position that

§ 1677b(b)(3) limits what sources Commerce may rely upon as facts otherwise available once the

agency determines that it does not have the information necessary to satisfy the definitional

requirements of "cost of production."

Discerning no such limits in the statutory text, the court next considers the relevant

legislative history.

### B.        *The Legislative History is Inconclusive.*

The Statement of Administrative Action ("SAA") is the legislative history of the Uruguay

Round Agreements Act ("URAA"), Pub.L. No. 103–465, 108 Stat. 4809 (1994), which codified

amendments to § 1677e(a).  <u>See</u> Statement of Administrative Action, H.R.Rep. No. 103–316, at

869 (1994), <u>reprinted in</u> 1994 U.S.C.C.A.N. 1440, at 4198–99; <u>see also</u> <u>Ningbo Dafa</u>, 580 F.3d at

1255.[12]  Regarding "determinations on the basis of the facts available," specifically, the SAA states

in relevant part:

> New section 776(a) requires Commerce and the Commission to make
> determinations on the basis of the facts available where requested information is
> missing from the record or cannot be used because, for example, it has not been
> provided, it was provided late, or Commerce could not verify the information.
> Section 776(a) makes it possible for Commerce and the Commission to make their
> determinations within the applicable deadlines if relevant information is missing
> from the record.  In such cases, Commerce and the Commission must make their
> determinations based on all evidence of record, weighing the record evidence to
> determine that which is most probative of the issue under consideration.

---

[12] By statute, the SAA is "an authoritative expression . . . concerning the interpretation and
application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a
question arises concerning such interpretation or application."  19 U.S.C. § 3512(d).

. . .

> [N]either Commerce nor the Commission must prove that the facts available are
> the best alternative information.  Rather, the facts available are information or
> inferences which are reasonable to use under the circumstances.  As noted above,
> the Commission balances all record evidence and draws reasonable inferences in
> reaching its determinations.  It is not possible for the Commission to demonstrate
> that its inferences are the same as those it would have made if it had perfect
> information.  Similarly, where Commerce uses the facts available to fill gaps in the
> record, proving that the facts selected are the best alternative facts would require
> that the facts available be compared with the missing information, which obviously
> cannot be done.

1994 U.S.C.C.A.N. at 4198–99.

In an exemplification of "Judge Leventhal's memorable phrase" that "investigation of
legislative history" can become "an exercise in 'looking over a crowd and picking out your
friends,'" Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 568 (2005) (quoting Patricia
M. Wald, Some Observations on the Use of Legislative History in the 1981 Supreme Court Term,
68 Iowa L. Rev. 195, 214 (1983)), Plaintiff and Defendants both claim the SAA as decisive support
for their respective conceptions of the interplay between § 1677e(a)(1) and § 1677b(b)(3).

For example, Dillinger latches onto the statement that "Commerce and the Commission
must make their determinations based on . . . that which is most probative of the issue under
consideration," 1994 U.S.C.C.A.N. at 4198 (emphasis added), to suggest that, in accordance with
§ 1677b(b)(3)'s definition, "the selection of facts available for the actual costs of non-prime
products must correspond, as closely as possible, to the cost of materials and of fabrication or other
processing employed in producing the non-prime products," Pl.'s Br. at 1–2 (emphasis added);
Pl.'s Oral Arg. Subm. at 6.  By contrast, the Government and Nucor invoke the SAA's statements
that facts otherwise available must be "reasonable to use under the circumstances" and need not
be "the best alternative information," 1994 U.S.C.C.A.N. at 4198, as support for their position that
the relied upon dataset must only be "a reasonable approximation of Dillinger's costs," Def.-

Inter.'s Oral Arg. Subm. at 8; Def.'s Oral Arg. Subm. at 3 (substantively similar), without "correspond[ing] to the cost of materials or other processing employed in producing non-prime products" under § 1677b(b)(3), Def.'s Br. at 9.

While parties contest whether the facts otherwise available must be the "most probative" or "best" information, see 1994 U.S.C.C.A.N. at 4198 (requiring Commerce to rely on the "most probative" information, while acknowledging that "[i]t is not possible" to "prov[e] that the facts selected are the best alternative facts"), everyone agrees that there must be at least some kind of correlation between the "issue under consideration" -- i.e., the gap to be filled -- and the selected record evidence, see id. (directing Commerce to use that which is "probative of the issue under consideration").  Because "[l]egislative history . . . is meant to clear up ambiguity, not create it," Milner v. Dep't of Navy, 562 U.S. 562, 574 (2011), and because the plain text of § 1677e(a)(1) contains no express indications that "the facts otherwise available" must be the "best" alternative information to "reach[] the applicable determination," see 19 U.S.C. § 1677e(a)(1), the court accepts only the baseline point of agreement that the selected facts otherwise available must relate in some way to the issue under consideration:  Here, the gap to be filled is the cost of production information for prime and non-prime plate; thus, Commerce's selected facts otherwise available must somehow correlate to Dillinger's costs.[13]

But what exactly is required to establish such a correlation remains "murky, ambiguous, and contradictory."  Exxon Mobil Corp., 545 U.S. at 568.  Specifically, the SAA does not address -- let alone resolve -- whether this court should impute the requirements of the statutory provision

---

[13] Such a conclusion aligns with the Federal Circuit's prior treatment of the SAA.  See, e.g., Ningbo Dafa, 580 F.3d at 1252 ("When § 1677e(a) applies, Commerce may use as 'facts available' any 'information or inferences which are reasonable to use under the circumstances' to make the applicable determination or substitute for the missing information." (emphasis added) (quoting 1994 U.S.C.C.A.N. at 4198)).

underlying the informational gap as the standard by which to assess the "reasonableness" of the agency's selection of facts otherwise available.  See 1994 U.S.C.C.A.N. at 4198 (instructing the selected facts otherwise available must be "reasonable to use under the circumstances").  This court looks to related Federal Circuit caselaw to discern that it should not.

### C.    *Federal Circuit Caselaw Supports that § 1677b(b)(3) Does Not Constrain Commerce's Selection of Facts Otherwise Available Under § 1677e(a)(1).*

Although the Federal Circuit has not spoken on the precise issue of the case at bar, this court distills and applies principles from related decisions to conclude that the requirements of § 1677b(b)(3) do not constrain Commerce's selection of facts otherwise available under § 1677e(a)(1).

The court first considers the Federal Circuit's opinion in Nan Ya Plastics Corp. v. United States, 810 F.3d 1333, 1346 (Fed. Cir. 2016).  There, the Federal Circuit considered whether Commerce's selection of certain record evidence as adverse facts available under 19 U.S.C. § 1677e(b) was impermissible because it, inter alia, "relie[d] upon incomplete criteria in light of other statutory and regulatory criteria."  Nan Ya, 810 F.3d at 1346.  The Federal Circuit first laid out the statutory text at issue,[14] which read:

> If [Commerce] . . . finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from [Commerce] . . . , [Commerce] . . . , in reaching the applicable determination under this subtitle, may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available.  Such adverse inference may include reliance on information derived from—
>
>> (1) the petition,
>
>> (2) a final determination in the investigation under this subtitle,

---

[14] The Federal Circuit noted that "[d]uring the pendency of the appeal, Congress amended . . . [the] provisions at issue."  Nan Ya, 810 F.3d at 1337 n.2.  Although the Federal Circuit's decision considered the pre-amended text of 19 U.S.C. § 1677e(b), the specific textual changes are not relevant here.

(3) any previous review under section 1675 of this title or determination under section 1675b of this title, or

(4) any other information placed on the record.

Id. at 1347 (quoting 19 U.S.C. § 1677e(b) (2006), amended by Trade Preferences Extension Act of 2015, Pub. L. No. 114–27, 129 Stat. 362).  In light of this text, the Federal Circuit concluded "[t]he statute simply does not require Commerce to select facts that . . . align with standards articulated in other statutes and regulations."  Id.; see also Deacero S.A.P.I. de C.V. v. United States, 996 F.3d 1283, 1301 (Fed. Cir. 2021) (quoting Nan Ya, 810 F.3d at 1347); Papierfabrik August Koehler SE v. United States, 843 F.3d 1373, 1381 (Fed. Cir. 2016) (quoting Nan Ya, 810 F.3d at 1347).  Thus, where § 1677e(b) did not "contain[] any of the requirements [Nan Ya] allege[d]," the Federal Circuit declined to "impose conditions not present in or suggested by the statute's text."  810 F.3d at 1347.

This court acknowledges that Nan Ya dealt with adverse facts available -- whereas the case at bar deals only with facts otherwise available or "neutral facts available" -- and that "Commerce has greater latitude in determining dumping margins when dealing with [adverse facts available]." Albemarle Corp. & Subsidiaries v. United States, 821 F.3d 1345, 1357 n.12 (Fed. Cir. 2016). However, because the Federal Circuit's decision in Nan Ya turned on foundational tenets of statutory interpretation -- i.e., parsing the statute's plain text -- and not on the particular characteristics of adverse facts available, this court deems transferrable the Federal Circuit's core interpretive conclusion: namely that, where -- as with 19 U.S.C. § 1677e(a)(1) -- the plain text does not "require Commerce to select facts that . . . align with [any] standards articulated in other statutes and regulations," Nan Ya, 810 F.3d at 1347, the court cannot agree with Dillinger that Commerce's selection of replacement cost information is constrained by the definitional "cost of

production" requirements under § 1677b(b)(3).

On first glance, such a conclusion might seem difficult to reconcile with the Federal Circuit's further opinion in Ningbo Dafa, 580 F.3d at 1254–58. There, the Federal Circuit addressed whether 19 U.S.C. § 1677b(c)(1) -- which lays out procedures for calculating normal value in non-market economy cases -- precludes Commerce from invoking facts otherwise available under § 1677e(a) to supply information on "factors of production" missing from the record. Id.

Section 19 U.S.C. § 1677b(c)(1) instructs:

> (c) Nonmarket economy countries
>
> > (1) In general
> >
> > If—
> >
> > > (A) the subject merchandise is exported from a nonmarket economy country, and
> > >
> > > (B) the administering authority finds that available information does not permit the normal value of the subject merchandise to be determined under subsection (a),
> >
> > the administering authority shall determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses. Except as provided in paragraph (2), the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority.

19 U.S.C. § 1677b(c)(1) (emphasis added).[15] Pursuant to Commerce's "longstanding policy that market economy prices are the 'best available information' [to value factors of production] under

---

[15] Commerce in Ningbo Dafa did not purport to rely on the exception in paragraph (2).

19 U.S.C. § 1677b(c)(1)," Commerce requested that Ningbo Dafa Chemical Fiber Company ("Ningbo") -- a Chinese manufacturer -- provide invoices for its market economy purchases of a certain input used to produce the subject merchandise under investigation for dumping.  Ningbo Dafa, 580 F.3d at 1251, 1257.  Where Ningbo supplied Commerce with invoices from its qualified market economy purchases, but not in the "form and manner requested" by Commerce, the agency invoked facts otherwise available under 19 U.S.C. § 1677e(a)(2)(B)[16] to supply the missing input values.  In litigation before this court and the Federal Circuit, Ningbo argued that § 1677b(c)(1)'s "best available information" standard barred Commerce from invoking facts otherwise available to value factors of production.  Ningbo Dafa, 580 F.3d at 1254.

In rejecting Ningbo's position, the Federal Circuit delineated "the proper interpretation and interaction of 19 U.S.C. § 1677b(c)(1) and § 1677e(a)."  Id.  The court noted that "[b]oth § 1677b and § 1677e are found in Subtitle IV of Title 19 of the United States Code" and that

---

[16] 19 U.S.C. § 1677e(a)(2) instructs, in relevant part:

(a) In general

If—
. . .
   (2) an interested party or any other person—

      . . .

      (B) fails to provide [information that has been requested by the administering authority] by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677m of this title,
      . . .
the administering authority and the Commission shall, subject to section 1677m(d) of this title, use the facts otherwise available in reaching the applicable determination under this subtitle.

19 U.S.C. § 1677e(a)(2) (emphasis added).

> Section 1677e(a) specifically provides: "If . . . (1) necessary information is not available on the record, or (2) an interested party or any other person . . . fails to provide such information . . . in the form and manner requested," Commerce "shall . . . use the facts otherwise available in reaching the applicable determination <u>under this subtitle</u>."

Id. (alterations and emphasis in original) (quoting 19 U.S.C. § 1677e(a)). Accordingly, where Commerce "shall . . . use the facts otherwise available in reaching the applicable determination under this subtitle," and where § 1677b falls within "this subtitle," the Federal Circuit concluded that Commerce is not barred from relying on facts otherwise available under § 1677e(a) to value factors of production under § 1677b(c)(1). Id. Furthermore, the court noted that § 1677b(c)(1) "provides that in NME investigations, Commerce 'shall' use the 'best available information regarding the values of such factors [of production].'" Id. (alteration in original). Thus, bringing the pieces together, the Federal Circuit held that "under § 1677e(a), where necessary information is unavailable on the record or a party fails to provide requested information, Commerce 'shall' use the 'facts otherwise available' to fill information gaps when determining the value of the factors of production under § 1677b(c)(1) <u>using the 'best available information</u>.'" Id. (emphasis added).

This court notes that it might be tempting to infer from <u>Ningbo Dafa</u> that the standards and/or requirements of the statutory provision underlying the informational gap to be filled govern the selection of facts otherwise available; there the Federal Circuit imputed "the 'best available information' mandate" of § 1677b(c)(1) into Commerce's application of facts otherwise available under § 1677e(a) to value factors of production. Id. at 1258 (quoting § 1677b(c)(1)). However, to divine any such overarching, "per se" rule would not only overread the Federal Circuit's holding

in <u>Ningbo Dafa</u>,[17] but also would ignore unique aspects of the "interaction of 19 U.S.C.

§ 1677b(c)(1) and § 1677(e)(a)."  <u>Id.</u> at 1254.

Specifically, recall that § 1677b(c)(1) states "<u>[e]xcept as provided in paragraph (2)</u>, the

valuation of the factors of production shall be based on the best available information."  19 U.S.C.

§ 1677b(c)(1) (emphasis added).  This particular language -- "except as provided in paragraph (2)"

-- expressly establishes the <u>only circumstances</u> in which the factors of production need not be

based on the "best available information.  Because paragraph (2) does not mention or otherwise

implicate the facts otherwise available provision of § 1677(e)(a), Commerce is required -- by

§ 1677b(c)(1)'s plain terms -- to adhere to the "'best available information' mandate" in applying

facts otherwise available under § 1677e(a) to value factors of production.  <u>See</u> <u>Conn. Nat.'l Bank

v. Germain</u>, 503 U.S. 249, 253–54 (1992) ("[C]ourts must presume that a legislature says in a

statute what it means and means in a statute what it says there.").   By contrast, 19 U.S.C.

§ 1677b(b)(3) -- the provision at issue in the case at bar -- contains no equivalent limiting language.

<u>Supra</u> pp. 18–21 (establishing that § 1677b(b)(3) provides the definition of "cost of production" in

the ordinary course, but does not expressly cabin Commerce's discretion in selecting facts

otherwise available to supply missing cost of production information).

The Federal Circuit's pronouncement in <u>Ningbo Dafa</u> that Commerce must adhere to the

"best available information" mandate of § 1677b(c)(1) in filling "factor of production"–related

gaps via facts otherwise available, 580 F.3d at 1254, exists comfortably alongside the appeals

court's further pronouncement in <u>Nan Ya</u> that Commerce is "simply . . . not require[d] . . . to select

---

[17] After all, the Federal Circuit in <u>Ningbo Dafa</u> undertook only to resolve whether § 1677b(c)(1)'s
"best available information" standard <u>barred</u> Commerce from invoking facts otherwise available
under § 1677e(a) when valuing factors of production, and not to delineate any "per se" standards
or methodologies for applying facts otherwise available.

facts . . . that align with standards articulated in other statutes and regulations," 810 F.3d at 1347. This is so,[18] because the Federal Circuit in <u>Nan Ya</u> parsed only the relevant plain text of 19 U.S.C. § 1677e, and not that of the "other statutory and regulatory criteria" that Nan Ya claimed Commerce's selection of adverse facts available failed to meet. 810 F.3d at 1346. Thus, it is entirely consistent to hold that the plain language of § 1677e(a)–(b) -- without more -- "does not require Commerce to select facts that . . . align with standards articulated in other statutes and regulations," <u>id.</u> at 1347, while holding open the possibility that -- where explicit -- the standards and requirements articulated in other statutes and regulations can override or cabin Commerce's discretion under § 1677e(a)–(b).[19]

    Thus, applying the principles distilled from the Federal Circuit's decisions in <u>Nan Ya</u> and <u>Ningbo Dafa</u>, where the plain text of § 1677e(a) does not prescribe the sources that Commerce may use when applying facts otherwise available, and where the plain text of § 1677b(b)(3) on cost of production does not expressly override or cabin Commerce's discretion under § 1677e(a), this court concludes that § 1677b(b)(3)'s definitional requirements do not constrain Commerce's selection of facts otherwise available to fill in the missing cost information.

---

[18] Not merely because the Federal Circuit's opinion in <u>Nan Ya</u> addressed the application of adverse facts available, as opposed to facts otherwise available; as this court explained above, <u>supra</u> p. 25, the Federal Circuit's conclusion in <u>Nan Ya</u> turned on a plain text rationale that applies with equal force to the language of 19 U.S.C. § 1677e(a) on facts otherwise available.

[19] The court notes that such an interpretation accords with the "whole act" canon of statutory construction. <u>See</u> <u>Richards v. United States</u>, 369 U.S. 1, 11 (1962) ("We believe it fundamental that a section of a statute should not be read in isolation from the context of the whole Act . . . ."); <u>see also</u> Norman Singer & Shambie Singer, 2 <u>Sutherland Statutes and Statutory Construction</u> § 46:5 (7th ed. 2022) ("[E]ach part or section of a statute should be construed in connection with every other part or section to produce a harmonious whole."). Indeed, a contrary conclusion could give rise to tension between 19 U.S.C. § 1677e(a) -- which by its plain text does not constrain what sources Commerce may use when applying facts otherwise available -- and § 1677b(c)(1) -- which the Federal Circuit interprets as requiring adherence to that provision's "best available information" standard even in a facts otherwise available scenario.

       **D.**      ***Summation: Commerce's Reliance on Dillinger's Normal Books and Records as Facts Otherwise Available Does Not Contravene <u>Dillinger III</u> and Otherwise Accords with Law.***

In sum, because the Federal Circuit in <u>Dillinger III</u> held that Plaintiff's normal "books and records did not reasonably reflect the costs associated with the production and sale of the merchandise as required by 19 U.S.C. § 1677b(f)," 981 F.3d at 1321, this court had to confront -- in the first instance -- whether the Federal Circuit's holding precludes by necessary implication Commerce's reliance on said normal books and records as facts otherwise available under § 1677e(a)(1) to supply the missing cost information.  Plaintiff has argued fervently that it does, submitting that where "cost of production" is "the informational gap that is being filled," Pl.'s Oral Arg. Subm. at 8, section 1677b(b)(3) requires that "the selection of facts available . . . must correspond, as closely as possible, to the cost of materials and of fabrication or other processing employed in produc[tion]," Pl.'s Br. at 1–2.

This court disagrees.  After review of the plain language of the relevant statutory provisions and related Federal Circuit caselaw, the court declines to impute the definitional requirements of § 1677b(b)(3) as the standard by which it assesses the "reasonableness" of Commerce's reliance on Dillinger's normal books and records as facts otherwise available under § 1677e(a)(1) to supply the missing cost information.  <u>See</u> 1994 U.S.C.C.A.N. at 4198 (instructing that the selected facts otherwise available must be "reasonable to use under the circumstances").

Nevertheless, after review of the relevant legislative history, this court concludes that there must be at least <u>some kind</u> of connection between the gap to be filled and the selected facts otherwise available, even if the selected facts otherwise available need not be the "best alternative information." <u>See</u> 1994 U.S.C.C.A.N. at 4198 (directing Commerce to use that which is "probative of the <u>issue under consideration</u>" (emphasis added)).  Here, the gap to be filled is the costs of

producing the prime and non-prime plate.  This leads the court -- in closing -- to resolve a further

question posed by the parties: whether the Federal Circuit's holding in <u>Dillinger III</u> is sufficiently

broad so as to preclude a finding of <u>any</u> such connection -- even without imputing the underlying

requirements of § 1677b(b)(3) as the guiding standard -- between Dillinger's normal books and

records and the missing cost information.  This court concludes that it is not.[20]

>       As the Federal Circuit explained in <u>Dillinger III</u>:

>       It is unclear . . . whether Commerce's calculation of normal value involved
>       determining constructed value (determining the sum of "<u>the cost of</u> materials and
>       fabrication or other processing of any kind employed in <u>producing the</u>
>       <u>merchandise</u>" and other factors under 19 U.S.C. § 1677b(e)), or involved
>       determining <u>cost of production</u> so as to exclude home market sales made below cost
>       of production under § 1677b(b)(3).  <u>In either event, § 1677b(f) applies</u>.[21]

981 F.3d at 1321 n.1 (emphasis added).  The Federal Circuit further interpreted "the legislative

history of section 1677b(f) . . . [and] its plain meaning[] [to] indicate[] Congress intended that

Commerce rely on a producer's or exporter's books and records if they . . . reasonably reflect the

<u>costs of production</u>."   <u>Dillinger III</u>, 981 F.3d at 1323 (emphasis added).   Where "costs of

production" is a defined term, <u>see</u> 19 U.S.C. § 1677b(b)(3), this court concludes that the Federal

Circuit's ruling in <u>Dillinger III</u> -- that "Dillinger's books and records did not reasonably reflect <u>the</u>

<u>costs associated with the production</u> and sale of the merchandise as <u>required by 19 U.S.C.</u>

---

[20] This conclusion likewise applies to the Federal Circuit's decision in <u>IPSCO, Inc. v. United</u>
<u>States</u>, 965 F.2d 1056 (Fed. Cir. 1992).

[21] Again, § 1677b(f)(1)(A) instructs:

>       Costs shall normally be calculated based on the records of the exporter or producer
>       of the merchandise, if such records are kept in accordance with the generally
>       accepted accounting principles of the exporting country (or the producing country,
>       where appropriate) and <u>reasonably reflect the costs associated with the production</u>
>       and sale of the merchandise.

19 U.S.C. § 1677b(f)(1)(A) (emphasis added).

§ 1677b(f)" -- turned on a determination that Dillinger's books and records did not satisfy the definitional requirements of § 1677b(b)(3).  981 F.3d at 1321.

Because this court has already resolved not to impute § 1677b(b)(3)'s definitional requirements as the standard for assessing the "reasonableness" of Commerce's selection of facts otherwise available, it -- correspondingly -- does not consider itself precluded from finding that Dillinger's normal books and records bear some kind of connection to "the issue under consideration," i.e., costs, for purposes of § 1677e(a).  <u>See</u> 1994 U.S.C.C.A.N. at 4198.  Thus, this court concludes that Commerce's reliance on Dillinger's normal books and records as facts otherwise available does not contravene <u>Dillinger III</u> and otherwise accords with law.

## II.    *Commerce's Selection of Facts Otherwise Available is Supported by Substantial Evidence.*

The court notes, however, that it is not enough to hold that Commerce's selection of facts otherwise available accords with law; Commerce's reliance on Dillinger's normal books and records under § 1677e(a) to supply the missing cost information must also be supported by substantial evidence.  <u>See Ningbo Dafa</u>, 580 F.3d at 1256 ("[I]t is not enough that the law permits Commerce to apply 'facts available' in valuing factors of production. . . . In addition, substantial evidence must support Commerce's" specific selection of facts otherwise available.).

Before delving into the substantial evidence review, the court pauses briefly to demarcate the scope of its inquiry.  In light of the preceding discussion, Commerce need only show that substantial evidence supports that its selected facts otherwise available are "probative of the issue under consideration" such that they relate in some way to Dillinger's costs.  Making such a showing does not require Commerce to show that substantial evidence supports that its selected facts otherwise available are the "best alternative information" or that they meet the standards articulated in other statutes, such as 19 U.S.C. § 1677b(b)(3) on costs of production.  Accordingly,

this court's substantial evidence inquiry here is a narrow one: Accounting for detracting evidence, does "more than a mere scintilla" support that Commerce's selected facts available -- i.e., Dillinger's normal books and records -- are probative of the missing cost information such that "a reasonable mind might accept" their use under the circumstances? Elbit, 881 F.3d at 1356. The court concludes that Commerce has met this reasonableness standard and, thus, sustains the Third Remand Results.

### A.       *Dillinger's Normal Books and Records Are "Probative of the Issue under Consideration."*

Commerce asserts "there is record evidence to demonstrate that the use of the likely selling price of non-prime products" -- as recorded in Dillinger's normal books and records -- "results in a reasonable allocation of total costs," Third Remand Results at 15, and this court agrees.

Commerce first notes the undisputed fact that "the production of non-prime products is an inevitable consequence of its production of prime products." Id. at 5. Commerce next cites to Note II.4.1 of Dillinger's audited 2015 financial statement, which states:

**II.4. Stocks and work-in-progress**

II.4.1. Modes and Methods of Evaluation

. . .

- Work-in-progress, 1st choice intermediate and finished products: These stocks are valued at their weighted-average production cost, this cost including direct and indirect costs that can be reasonably related with their production.

- The stock of 2nd choice sheet metal is valued at its likely selling prices.

Id. at 15 (citing Dillinger France S.A. Section A Resp. app. 18, at 600, June 29, 2016, ECF No. 158). Commerce interprets this note to constitute an "acknowledg[ment]" by Dillinger's auditor that any "lost value attributable to the production of non-prime products is an indirect cost of producing prime products," such that the figures in Dillinger's normal books and records

"recognize[] the total direct costs (i.e., direct materials and conversion costs) and indirect costs (i.e., the lost value of the non-prime plates) attributable to the production of prime plates."  Id. at 15–16.  Accordingly, Commerce concludes that where "Dillinger failed to provide the [actual cost] information requested by Commerce, which is solely in its control,"

> [r]elying on Dillinger's normal books and records, as facts available, to value both the prime and non-prime merchandise is the only reasonable approach . . . . [I]t recognizes that, where Dillinger cannot produce 98 perfect plates without producing two imperfect plates, the lost value of the two imperfect plates is actually a cost of producing the 98 perfect ones and should be accounted for as such.

Id. at 6, 14.  This court assesses that in light of the above identified record evidence and the agency's explanation, "more than a mere scintilla" supports that Dillinger's normal books and records are "probative" of the missing cost information, such that they are "reasonable to use under the circumstances."  Elbit Sys., 881 F.3d at 1355; 1994 U.S.C.C.A.N. at 4198.

### B.    Dillinger's Counterarguments Are Unavailing.

Plaintiff submits several counterarguments as to why it is "unreasonable" to rely on Dillinger's normal and books records as facts otherwise available, including that: (1) "the use of the likely selling price in place of the cost of production was specifically prohibited by the" Federal Circuit, Pl.'s Br. at 7; (2) "Commerce fails to explain how this 'likely selling price' in any way corresponds to the cost of materials and of fabrication or other processing employed in producing the non-prime products," id. at 2; and that (3) "[t]here is no provision in the statute to reduce the costs of materials, fabrication and processing employed in producing the merchandise by the 'lost value' resulting from the sale of the merchandise," id. at 8.

While Commerce responds to Dillinger's counterarguments on the merits in the Third Remand Results,[22] as a threshold matter, each of these arguments presupposes that this court will impute the underlying requirements of 19 U.S.C. § 1677b(b)(3) as the standard for assessing reliance on Dillinger's normal books and records as facts otherwise available to supply the missing cost information. Because this court has already held that the underlying requirements of § 1677b(b)(3) do not here govern, such that the Federal Circuit's Dillinger III decision is not here decisive, supra, the court rejects the above counterarguments outright.

Dillinger's only counterargument that requires further discussion is that Commerce's proffered rationale -- i.e., that any "lost value attributable to the production of non-prime products is an indirect cost of producing prime products," Third Remand Results at 15 -- concedes "that the sales price of non-prime products does not cover the costs of production of those products," such that the "likely selling price" in Dillinger's normal books and records "bears no relationship with the actual costs of production," Pl.'s Br. at 8, 21. While this argument has some initial appeal, Commerce explains that it rests on unsubstantiated assumptions. This is so, because "the 'actual' costs of nonprime products are dependent on the physical characteristics of the non-prime products (e.g., products which undergo more processing have higher processing costs)," and Dillinger has not provided any information on those physical characteristics necessary to establish their actual

---

[22] For example, Dillinger argues that where the production of non-prime products is an inevitable consequence of the production of prime products, a simple comparison of the [[         ]] Euros/ton likely selling price for non-prime plate to the lowest total cost of manufacture reported for prime plate of [[         ]] Euros/ton establishes that the likely selling price recorded in Dillinger's normal books and records is not "probative" of the cost of producing the non-prime products. Pl.'s Br. at 2–3. Commerce responds on the merits that Dillinger's argument rests on several unsubstantiated assumptions, including that: (1) Plaintiff has in fact reported the actual costs of producing the prime products; and that (2) the prime and non-prime products incurred the same processing costs (which is unknown because Dillinger did not submit the physical characteristics of the non-prime plate necessary to derive said processing costs). See Second Remand Results at 6; Third Remand Results at 12.

costs.  See Def.'s Suppl. Qs. Resp. at 2.  Commerce is, therefore, faced with a situation where Dillinger did not submit "information which would have permitted Commerce to determine the actual costs of producing non-prime products."  Third Remand Results at 16.  To the extent that the selling price is lower than the cost of producing the non-prime products -- again, a fact that Commerce does not know on the current record -- "Commerce's selected approach recognizes that . . . the difference between the unknowable 'actual' costs of producing the non-prime products and their selling price is the lost value of production to be borne as an indirect cost of producing the prime products."  Def.'s Oral Arg. Subm. at 9; see also Third Remand Results at 16 (substantively similar).

Because this explanation establishes that Dillinger's normal books and records are "probative of the issue under consideration," i.e., costs, and because Dillinger's counterarguments rest either on imputing the definitional requirements of 19 U.S.C. § 1677b(b)(3) as the governing standard or on unsubstantiated assumptions, Commerce's selection of facts otherwise available is supported by substantial evidence.

### C.    Summation: Under the Substantial Evidence Standard, Ties Go to the Agency.

Dillinger insists that "[t]he most accurate information on the administrative record" -- and thereby, "[t]he most reasonable calculation of actual production costs of non-prime plate" -- are the figures that Dillinger derived via its percentage yield approach.  Pl.'s Br. at 6; see also id. at 11("[T]he guiding principle for choosing what facts to apply is accuracy in the given case." (quoting Shandong Rongxin Imp. & Exp. Co. v. United States, 43 CIT __, __, 355 F. Supp. 3d 1365, 1370 (2019))).  But the Federal Circuit has established that a determination by Commerce is "'accurate' if it is correct as a mathematical and factual matter, [and] thus supported by substantial evidence."  Nan Ya, 810 F.3d at 1344.  Given the broad discretion that Commerce has

in selecting facts otherwise available, supra pp. 18–33 (establishing that the plain language of 19

U.S.C. § 1677e(a) imposes no constraints, such that Commerce's selection of facts otherwise

available need only be "reasonable under the circumstances" and not necessarily the "best

alternative information"), substantial evidence supports that Dillinger's normal books and records

are "probative" of costs and, therefore, "reasonable" to supply the missing cost information.

It may well be that Dillinger's proposed dataset also represents a "reasonable" cost

allocation method.[23]  But where, as here, substantial evidence supports Commerce's selection of

facts otherwise available, a court "may [not] displace the [agency's] choice between two fairly

conflicting views, even [if] the court [might] justifiably have made a different choice had the matter

been before it de novo."  Universal Camera, 340 U.S. at 477; see also In re Cree, Inc., 818 F.3d

694, 701 (Fed. Cir. 2016) ("[W]here two different, inconsistent conclusions may reasonably be

drawn from the evidence in record, an agency's decision to favor one conclusion over the other is

the epitome of a decision that must be sustained upon review for substantial evidence." (alteration

in original) (quoting In re Jolley, 308 F.3d 1317, 1329 (Fed. Cir. 2002))).  In short, "[u]nder the

substantial evidence standard, ties go to the agency."  MTD Prods. Inc. v. United States, 47 CIT

__, __, Slip Op. 23-34, at 21 (Mar. 16, 2023).

### III.    *Commerce's Selection of Facts Otherwise Available Does Not Impose an Impermissible Adverse Inference.*

Having held that Commerce's selection of facts otherwise available is supported by

substantial evidence and in accordance with law, the court proceeds to consider Plaintiff's

alternative argument: that reliance on Dillinger's normal books and records as facts otherwise

available imposes an impermissible adverse inference.  Pl.'s Br. at 14–21; see Oral Arg. at 24:18–

---

[23] A point this court need take no view on.

32 (assertion by Plaintiff's counsel that "the adverse inference is a supplemental argument . . . the real main argument is that it's not the most probative").

As discussed extensively above, if "necessary information is not available on the record," 19 U.S.C. § 1677e(a)(1), Commerce "shall . . . use facts otherwise available" to fill informational gaps and render determinations, id. § 1677e(a).  Additionally, where Commerce makes a "valid decision to use facts otherwise available," Shandong Huarong, 30 CIT at 1301, 435 F. Supp. 2d at 1289, Commerce may then make the additional decision to "use an inference that is adverse to the interests of [a respondent] in selecting from among the facts otherwise available" provided that Commerce supportably finds the respondent "has failed to cooperate by not acting to the best of its ability," Nippon Steel, 337 F.3d at 1380–81 (quoting 19 U.S.C. § 1677e(b)(1)).

Commerce does not here purport to have imposed an adverse inference by relying on Dillinger's normal books and records to fill the cost-related informational gap.  See Third Remand Results at 17.  Nevertheless, Dillinger maintains that "[b]y rejecting all of the cost of production figures . . . and applying an unreasonably low cost of production to non-prime plate based upon resale value, Commerce is applying an adverse inference that . . . increases the dumping margin." Pl.'s Br. at 21.

The problem for Dillinger is that it "provides no basis for concluding that relying on [its normal books and records] imposed an 'adverse inference' other than to assert that it is so."  Def.-Inter.'s Oral Arg. Subm. at 13.  Dillinger has provided no authority in which a court has imputed an adverse inference into Commerce's selection of facts otherwise available.  See Huvis Corp v. United States, 31 CIT 1803, 1808, 525 F. Supp. 2d 1370, 1376 (2007) (rejecting an argument that Commerce's selected facts otherwise available were "so high that they must be characterized as 'adverse'" where respondent "cite[d] no statute, regulation, or case law for its claim"), aff'd, 570

F.3d 1347 (Fed. Cir. 2009).[24]  Instead, Dillinger merely notes that reliance on its own preferred

facts otherwise available would reduce its dumping margin from 6.15 percent to 5.91 percent.  Pl.'s

Oral Arg. Subm. at 13.  This is insufficient.

      As Defendant-Intervenor persuasively argues:

> If Commerce were deemed to have imposed an adverse inference simply because a
> party can propose "facts available" that would result in a lower margin[,] [that]
> would effectively create a "favorable inference" standard in the statute.  Such a
> standard, however, is not required by the statute or implicated by the SAA.

Def.-Inter.'s Oral Arg. Subm. at 12.  In concluding that Commerce did not here impose an

impermissible adverse inference, the court does not foreclose the possibility that Commerce may

in the future select as facts otherwise available information that "must be characterized as 'adverse'

under the antidumping law."  Huvis, 31 CIT at 1808, 525 F. Supp. 2d at 1376 (citation omitted).

The court merely holds that Dillinger has not made such a showing in the case at bar.

## CONCLUSION

      For the foregoing reasons, the court concludes that Commerce's selection of facts

otherwise available to supply the missing cost of production information for Dillinger's prime and

non-prime plate was supported by substantial evidence and otherwise in accordance with law.

Accordingly, the court sustains Commerce's Third Remand Results.

      **SO ORDERED.**

                              */s/  Gary S. Katzmann*
                               Gary S. Katzmann, Judge

Dated:  August 15, 2023
       New York, New York

---

[24] Dillinger's citations to National Steel Corp. v. United States, 18 CIT 1126, 870 F. Supp. 1130
(1994), Garg Tube Export LLP v. United States, 45 CIT __, 527 F. Supp. 3d 1362 (2021), and
Hyundai Electric & Energy Systems v. United States, 2022 WL 3273811 (Fed. Cir. Aug. 11, 2022)
are inapposite.  None of these cases involved a court imputing an adverse inference into
Commerce's selection of facts otherwise available.  Contra Huvis, 570 F.3d at 1353–54
(disagreeing "that the constructed market price . . . constitute[s] an adverse inference against
[respondent]").